**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | * | |
| THE ESTATE OF | * | |
| ANDREA S. PARHAMOVICH | * | |
| | * | |
| AND | * | |
| | * | |
| VICKI L. PARHAMOVICH | * | |
| (*Individually and as the Administrator* | * | |
| *of the Estate of Andrea S. Parhamovich*) | * | |
| | * | |
| AND | * | |
| | * | |
| ANDRE E. PARHAMOVICH | * | |
| | * | |
| AND | * | |
| | * | |
| MARCELLA ZAMPINI | * | |
| | * | |
| AND | * | |
| | * | |
| CORY PARHAMOVICH | * | |
| | * | |
| AND | * | |
| | * | |
| CHRIS PARHAMOVICH | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | **Case No. 17-cv-061** |
| | * | |
| THE SYRIAN ARAB REPUBLIC, | * | |
| c/o Wallid Muallem | * | |
| Ministry of Foreign Affairs and Expatriates | * | |
| Shora, Muarijeen, Damascus, Syria | * | |
| | * | |
| AND | * | |
| | * | |
| THE ISLAMIC REPUBLIC OF IRAN | * | |
| c/o Dr. Mohammad Javad Zarif | * | |
| Minister of Foreign Affairs | * | |
| Imam Khomeini Avenue | * | |
| Tehran, Iran | * | |
| | * | |

Defendants.                          *
                                     *
**************************************************************************

# COMPLAINT

Plaintiffs bring this action pursuant to the provisions of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602, *et seq.* (hereinafter "the FSIA").


## I.    THE PARTIES

1.    The Plaintiffs have brought this action, by and through their counsel, in the individual capacity of each Plaintiff and, as appropriate, in the capacity as Administrator of the Estate of Andrea S. Parhamovich ("the Estate"), for their own benefit, and for the benefit and on behalf of all those legally entitled to assert a claim under the FSIA, state common law, and statutory law.

2.    Plaintiff Vicki L. Parhamovich ("Vicki") at all times relevant hereto was and is the mother of victim-decedent, U.S. citizen Andrea S. Parhamovich ("Andi" or "the late Andrea Parhamovich"). Vicki L. Parhamovich is a citizen of the United States of America.  Plaintiff Vicki L. Parhamovich can sue and be sued in this Court. Vicki L. Parhamovich brings this suit in her own capacity and in her capacity as Administrator of the Estate.

3.    Plaintiff Andre E. Parhamovich ("Andre") at all times relevant hereto was and is Andi's father. Plaintiff Andre E. Parhamovich is a citizen of the United States of America. Plaintiff Andre E. Parhamovich can sue and be sued in this Court.

4.    Plaintiff Marcella Zampini ("Marcella") at all times relevant hereto was and is Andi's sister. Plaintiff Marcella Zampini is a citizen of the United States of America. Plaintiff Marcella Zampini can sue and be sued in this Court.

5.      Plaintiff Cory Parhamovich ("Cory") at all times relevant hereto was and is Andi's brother. Plaintiff Cory Parhamovich is a citizen of the United States of America. Plaintiff Cory Parhamovich can sue and be sued in this Court.

6.      Plaintiff Chris Parhamovich ("Chris") at all times relevant hereto was and is Andi's brother. Plaintiff Chris Parhamovich is a citizen of the United States of America. Plaintiff Chris Parhamovich can sue and be sued in this Court.

7.      Defendant, the Syrian Arab Republic ("Syria") is a foreign state that was designated a state sponsor of terrorism on December 29, 1979, pursuant to section 6 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780. Syria has remained so designated continuously ever since.

8.      Defendant, the Islamic Republic of Iran ("Iran") is a foreign state that was designated a state sponsor of terrorism on January 19, 1984, pursuant to section 6 of the Export Administration Act of 1979, 50 U.S.C. App. § 2405, section 620A of the Foreign Assistance Act of 1961, 22 U.S.C. § 2371, and section 40 of the Arms Export Control Act, 22 U.S.C. § 2780. Iran has remained so designated continuously ever since.

## II.      JURISDICTION AND VENUE

9.      Jurisdiction over the subject matter of this case arises under 28 U.S.C. §§ 1330(a), 1331, 1332(a)(2) and 1605A (the "FSIA").

10.     Pursuant to the FSIA and related statutes, defendants Syria and Iran are subject to suit in the courts of the United States for each State Sponsor of Terrorism's material support of the Islamic State in Iraq ("ISI"). Syria and Iran's material support for ISI, a/k/a al-Qaeda in Iraq

("AQI"), and a/k/a/ the Mujahadeen Shura Council caused the attempted abduction and extrajudicial killing of the late Andrea Parhamovich.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4), which provides, in pertinent part, that a civil action against a foreign state may be brought in the United States District Court for the District of Columbia.

12.     28 U.S.C. § 1605A(c) provides a federal private right of action against a foreign state that is or was a state sponsor of terrorism, and also against any official, employee or agent of that foreign state while acting within the scope of his or her office, employment or agency, for wrongful death, personal injury and related torts caused by an act of torture or extrajudicial killing or the provision of material support and resources for such acts.

### III.     THE ATTEMPTED ABDUCTION AND EXTRAJUDICIAL KILLING OF ANDREA S. PARHAMOVICH

13.     The late Andrea Parhamovich spent the last months of her life in Baghdad, Iraq – from September 2006 to her death on January 17, 2007 – working to build democracy in Iraq, first for the International Republican Institute ("IRI") and then for the National Democratic Institute ("NDI").

14.     In approximately November 2006, Andi began working for NDI's Iraq program. NDI is a "nonprofit, nonpartisan organization working to support and strengthen democratic institutions worldwide through citizen participation, openness and accountability in government." https://www.ndi.org/iraq

15.     At all times relevant hereto, NDI's headquarters were located in Baghdad's "Green Zone," which was a heavily fortified zone in the center of Baghdad that was run by the Americans after the U.S. invasion of Iraq in 2003.

16.     On the morning of January 17, 2007, Andi was tasked by NDI with traveling to the headquarters of the Iraqi Islamic Party ("IIP") for a meet-and-greet with party officials.

17.     At all times relevant hereto, IIP was known to have ties to AQI/ISI.  In April 2006, American kidnapping victim, reporter Jill Caroll, had been released by AQI/ISI to IIP's headquarters.

18.     At all times relevant hereto, the IIP Headquarters was located in the neighborhood of Yarmouk, which is located in the Mansour District of Baghdad, approximately a 20-minute drive outside of the Green Zone.

19.     Specifically, the Mansour District is located in Western Baghdad, in the area that stretches from the Abu Ghraib area and the Baghdad airport to the Karkh district.

20.     A predominantly Sunni Muslim district, Mansour neighbors the Shi'a Muslim-dominated areas of Kadhimiyah to the north and East Rasheed to the south.

21.     Prior to the U.S. invasion of Iraq in 2003, the Mansour District was home to many wealthy Sunnis and Ba'athist officials.

22.     When Saddam Hussein's regime fell, the Mansour District, and Yarmouk, quickly became strongholds for the Sunni insurgency in Iraq.

23.     Throughout 2005 and 2006, AQI, and later as it became known, ISI became increasingly embedded in Mansour District.

24.     By late 2006, Yarmouk was thoroughly infiltrated by ISI.

25.     And through early 2007 Yarmouk was completely under the sway of ISI.

26.     Andi arrived at IIP Headquarters in Yarmouk at around 10:30 a.m.

27.     After the meet-and-greet, Andi and her armed guards left the IIP's Headquarters at approximately 12:07 p.m.

28.     Andi and her guards prepared to leave the IIP fortified compound in an armored three-vehicle convoy: a lead car, a middle car, and a tail car.

29.     Andi was in the middle car of the convoy, a BMW armored with B-6 level armor, which is designed to stop bullets.  Andi was sitting in the backseat of the car. An Iraqi driver and Yonni, Andi's Hungarian security guard, were seated in the front seat.

30.     The lead car drove out of the IIP's fortified compound and headed down the street.

31.     Approximately 30 seconds later, Andi's car followed with the tail car closely behind her.

32.     When they were about 150 to 300 meters from IIP Headquarters, Andi's car came under attack.

33.     A local Iraqi car, manned by some of Andi's attackers, pulled out in front of Andi's car to slow it down.

34.     The attackers, numbering as many as 50, first attempted to disable Andi's car with heavy machine gun gunfire, with armor piercing rounds.  Men surrounded her vehicle, and attempted to break in through the back doors where Andi was located.  Other attackers surrounded the tail car with machine gun gunfire, shooting from all directions, destroying the car and killing one of the security guards from that car.

35.     When the attackers could not open the doors of Andi's vehicle, they lobbed grenades under Andi's car.  The fuel tank exploded, and Andi's car was engulfed in smoke.

36.     There was enough time during the duration of the attack on Andi's vehicle for Yonni to leap into the backseat and cover Andi's body with his own.

37.     The vehicle was destroyed by the fuel tank explosion.  Andi, Yonni, and her Iraqi driver were all killed.

38.     ISI took responsibility for the attack on Andi, admitting

> With the blessings of Allah, two four-wheel-drive vehicles owned by the Zionist Mossad were destroyed in the Yarmouk neighborhood in the state of Baghdad. All persons boarding the car have been killed after they have been attacked by light and medium-size weapons and RPG rockets.

39.   RBG rockets in paragraph 38 refer to RBG-6 Grenade Launchers, a semiautomatic grenade launcher which is lightweight and intended for infantry use.

40.   Neither Andi, Yonni, nor her Iraqi driver was a member of Mossad.  Andi was a U.S. citizen who came to Iraq to assist two well-known American NGO's – IRI and NDI –  to bring peace and freedom to the Iraqi people.

41.   The U.S. Ambassador to Iraq, Zalmay Khalilzad, formally condemned the attack on Andi: "The young American who was killed in this attack along with her security team exemplified a commitment by all those who have never wavered in their resolve to build a stable, united and democratic Iraq."

42.   NDI chairwoman, former U.S. Secretary of State Madeleine K. Albright, also released a statement referring to Andi and the others killed in the attack: "They did not see themselves as heroes, only people doing a job on behalf of a cause they believed in. They were not the enemies of anyone in Iraq; they were there to help."

43.   As her family explained in a statement released after her death, "Andi's desire to help strangers in such a dangerous environment thousands of miles away might be difficult for others to understand, but to us, it epitomized Andi's natural curiosity and unwavering commitment. She was passionate, bold and caring, as exemplified by her work to improve the lives of all Iraqis."

44.   Her fiancé, the late reporter, Michael Hastings told the press after Andi's death, "She [was] pure at heart."

45.     Vicki, Andre, Marcella, Cory, and Chris continue to be devastated by the loss of their

beautiful daughter and sister.

### IV.     THE RISE OF ISI

46.     The founder of ISI is the late Abu Musab al-Zarqawi ("Zarqawi"), a Sunni Jordanian

jihadist who had longstanding ties to Osama bin Ladin and al-Qaeda.

47.     In 2000, Zarqawi was put in charge of a training camp in Herat, Afghanistan's third-

largest city, situated on the border with Iran.  Hereinafter, this camp shall be referred to as

"the Herat training camp."

48.     The Herat training camp was built with $200,000.00 of al-Qaeda start-up money.

49.     At the Herat training camp, Zarqawi fielded recruits for what he called "Jund al-Sham"

(Soldiers of the Levant).  The banner over the entrance to the Herat training camp bore the

same slogan that would later become the name of Zarqawi's initial terrorist cell in Iraq:

"Tawhid wal-Jihad" or "Monotheism and Jihad." The soldiers at the Herat training camp

were being groomed by Zarqawi for terrorist operations throughout the Middle East.

50.     One of Zarqawi's lieutenants at the Herat training camp was another Jordanian, Abu

Abdel Rahman al-Shami ("al-Shami").  Al-Shami's mission was expanding the network into

northern Iraq via Iran.  Al-Shami's terrorist group was known as Jund al-Islam.

51.     Granted safe passage for travel by the Iranians, Jund al-Islam eventually occupied a 500

kilometer area in northern Iraq.

52.     After the U.S. declared war in Afghanistan following the September 11, 2001 attacks,

Zarqawi fled to Iran. Although he was a known terrorist, Iran permitted him entry. In Iran,

Zarqawi was reunited with al-Qaeda leader Saif al-Adel, the alleged mastermind of the 1998

al-Qaeda bombings of the U.S. embassies in East Africa.

53.     Saif al-Adel encouraged Zarqawi to go to Iraq and provided contacts there—and for a time, Zarqawi stayed at a farm belonging to the fiercely anti-American Afghan jihad leader Gulbaddin Hekmatyar.

54.     From approximately 2002 through 2003, Zarqawi was located in Iran and in the autonomous area of Kurdistan, in northern Iraq, traveling from time to time to Syria and to the Ayn al-Hilwah Palestinian refugee camp in Syrian-controlled Southern Lebanon—a camp that, according to a former Jordanian intelligence official, became Zarqawi's main recruiting ground.

55.     In 2002, Zarqawi was invited to Syria, where he helped plan the assassination of Laurence Michael Foley, the U.S. Ambassador to Jordan.  Jordanian intelligence has stated that Zarqawi worked with Syrian leader Bashar al-Assad's security services to plan the Foley assassination.

56.     In the summer of 2003, three months after the American invasion, Zarqawi moved to the Sunni areas of Iraq.

57.     In October 2004, after resisting for nearly five years, Zarqawi finally paid bayat (formal allegiance) to Osama bin Laden/al-Qaeda.  Zarqawi's group then became known as al-Qaeda in Iraq or AQI.  From then on, the only "al-Qaeda" presence in Iraq was the group founded by Zarqawi, regardless of its name.

58.     AQI became a leading force in the anti-American insurgency and sectarian war. AQI distinguished itself through its military effectiveness, brutality against rival Sunni factions, and gruesome murders of Shiite civilians.

59.     Following its loss of influence in Iraq, in January 2006, AQI merged with several terrorist groups to create the Mujahadeen Shura Council.  Nevertheless, the Mujahadeen Shura

Council was still considered to be the only al-Qaeda presence in Iraq and continued to be affiliated with al-Qaeda.

60.     In June 2006, Zarqawi was killed by U.S. forces in Hibhib, Iraq.

61.     In October 2006, the Mujahadeen Shura Council proclaimed the formation of the Islamic State of Iraq (ISI), under the leadership of Abu Ayyub al-Masri and Abu Adullah alRashid al-Baghdadi.  Nevertheless, ISI was still considered to be the only al-Qaeda presence in Iraq and continued to be affiliated with al-Qaeda.

62.     In April 2010, Abu Ayyub al-Masri and Abu Adullah al-Rashid al-Baghdadi were killed in a joint U.S.-Iraqi operation, and Abu Bakr al-Baghdadi ("al-Baghdadi") took over leadership of ISI.

63.     In April 2013, having expanded into Syria, ISI adopted the name Islamic State of Iraq and the Levant, also widely known as "Daesh."

## V.     SYRIAN MATERIAL SUPPORT FOR AQI/ISI

64.     The government of Syria has been controlled by the Assad family since 1970.  Hafez al-Assad was president of Syria for 35 years before his death in 2005.  His son Bashar al-Assad then took over as president. Bashar al-Assad won the subsequent election with more than 95 percent of the vote; there were no other candidates.

65.     The Syrian government structure is straightforward, with all the major offices and organizations being under the strict control of the President.  Bashar al-Assad rules with cooperation from his co-religionists from the Alawite sect, a heterodox offshoot of Shia Islam to which about one-eighth of Syrians belong.  Alawites control the major Syrian government institutions.  Their role is resented by many Sunni Muslims, who make up the vast majority of Syria's population.

66.     Faced with the problem of legitimizing the rule by the minority Alawite community, both

Hafez Assad and Bashar Assad presented themselves as defenders of what they described as

an Arab cause against hostile powers, meaning primarily Israel but also its ally the United

States.  While Hafez Assad was careful to accommodate the United States enough to give

Washington hope that it could work with him, Bashar Assad has been much more

confrontational and much less cooperative with the United States.

67.     Bashar al-Assad strongly opposed the 2003 U.S.-led invasion of Iraq.  While his regime

proclaimed itself as secular, it organized the transit of Islamist militants, including those from

AQI/ISI, to fight the U.S. forces.  For instance, in May 2003, British forces stopped four

buses of would-be suicide bombers carrying Syrian passports who had just crossed into Iraq.

A network provided passports, weapons, and allowances to foreign fighters, many of whom

were AQI/ISI, arriving at Damascus Airport, as well as safe houses and guides to take them

to Iraq.

68.     U.S. forces seized and later released the detailed records kept by ISI for those crossing

from Syria into Iraq at one border post (Sinjar) for one year (August 2006 to August 2007).

During that time at that border post, at least 700 foreign fighters crossed from Syria to join

ISI.  The records provide detailed information about their nationality, method of recruitment,

how they arrived in Syria, where they stayed while there, and how much they had been paid.

The documents also showed that Syria's military intelligence chief Assef Shawkat (Bashar

al-Assad's brother-in-law) was fully informed about the ISI networks in Syria.

69.     Syrian government assistance to ISI continued for years.  After a senior ISI operative was

killed by a defector inside Syria on September 28, 2008, his funeral was attended by many

senior Syrian government officials. In the spring of 2009, senior ISI commanders met with

Syrian government officials, not knowing that one of the attendees had been turned by Iraqi intelligence and was wearing a wire recording the conversation.  The two sides discussed the operational plans for a series of attacks in Baghdad and how Syria could assist with those attacks.  Also in August 2009, the commander of ISI operations in Iraq's Diyala province, one of the most active in the war there, was captured and provided a detailed account of his training in Syria and the support ISI received from Syria.

70.     In *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008), this court found Syria liable for the AQI beheadings of two U.S. civilian contractors in Iraq. The court found that beginning in 2003 at the latest, Syria provided material support to AQI and Zarqawi including training at facilities in Syria, free passage through Syria accompanied by Syrian intelligence officers, transportation across the Syria-Iraq border, false documents, safe haven in Syria, weapons, and funding.

71.     Syria has provided material support to ISI through each iteration of the group and each generation of leadership, from Zarkawi to al-Masri to al-Baghdadi, facilitating horrific terrorist attacks in Iraq, including the death of the late Andrea Parhamovich.

## VI.    IRANIAN MATERIAL SUPPORT FOR AQI/ISI

72.     In 1979, the Islamic Republic of Iran came to power both through a popular revolution and then through a series of referenda.  This government replaced the previous regime, which was headed by Shah Mohammad Reza Pahlavi.

73.     From the beginning, Iran's political and religious institutions were overseen by a single person, who was called "the Supreme Leader."

74.     The philosophy of government has prevailed since the early days following the revolution, and continues through the current day.  In this philosophy, the Supreme Leader is

acting as the earthly representative for the "hidden imam," who will return one day at the end of days.

75.     In the hidden imam's absence, the Supreme Leader has the authority to make any decision – be it religious or political.  The Iranian Constitution provides that the Supreme Leader has the authority to dismiss the Iranian President, overrule the parliament and the courts, and overrule any secular law.  In addition, the Supreme Leader is imbued by the religious community with the authority to overrule any religious law if necessary for the "expediency of the system."  Indeed, under the Constitution, the Supreme Leader appoints an Expediency Council to advise and assist him in overriding any law, civil or religious, which is found inexpedient.

76.     At the time of the 1979 revolution, Ayatollah Ruhollah Khomeinei was the Supreme Leader. Currently, the Supreme Leader is Ayatollah Ali Khamenei.  He is the only person, other than Ayatollah Khomeinei, to hold the title of Supreme Leader.

77.     The Supreme Leader is not popularly elected.  He is chosen by an *Assembly of Experts*," the members of which, in theory, are popularly elected.  In fact, however, all candidates must be approved by the previous Supreme Leader. That makes the selection of the Supreme Leader rather like the election of a Pope by the College of Cardinals.

78.     The Islamic Republic of Iran's political structure is bifurcated into two aspects: 1. A formal governmental structure; and 2. A revolutionary structure.  The Supreme Leader oversees both aspects.

79.     Iran's President is subordinate to the Supreme Leader, but otherwise leads Iran's formal governmental structure.

80.     The Supreme Leader oversees the revolutionary structure, which includes entities, some of which are described herein, that are parallel to the traditional government agencies within the formal government structure.   For example, the Iranian Revolutionary Guard Corps (IRGC) is parallel to the regular military of Iran.   There are revolutionary courts that are parallel to the regular courts of Iran.   However, in each case, the revolutionary institution is the more powerful of the pair.

81.     The IRCG was established in the immediate wake of the 1979 revolution. Its role is built into Iran's constitution as defenders of the revolution – not just defenders of Iran as a country, but defenders of the 1979 revolution. The IRGC is one of the major organizations through which Iran has historically carried out its support for terrorism.

82.     From its creation through the present day, the IRGC has been directly controlled by the Supreme Leader. It has not reported, in any way, to the President or Parliament.

83.     Among its other tasks, the IRGC is dedicated to the spread of fundamentalist Islamist principles throughout the world, and the establishments of fundamentalist Islamist governments in nations other than Iran.  The Qods Force is the branch of the IRGC generally charged with "foreign operations."  Hereinafter, this force of the IRGC will be referred to as "IRGC/Qods."

84.     The foreign operations IRGC/Qods supports include foreign insurgents and terrorists such as those fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq. IRGC/Qods is the principal Iranian organization working with the Lebanese Hizbollah organization's armed elements, which carry out terrorist operations worldwide, engage in military operations in Syria in support of the Assad regime's battle against insurgents, and prepare for battle against Israel.

85.     It has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens.  Such activities have included support for al-Qaeda, including its operations through AQI/ISI in Iraq.

86.     Although they have a long history of cooperating in a common anti-American agenda, Iran and al-Qaeda have always had serious ideological differences.  In providing support to al-Qaeda and Hizbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.

87.     After the U.S. invasion of Iraq in 2003, Iran sought to control Iraq. Part of Iran's strategy was to support AQI/ISI, tactically but not strategically.

88.     For example when Zarqawi was in Iraq through the army of Ansar al-Islam in approximately 2002-2003, Iran provided him with automatic weapons, uniforms, military equipment.

89.     In April 2007, the chief spokesman for the American military command in Iraq Major General William B. Caldwell IV, said, according to the *New York Times*, http://www.nytimes.com/2007/04/12/world/middleeast/12iraq.html, "Detainees in American custody had indicated that Iranian intelligence operatives had given support to Sunni insurgents. 'We have in fact found some cases recently where Iranian intelligence sources have provided to Sunni insurgent groups some support,' said General Caldwell, who sat near a table crowded with weapons that he said the military contended were largely of Iranian manufacture."

90.     On January 9, 2008, the Treasury Department designated under Executive Order 13438, which targets insurgent and militia groups and their supporters, of Ahmed Foruzandeh, a Brigadier General in the IRGC-QF. In the wording of the designation, https://www.treasury.gov/press-center/press-releases/Pages/hp759.aspx, "In early-April 2007, Foruzandeh provided $25,000 USD to help fund military operations against Coalition Forces in Salah Ad Din Province, Iraq. Foruzandeh provided the funds to two men claiming to be members of a Sunni terrorist organization in Iraq, promising the men additional funds if they would deliver videos of attacks against Coalition Forces. Foruzandeh also offered to deliver weapons to the border, if the two men could transport the weapons into Iraq in order to fight Coalition Forces. "

91.     On February 6, 2012, the Treasury Department designated MOIS under Executive Orders 13224, 13553 and 13572, which target terrorists and their supporters and those responsible for human rights abuses in Iran and Syria. In the wording of the designation https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx, "MOIS also provided money and weapons to al Qa'ida in Iraq (AQI), a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."

92.     The Iranians materially supported AQI/ISI by facilitating travel. A July 7, 2007 article in the *Financial Times* reported, "Evidence that Iranian territory is being used as a base by al Qaeda to help in terrorist operations in Iraq and elsewhere is growing, say western officials....The group's operatives, who link the al Qaeda leadership in Pakistan with their disciples in Iraq, the Levant and North Africa, move with relative freedom in the country, they said."

93.     According to a 2007 report in *Newsweek*, "A super-secret group called Department 9000, which is part of the elite Quds Force of the Iranian Islamic Revolutionary Guard Corps, according to three U.S. officials [has] begun to help Sunni insurgent groups in order to keep the Americans bogged down."

94. A 2008 report from the U.S. Army's Combatting Terrorism Center at West Point explained an Iraqi militant's view: "Iran does not care about the fight between Shi'a and al Qaeda. Iran just wants to force CF (Coalition Forces) out of Iraq because Iran is afraid CF will use Iraq as a base for an attack in the future." The U.S. Treasury Department's February 5, 2014 designation of senior al-Qaeda member Jafar al-Uzbeki described him as part of an al-Qaeda network  which "operates there [in Iran] with the knowledge of Iranian authorities." The Treasury statement added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria."

### VII.     CLAIM I – ACTION FOR EXTRAJUDICIAL KILLING
### UNDER 28 U.S.C. §1605A(C)

95. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

96. The death of the late Andrea Parhamovich was caused by ISI's deliberate act of extrajudicial killing.   ISI deliberately targeted Andi's vehicle with grenades and gunfire from semiautomatic machine guns after unsuccessfully attempting to abduct her.  As a direct and proximate result of the material support of the defendants, ISI committed the extrajudicial committed killing of Andrea Parhamovich.   Andi endured pain and suffering and her estate is entitled to economic damages due to her premature death.

**WHEREFORE**, Plaintiffs the Estate of Andrea S. Parhamovich, Vicki L. Parhamovich, and Andre E. Parhamovich, Marcella Zampini, Cory Parhamovich, and Chris Parhamovich demand that judgment be entered against defendants jointly and severally for the damages each suffered, including but not limited to economic losses which result from Andi's premature death, and pain, suffering, mental anguish, and pecuniary losses, in the amount of not less than $10 million ($10,000,000) and pre-judgment interest, for each of them, for the death of Andrea S. Parhamovich, and their costs expended.

## VIII.     CLAIM II – BATTERY UNDER 28 U.S.C. § 1605A(C)

97. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

98. ISI, with the material support of the defendants, violently and forcefully committed illegal acts during the attempted abduction, and extrajudicial killing of Andrea S. Parhamovich, shooting machinegun bullets and grenades. These willful, wrongful and intentional acts constitute a batter upon the person of the late Andrea S. Parhamovich, causing injury to her.

99. As a direct and proximate result of the willful, wrongful and intentional act of ISI, with the material support of the defendants, Andrea S. Parhamovich was injured in that she endured extreme mental anguish, physical injury, and pain and suffering, all to her damage.

**WHEREFORE**, Plaintiffs the Estate of Andrea S. Parhamovich demands that judgment be entered against defendants jointly and severally for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of not less than $10 million ($10,000,000) and pre-judgment interest, for the Estate, and its costs expended.

## IX.     CLAIM III – ASSAULT UNDER 28 U.S.C. § 1605A(C)

100. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

101. During the attempted abduction and extrajudicial killing of the late Andrea S. Parhamovich, ISI, with the material support of the defendants, intentionally and willfully put Andi in fear for her life and apprehension of harm and injury as a direct result of the attacker's physical and mental abuse inflicted upon her.

102. As a direct and proximate result of the willful, wrongful, and intentional act of ISI, with the material support of the defendants, the late Andrea S. Parhamovich was injured in that she endured extreme mental anguish, physical injury, and pain and suffering, all to her damage.

**WHEREFORE**, Plaintiffs the Estate of Andrea S. Parhamovich demands that judgment be entered against defendants for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of not less than $10 million ($10,000,000) and pre-judgment interest, for each of them, and their costs expended.

## X.   CLAIM IV – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, INCLUDING SOLATIUM UNDER 28 U.S.C. § 1605A(C)

103. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

104. The public extrajudicial killing of the late Andrea S. Parhamovich constitutes extreme and outrageous conduct with the intent to inflict emotional distress, including solatium, upon the victim and the victim's family.

105. As a direct and proximate result of the willful, wrongful, and intentional act of ISI, with the material support of the defendants, Andi's immediate family, her mother Vicki L.

Parhamovich, her father Andre E. Parhamovich, her sister Marcella Zampini, her brother Cory Parhamovich, and her brother Chris Parhamovich were injured in that they endured extreme mental anguish, physical injury, and pain and suffering, all to their damage.

**WHEREFORE**, Plaintiffs Vicki L. Parhamovich, Andre E. Parhamovich, Marcella Zampini, Cory Parhamovich, and Chris Parhamovich demand that judgment be entered against defendants jointly and severally for the damages suffered, including but not limited to solatium, pain, suffering, mental anguish, and pecuniary losses, in the amount of $10 million ($10,000,000) and pre-judgment interest, for each of them, and their costs expended.

## XI.   CLAIM V – ACTION FOR SURVIVAL DAMAGES UNDER 28 U.S.C. § 1605A(C)

106. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein.

107. Before her death, Andi suffered extreme bodily pain and suffering, entitling her Estate to compensatory damages.

**WHEREFORE**, Plaintiff the Estate of Andrea S. Parhamovich demands that judgment be entered against defendants jointly and severally for the damages suffered, including but not limited to pain, suffering, mental anguish, and pecuniary losses, in the amount of not less than $10 million ($10,000,000) and pre- judgment interest, and its costs expended.

## XII.   CLAIM VI – PUNITIVE DAMAGES UNDER 28 U.S.C. § 1605A(C)

108. Plaintiffs repeat, reallege and incorporate by reference those facts and allegations set forth in all the forgoing paragraphs as if fully set forth herein

109. The actions of the defendants as set forth above were intentional and malicious and in willful, wanton, and reckless disregard of the rights and well-being of all Plaintiffs. All of the

acts of ISI were facilitated by funding, military protection, and arms provided by the defendants.

110.    ISI, with the material support of the defendants, carried out the attempted abduction, assault and battery and extrajudicial killing of the late Andrea S. Parhamovich. Under 28 U.S.C. § 1605A(c), Plaintiffs are entitled to an award of economic damages, solatium, pain and suffering, and punitive damages, and the same is hereby requested against defendants in accordance with that provision.

**WHEREFORE**, Plaintiffs the Estate of Vicki L. Parhamovich, Andre E. Parhamovich, Marcella Zampini, Cory Parhamovich, and Chris Parhamovich  demand that judgment be entered against each defendant, jointly and severally, for punitive damages in the amount of at least three times the amount each defendant expends on material support for terrorism, and pre-judgment interest, and their costs expended, for these acts of abduction and extrajudicial killing.  The award of punitive damages, as requested, is to punish defendants for their conduct in supporting the murderous acts described herein and to serve notice that the rule of law can and will be used to deter state sponsorship of terrorism against citizens of the United States of America. Defendants' outrageous actions cannot be tolerated by a civilized society and deserves the harshest condemnation of our ordered legal system.

## XIII.    ADDITIONAL RELIEF REQUESTED

Plaintiffs request leave of the court to amend this Complaint as the interest of justice require and such other and further relief which the Court deems just and proper.

Dated: January 11, 2017                                      Respectfully Submitted,

_____ /s/ Joshua M. Ambush
Joshua M. Ambush (Bar No. MD 27025)
Law Offices of Joshua M. Ambush, LLC
Hilton Plaza
1726 Reisterstown Road
Suite 206
Baltimore, Maryland 21208
410-484-2070 (Office)
410-484-9330 (Facsimile)
joshua@ambushlaw.com
