# EXHIBIT 43

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE ESTATE OF | * | |
| ANDREA S. PARHAMOVICH, *et. al.,* | * | |
|     Plaintiffs, | * | |
| | * | |
|     v. | * | Case No.  1:17-CV-0061 (KBJ) |
| | * | |
| ISLAMIC REPUBLIC | * | |
| OF IRAN, *et al.,* | * | |
| | * | |
|     Defendants. | * | |

## DECLARATION  OF PATRICK L. CLAWSON, Ph.D.

I, Patrick L. Clawson, Ph.D., being competent to testify to the facts stated herein, and pursuant to 28 U.S.C.§1746, hereby declare as follows.

### I. Qualifications of the Witness

1.    I am an adult citizen who resides in the District of Columbia.

2.    I am an expert on the Islamic Republic of Iran ("Iran") and have extensively studied and researched Iran and its sponsorship of terrorism, its economy, and its politics.  This declaration is submitted to provide the Court with facts and evidence concerning Iran's sponsorship of certain fundamentalist Islamist terrorist groups, including Hizbollah and al-Qaeda, and to describe Iran's extensive provision of money, military training, and other material resources to terrorists.

3.    I am the Director of Research at the Washington Institute for Near East Policy (which I will refer to from now on as "The Washington Institute"), where I have been employed since 1997.  My previous positions include five years as senior research professor at the

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000212**

Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.  Most of my professional life has been spent studying the Middle East, in particular, Iran.  My first scholarly article on the Middle East was published approximately thirty years ago, and the first work I did on the region for the Central Intelligence Agency was twenty years ago, approximately.

4.    The Washington Institute is a think tank, in other words, a 501(c)(3) organization, which receives funding from a variety of individuals, only Americans, to conduct studies about U.S. foreign policy interests and concerns in the Middle East.  The Washington Institute also studies domestic and internal issues relating to the Iranian government.  My work includes extensive research regarding the Iranian Ministry of Intelligence and Security ("MOIS") the Iranian Revolutionary Guard Corps (the "IRGC") and its Qods Division ("IRGC Qods").

5.    I have done contract consulting work on Iran and the Middle East for several U.S. government agencies over the last twenty-nine years, including the Central Intelligence Agency, the Defense Department, the State Department Bureau of Intelligence and Research, and through various contractors, the National Security Agency and the Defense Intelligence Agency.   While at the National Defense University, I worked closely with officials from a wide range of U.S. government agencies on issues of Middle Eastern politics, including close work with the Central Command (the U.S. military command responsible for the Middle East) and its subordinate commands, and with the staff of the Joint Chiefs of Staff.

6.  For the past nineteen years, I have been the Director for Research (or, before staff reorganization, Deputy Director) at the Washington Institute, a think tank focusing on contemporary issues of the Middle East.  In this capacity, I, *inter alia*, supervise a staff of about twenty senior researchers who study Middle East politics and terrorism, with considerable focus on Iran.  Researchers who I have worked with at the Washington Institute include, Dennis Ross, President Clinton's chief Middle East peace process negotiator, and who was for four years the person at the Obama Administration's National Security Council responsible for the "Central Region," the Central Command covering the Middle East; former Deputy Assistant Secretary of the Treasury for Intelligence Matthew Levitt, responsible *inter alia* for following Iranian terror financing; and former Deputy Assistant Secretary of State, Scott Carpenter, who worked on Middle East reform programs.   I also brief and receive briefings from senior United States military officials and senior officials of other governments friendly to the United States.

7.  I have previously been designated and qualified by federal courts as an expert witness on issues relating to Iran, Iran's support for terrorism, its economy and other issues, and have given live or written testimony in various cases brought against Iran for its sponsorship of terrorism, including *Cicippio v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 96-01805 (1996); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998); *Cronin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02890 (1999); *Higgins v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-00377 (1999); *Stethem v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00159 (2000); *Hegna v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-00716 (2000); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000);  *Eisenfeld v. Islamic Republic of Iran*, 172 F.

PLA000214

Supp. 2d 1, 5 (D.D.C. 2000); *Elahi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 99-02802 (1999); *Wagner v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-017999; *Polhill v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 00-01798 (2000); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001); *Raffi v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-850 (2001); *Kerr v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-01994 (2001); *Surette v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 01-00570 (2001); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002); *Ungar v. Islamic Republic of Iran*, 271 F. Supp. 2d 91, 93 (D.D.C. 2002); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 288 (D.D.C. 2003); *Rieger v. Islamic Republic of Iran*, 281 F. Supp. 2d 87, 90 (D.D.C. 2003); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003); *Greenbaum v. Islamic Republic of Iran*, No. 02-2148, 2006 WL 2374221 at * 3 (D.D.C. Aug. 10, 2006); *Levin v. Islamic Republic of Iran*, U.S.D.C., D.C. No. 05-2494 (2007); *Owens v. Republic of Sudan, et al.*, No. 01-2244, 2011 U.S. Dist. LEXIS 135961 (D.D.C. Nov. 28, 2011); *In Re Terrorist Attacks on September 11, 2001*, No. 03-MDL-1570 (S.D.N.Y. Dec. 22, 2011), and *In Re: 650 Fifth Avenue and Related Properties,* 08 Cv. 10934 (KBF), among others.

8.   I have testified about Iran before the House International Relations, National Security, and Banking and Financial Services Committees, as well as the Senate Foreign Relations and Banking Committees.

9.   I have made presentations about the foreign and economic policy of Iran and U.S. policy towards those countries at conferences sponsored by, amongst other organizations, the Iranian Foreign Ministry's Institute for Political and International Studies in Tehran, Iran, the Royal Institute for International Affairs in London, UK, the Royal United Services

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000215**

Institute in London, UK, the Japanese Foreign Ministry in Tokyo, Japan, the Institute for Defense Studies and Analysis in New Delhi, India, the Shanghai Institute for International Studies in Shanghai, China, the Jaffee Center of Tel Aviv University in Tel Aviv, Israel, the Council for Foreign Relations in New York City, New York, the Nixon Center (part of the Nixon Presidential Library) and the Carnegie Endowment for International Peace in Washington, D.C., and a great many universities. I have given presentations concerning Middle Eastern politics and security at more than 200 symposiums in more than twenty countries.

10.    My books and monographs include: *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2011), *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute. 2010);  *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventative Military Action Against Iran* (The Washington Institute, 2008, with Michael Eisenstadt); *Eternal Iran: Continuity and Chaos* (Palgrave Press, 2005, with Michael Rubin); *Getting Ready for a Nuclear-Ready Iran* (U.S. Army War College, 2005, with Henry Sokolski, edited); *Checking Iran's Nuclear Ambitions* (U.S. Army War College, 2004, with Henry Sokolski, edited); *Iran Under Khatami* (The Washington Institute for Near East Policy, 1998, with others); *Strategic Assessment*, (the flagship annual report of the Institute for National Strategic Studies of the National Defense University, which I inaugurated and edited for three years, 1995-1997) *U.S. Sanctions on Iran* (Emirates

Centre for Strategic Studies and Research, 1997); *Business as Usual? Western Policy Options Towards Iran* (American Jewish Committee 1995); *Energy Security in the Twenty-First Century* (National Defense University Press, 1995, edited) ; *Iran's Strategic Intentions and Capabilities* (National Defense University Press, 1994, edited); and *Iran's Challenge to the West: How, When, and Why* (the Washington Institute for Near East Policy, 1993).

11.  I have written about the contemporary Middle East for *The New Republic* including op-ed articles in *The New York Times, Wall Street Journal*, and *Washington Post*, amongst other newspapers.  I am the author of more than forty scholarly articles in *Foreign Affairs*, *Survival*, *Washington Quarterly*, *International Journal of Middle East Studies*, *Middle East Journal*, *Les Cahiers de l'Orient*, and *Oxford Bulletin of Economics and Statistics*, among other journals.

12.  From 1995 to 2012, I was senior editor of *Middle East Quarterly*, a journal of Middle Eastern affairs, which regularly publishes on Iranian politics and foreign policy.  From 1990 through 1994, I was editor of *Orbis*, a foreign policy journal.

13.  My Ph.D. in economics is from the New School for Social Research and my B.A. is from Oberlin College.

14.  I am able to read and/or speak Persian and French as well as some Hebrew, Spanish, and German. I read the Iranian press regularly through the internet.  I also read other publications from Iran, including books in Persian.

15.  My knowledge of Iranian sponsorship of terrorism comes as a result of my routine and in-depth access to facts concerning these countries, their support of terrorism, their economy and politics and my extensive study of these countries as outlined herein,

Page 6 of 29

including my professional research and publishing in this field over the course of many years. Indeed, as part of my work, I spend at least an hour a day reviewing writings, including online sources, of Iran. Iran in particular is a relatively open information country in which the competing political forces frequently reveal information about the country's security apparatus and debate issues relating to terrorism.  Iran even has many internet sites that publish information on these subjects.  From my years studying Iranian politics and given the competing sources that can be compared, I believe that I am able to determine whether Iranian reports on these subjects are credible.  Indeed, I use this information as a source to brief the United States and other governments.  Furthermore, Iran and some of the terrorist groups it sponsors have been openly boastful about their relations, and have described and detailed their connections in print.

16.    My opinions set forth below are based upon my education, research, and experience as well as my review and analysis of documents typically relied upon by experts in my field. Such basis includes, but is not limited to: official speeches made by Iranian officials, U.S. officials, and the officials of other countries, my conversations with U.S. officials, former Iranian officials, and officials of other countries; and my review and analysis of relevant documents, including newspaper accounts (in both the English-language press and Persian language press). A true and correct copy of my CV detailing my qualifications is attached hereto as Appendix 1, and incorporated by reference herein.

**II. Iranian Regime**

17.    In 1979, the Islamic Republic of Iran came to power both through a popular revolution and then through a series of referenda.  This government replaced the previous regime, which was headed by Shah Mohammad Reza Pahlavi.

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000218**

18.    From the beginning, the Islamic Republic of Iran's political and religious institutions were overseen by a single person, who was called "the Supreme Leader."

19.    The philosophy of government has prevailed since the early days following the revolution, and continues through the current day.  In this philosophy, the Supreme Leader is acting as the earthly representative for the "hidden imam," who will return one day at the end of days.

20.    In the hidden imam's absence, the Supreme Leader has the authority to make any decision – be it religious or political.  The Iranian Constitution provides that the Supreme Leader has the authority to dismiss the Iranian President, overrule the parliament and the courts, and overrule any secular law.  In addition, the Supreme Leader is imbued by the religious community with the authority to overrule any religious law if necessary for the "expediency of the system."  Indeed, under the Constitution, the Supreme Leader appoints an Expediency Council to advise and assist him in overriding any law, civil or religious, which is found inexpedient.

21.    At the time of the 1979 revolution, Ayatollah Ruhollah Khomeinei was the Supreme Leader.  Currently, the Supreme Leader is Ayatollah Ali Khamenei.  He is the only person, other than Ayatollah Khomeinei, to hold the title of Supreme Leader.

22.    The Supreme Leader is not popularly elected.  He is chosen by an "*Assembly of Experts*," the members of which, in theory, are popularly elected.  In fact, however, all candidates must be approved by the previous Supreme Leader. That makes the selection of the Supreme Leader rather like the election of a Pope by the College of Cardinals.

23.    The Islamic Republic of Iran's political structure is bifurcated into two aspects: 1. A formal governmental structure; and 2. A revolutionary structure.  The Supreme Leader oversees both aspects.

24.    Iran's President is subordinate to the Supreme Leader, but otherwise leads Iran's formal governmental structure.

25.    The Supreme Leader oversees the revolutionary structure, which includes entities, some of which are described herein, that are parallel to the traditional government agencies within the formal government structure.  For example, the Iranian Revolutionary Guard Corps (IRGC) is parallel to the regular military of Iran.   There are revolutionary courts that are parallel to the regular courts of Iran.  However, in each case, the revolutionary institution is the more powerful of the pair.

## IV. IRCG/IRGC Qods

26.    The IRCG was established in the immediate wake of the 1979 revolution. Its role is built into Iran's constitution as defenders of the revolution-- not just defenders of Iran as a country, but defenders of the 1979 revolution. The IRGC is one of the major organizations through which Iran has historically carried out its support for terrorism.

27.    From its creation through the present day, the IRGC has been directly controlled by the Supreme Leader. It has not reported, in any way, to the President or Parliament.  Other aspects of Iran's formal government structure, such as the parliament, have little influence on it.

28.    The IRGC was established by Ayatollah Khomeinei because, after the 1979 revolution, he was suspicious about the ordinary military's devotion to revolutionary ideals.

PLA000220

29.     Consequently, the IRGC's leadership and activities were purposefully created to be separate and apart from the formal government structure, and to act as a counterbalance against the formal governmental agencies.

30.     The IRGC operates parallel to the formal governmental structure. In fact, the IRGC has steadily increased its influence over the formal governmental structure in recent years.

31.     Among its other tasks, the IRGC is dedicated to the spread of fundamentalist Islamist principles throughout the world, and the establishments of fundamentalist Islamist governments in nations other than Iran. The Qods Force is the branch of the IRGC generally charged with "foreign operations." I will refer to this force of the IRGC as IRGC/Qods.

32.     The foreign operations it supports include foreign insurgents and terrorists such as those fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq. It is the principal Iranian organization working with the Lebanese Hizbollah organization's armed elements, which carry out terrorist operations worldwide, engage in military operations in Syria in support of the Assad regime's battle against insurgents, and prepare for battle against Israel.

33.     While in theory the Qods Force is a component element of the IRGC, in practice it operates largely autonomously. It reports directly to the Supreme Leader, rather than being subordinate to the IRGC command structure. The IRGC defines itself as an agent and instrumentality of the Supreme Leader, to which it pledges its unflinching loyalty. The IRGC and the Supreme Leader both frequently speak about the IRGC as the guardian of the principles of the Iranian revolution of 1979.

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000221**

34.     The IRGC runs a large number of commercial activities, including engineering businesses, smuggling operations, and commercial activities in the oil and gas sector.  For example, one company directly run by the IRGC has been awarded contracts worth billions of dollars by government agencies and the National Iranian Oil Company. By way of further example, the IRGC engages in widespread smuggling activities involving Iran and Iraq.  These smuggling activities include, but are not limited to, drug and alcohol smuggling.  Over and above its military assets (weapons, bases, and the like), the IRGC commercial assets considerable exceed billions in value.  The IRGC has long refused to provide information about its commercial activities to the Parliament or government auditors, insisting on the right to use the resources generated by commercial activities at its own discretion as directed by the Supreme Leader.

### V. Iranian Support for the Islamic State in Iraq

35.     It has been well-documented for over twenty years that the IRGC has historically provided funding and/or training for terrorism operations that targeted United States and Israeli citizens.  Such activities have included support for Hizbollah of Lebanon, the Palestinian group HAMAS, as well as al-Qaeda, with the character of that support being quite different in each case.

36.     Al-Qaeda is a Sunni terrorist group established in approximately 1988 or 1989 by Usama bin Ladin and Ayman al-Zawahiri to conduct international *jihad*, a term I use here to refer in the sense al-Qaeda prefers, namely, holy war towards the establishment of the Islamic Caliphate worldwide (most devout Muslims reject that meaning of *jihad*). Although they have a long history of cooperating in a common anti-American agenda, Iran and al-Qaeda have always had serious ideological differences.  In providing support

PARHAMOVICH V. IRAN
1:17-CV-00061 (KBJ)                                                                                      PLA000222

to al-Qaeda and Hizbollah, the IRGC, including the IRGC Qods division, is acting as an official agency whose activities are tightly and carefully controlled by the Iranian government through the Supreme Leader and his representatives.

37.    The main elements of the Iraqi insurgency, which began after the U.S.-led invasion, proclaimed themselves to be Al Qaeda in Iraq in September 2004 before changing their name in June 2006 to the Islamic State in Iraq (ISI).

38.    In April 2007, the chief spokesman for the American military command in Iraq Maj. Gen. William B. Caldwell IV, said, according to the *New York Times*,  "detainees in American custody had indicated that Iranian intelligence operatives had given support to Sunni insurgents…. 'We have in fact found some cases recently where Iranian intelligence sources have provided to Sunni insurgent groups some support,' said General Caldwell, who sat near a table crowded with weapons that he said the military contended were largely of Iranian manufacture." Alissa J. Rubin, *U.S. Suspects That Iran Aids Both Sunni and Shiite Militias,* THE NEW YORK TIMES ( April 12, 2007), http://www.nytimes.com/2007/04/12/world/middleeast/12iraq.html.  (attached hereto as Exhibit 1).

39.    On January 9, 2008, the Treasury Department designated under Executive Order 13438, which targets insurgent and militia groups and their supporters, Ahmed Foruzandeh, a Brigadier General in the IRGC-QF.  In the wording of the designation (attached hereto as Exhibit 2):

> In early-April 2007, Foruzandeh provided $25,000 USD to help fund military operations against Coalition Forces in Salah Ad Din Province, Iraq. Foruzandeh provided the funds to two men claiming to be members of a Sunni terrorist organization in Iraq, promising the men additional funds if they would deliver videos of attacks against Coalition Forces. Foruzandeh also offered to

Page 12 of 29

deliver weapons to the border, if the two men could transport the weapons into Iraq in order to fight Coalition Forces.

https://www.treasury.gov/press-center/press-releases/Pages/hp759.aspx.

40.    On February 6, 2012, the Treasury Department designated MOIS under Executive Orders 13224, 13553 and 13572, which target terrorists and their supporters and those responsible for human rights abuses in Iran and Syria.  In the wording of the designation, (attached hereto as Exhibit 3) "MOIS also provided money and weapons to al Qa'ida in Iraq (AQI), a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."    https://www.treasury.gov/press-center/press-releases/Pages/tg1424.aspx.

41.    One area in which Iranian assistance to AQI is not in dispute was facilitating travel. A July 7, 2007 article in the *Financial Times* stated, "Evidence that Iranian territory is being used as a base by al Qaeda to help in terrorist operations in Iraq and elsewhere is growing, say western officials....The group's operatives, who link the al Qaeda leadership in Pakistan with their disciples in Iraq, the Levant and North Africa, move with relative freedom in the country, they said."  Stephen Fidler, *Al-Qaeda linked to operations from Iran*, THE FINANCIAL TIMES, July 7, 2007 (attached hereto as Exhibit 4).

42.    According to a 2007 report in *Newsweek*, "A super-secret group called Department 9000, which is part of the elite Quds Force of the Iranian Islamic Revolutionary Guard Corps, according to three U.S. officials [has] begun to help Sunni insurgent groups in order to keep the Americans bogged down." Newsweek Staff, *Tehran's Secret 'Department 9000'*, NEWSWEEK, June 3, 2007 (attached hereto as Exhibit 5).

43.    It may seem odd that at the same time that Iran was providing ample support for the Shia militias in Iraq that were fighting Al Qaeda in Iraq, Iran would also support Al Qaeda in

Iraq. A 2008 report from the U.S. Army's Combatting Terrorism Center at West Point (*Iranian Strategy in Iraq: Politics and "Other Means"* by Joseph Felter and Brian Fishman, attached hereto as Exhibit 6) paraphrased an alleged Iraqi militant's view: "Iran does not care about the fight between Shi'a and al Qaeda. Iran just wants to force CF (Coalition Forces) out of Iraq because Iran is afraid CF will use Iraq as a base for an attack in the future." That fits the pattern of Iran's relationship with Al-Qaeda, which has continued even in situations where Iran is also supporting those fighting Al-Qaeda.

44.  The U.S. Treasury Department's February 5, 2014 designation of senior al-Qaeda member Jafar al-Uzbeki (attached hereto as Exhibit 7) described him as part of an al-Qaeda network  which "operates there [in Iran] with the knowledge of Iranian authorities." The Treasury statement added that this network "uses Iran as a transit point for moving funding and foreign fighters through Turkey to support al Qaeda-affiliated elements inside Syria." This despite the fact that Iran has made a major commitment of men and arms to fight Al-Qaeda in Syria.

### VI. Killing of  U.S. Citizen Andrea S. Parhamovich

45.  On January 17, 2007, U.S. citizen Andrea S. Parhamovich and three private security contractors were killed when their vehicle convoy was attacked leaving the headquarters of the Iraqi Islamic Party in the Yarmouk neighborhood of Baghdad, a largely Sunni area. Ms. Parhamovich, who was working for the non-governmental organization the National Democratic Institute (NDI) teaching classes in democracy, had been at the headquarters for a meet and greet with party leaders.  Overwhelming information establishes that Ms. Parhamovich died in a terrorist attack.

PLA000225

**U.S. Government Documents**

46.    The official U.S. government document named the Certificate of Death (Overseas), issued by Marine Captain Stephen Robinson on January 23, 2007 states that Andrea Parhamovich, the victim, died on January 17, 2007 in Baghdad, Iraq.

47.    Another useful indication comes from the U.S. government's National Counterterrorism Center (NCTC)'s "Annex of Statistical Information" drawn from its Worldwide Incidents Tracking System (WITS). This is issued to accompany the State Department's annual report, "Country Reports of Terrorism," a report mandated under Section 2656f of title 22 of the U.S. Code. The Country Reports on Terrorism are carefully drafted and carefully worded reports that are based on intelligence and are much valued by researchers as statements of the judgment of the U.S. government.  As part of this process, the NCTC devotes much care to the accuracy of this annex. In its April 30, 2008 report, the NCTC includes a box entitled "An Academic's Perspective of Statistical Data," in which David Laitin of Stanford University writes, "Building up a small but dedicated staff of enumerators and subjecting their procedures to annual critiques of a Brain Trust (on which I serve), the WITS product has markedly improved in the past several years."

48.    The April 30, 2008 NCTC report, attached hereto as Exhibit 8, in its table entitled "Terrorism Death of Private U.S. Citizens in 2007 (By Country)," lists one death on January 17 in Iraq, with the location being given as "Baghdad." That is the date on which Andrea Parhamovich died and the city in which she died. In the extensive media and academic reporting about Iraq at the time, there is no record of any other private American citizen dying in an attack in Baghdad on the day in question.

49.  On May 6, 2019, Jennifer Garner, the Victim Services Coordinator for the Terrorism and Special Jurisdiction Unit of the Federal Bureau of Investigation (FBI) sent a letter to Marci Zampini in which she states, "In regards to the death of Andrea Parhamovich, Ms. Parhamovich has been identified as a victim of an incident that occurred on January 17, 2007 in Baghdad, Iraq.  The FBI is currently investigating this crime as a Counterterrorism matter."  The fact that the investigation is still open suggests strongly that the FBI has not identified the individuals who carried out the attack who would be the ones who could be charged with a crime. Note that it is not the responsibility of the FBI to identify which group may have carried out the attack, only which individuals may be charged with a crime. In short, the FBI is investigating Ms. Parhamovich's death as a death by terrorists but has not yet charged any individuals as being responsible for the attack.

50.  Michael Hastings, Parhamovich's fiancé who was a journalist in Iraq, wrote a book about her death, entitled,  *I Lost My Love in Baghdad: A Modern War Story* (New York: Scribner, 2008), an excerpt of which is attached hereto as Exhibit 9, Hastings writes, "On Saturday night [January 20, 2007, three days after Parhamovich's death], I print out an email containing my travel orders: authorization for 'Fiancé of Andrea Suzanne Parhamovich to Accompany her Remains... The Department of State requests that the Department of Defense authorize Michael Mahon Hastings...to accompany the remains of Ms. Parhamovich aboard U.S. military aircraft...' The document, on DOD letterhead, notes she was 'killed by terrorists in Baghdad.'" In other words, the Department of Defense described Parhamovich's death as the result of a terrorist attack. *Id* at 229.

**Credible Accounts**

51.    In the book cited earlier, Hastings quotes "Andi's direct supervisor in Iraq," to whom he gives the pseudonym "Karen," about the attack which killed Andi Parhamovich. *Id.* at 241. He writes about the information Karen gave him from one of the guard team (known as PSD, for Protective Security Detail, Personal Security Detachment, or Personal Security Detail):

> Karen tells me her information about the attack is from one of the PSDs who survived the attack, the man in the first car. According to him, the first car drives out of the compound and down the street; his radio crackles with the word "contact." The driver, an Iraqi man, pulls a U-turn, and something gets in the way-an Iraqi family or something. Karen says the Iraqi driver then gets nervous, like something is wrong, maybe the family was trying to slow them down. By the time the first car goes back down the street, they think Andi's car has escaped, because there is so much smoke they couldn't see it. So then the first car pulls back into the IIP compound," referring to the compound of the Iraqi Islamic Party which Parhamovich had been visiting before the attack.

52.    Hastings goes on to add about his efforts to get more information from Parhamovich's employer, the National Democratic Institute (NDI), and their security firm, the Unity Resources Group (URG):

> After months of asking NDI and URG for a full briefing, I finally get one in August 2007. I learn that the incident happened at 12:07P.M. I learn that a local Iraqi car, believed to belong to the insurgents, got in front of Andi's car to slow it down. At that point, the car was attacked and disabled with machine-gun fire. The attackers rushed the car, shooting, tried to open the doors, and threw a grenade under it. After the explosion, the third car sped ahead into the smoke, crashing into Andi's car. That's what Jacob [the pseudonym Hastings used for a security guard] crashed into, the crash he couldn't talk to me about. One of the security guards in the third car got out and was killed; the other two, Jacob and the Iraqi driver, ran into a building for cover. The insurgents then rolled a grenade under the third car and it exploded. The first car

Page 17 of 29

returned to the incident, but it was too late. Twenty minutes later,
they were joined by NDI's reinforcements.

53.   *Id.* at 242.  Hastings' account is highly credible because of the extensive research he

did, using the best available sources. He writes, "The events recounted in this book are

largely drawn from my own notes, observations, and conversations over a two-year

period, from August 2005 when I first arrived in Iraq to August 2007 when  I completed

the reporting for this book. But I also relied on day-to-day news accounts."

54.   Several accounts in serious newspapers state that Andrea Parhamovich died in a terrorist

attack on January 17, 2007. The *New York Times* report of the January 17, 2007 incident

cites witness account that "perhaps as many as 30 attackers... used heavy weapons,

possibly including grenades" and that three of her armed guards were killed in the attack.

Damien Cave, *American Woman Was Killed After Visit to Sunni Office*, NEW YORK

TIMES, January 18, 2007 (attached hereto as Exhibit 10).  The *Washington Post* carried

an Associated Press story, which quoted a statement issued by the spokesman of the

Islamic State in Iraq (ISI), which the story said "was posted on a Web forum where Sunni

insurgents often release messages." Maamoun Youssef, *Insurgents in Iraq Claim Convoy*

*Attack*, WASHINGTON POST, January 18, 2007 (attached hereto as Exhibit 11).  The

story identified the reported author as "al-Qaida in Iraq's political arm."  As quoted in the

*Washington Post*, the statement said, "Praise be to God, in an attack with light and

medium weapons and RPGs in the Yarmouk area in Baghdad on Jan. 17, two SUVs

belonging to the Zionist Mossad were destroyed and a third one was severely damaged."

The World News Network website full version of the statement also has the line, "all

persons boarding the car have been killed." Based upon my experience, information and

PLA000229

belief, this communique taking credit for the attack can reliably be viewed as an admission that ISI murdered Andrea Parhamovich in a terror attack.

### VII.      Financial Deterrence of Iranian Material Support to Terrorists

55.   As explained by Judge Jackson in *Colvin et al. v. Syrian Arab Republic* (Civil Action No. 16-1423 (ABJ)):

> Section 1605A authorizes punitive damages to be assessed against foreign state sponsors of terrorism. 28 U.S.C. § 1605A(c). Punitive damages, unlike compensatory damages, are intended to "punish and deter" defendants for their bad acts. *Valore*, 700 F. Supp. 2d at 87.   Courts calculate punitive damages by considering the following four factors: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 27 (D.D.C. 2017).

56.   On the first factor, Iran is still continuing to sponsor terrorism now. The 2018 State Dept. Country Reports on Terrorism (the most recent one released) states, "Iran remains the world's worst state sponsor of terrorism. The regime has spent nearly one billion dollars per year to support terrorist groups that serve as its proxies and expand its malign influence across the globe. Tehran has funded international terrorist groups such as Hizballah, Hamas, and Palestinian Islamic Jihad…. Designated as a State Sponsor of Terrorism in 1984, Iran continued its terrorist-related activity in 2018, including support for Hizballah, Palestinian terrorist groups in Gaza, and various groups in Syria, Iraq, and throughout the Middle East."   2018 Country Reports on Terrorism, United States Department of State, Bureau of Counterterrorism, October 2019[1] at 9, 211.

---

[1]  Available at https://www.state.gov/wp-content/uploads/2019/11/Country-Reports-on-Terrorism-2018-FINAL.pdf

PLA000230

57.   There is little if any prospect that Iran will stop supporting terrorism.  In particular, terrorist attacks on Israel and Israelis are an important part of the Islamic Republic's basic ideological and strategic approach, both because of hostility to Israel and deep believe that "resistance" including terrorism is the only way Iran can achieve its objectives.  That said, there is some possibility Iran can be led to pause at least some aspects of its support for terrorism.  For instance, the Iranian-controlled Lebanese Hezbollah organization once kidnapped many Americans in a vain effort to reduce U.S. influence in Lebanon  but, in part due to strong U.S. pressure, has for nearly two decades not threatened the large American community in Lebanon.

58.   There are few reliable estimates in the unclassified realm about Iran's total support for terrorism.  Part of the problem is defining the terms, e.g., does Iran's support for a state like Syria which engages in many terrorist acts constitute Iranian state support for terrorism?  What can be said with certainty is that Iranian state support for terrorism has been and remains vast.  As noted earlier, the State Department's Country Reports on Terrorism 2018 stated, "Iran remains the world's worst state sponsor of terrorism. The regime has spent nearly one billion dollars per year to support terrorist groups that serve as its proxies and expand its malign influence across the globe." *Id*. at 9.

59.   In *Colvin*, Judge Jackson described the defendant's deliberate targeting of Marie Colvin as a factor in the amount of punitive damages awarded. While my personal suspicion is that Parhamovich was targeted specifically because she was working for a U.S. government-funded organization that worked with Iraqi civil society groups that the insurgents detested, I cannot present much material to support what remains my personal suspicion.  The counter-argument would be that the insurgent groups in Iraq at that time

were targeting all Americans first and foremost, with other non-Muslim foreigners also being occasionally hit as the opportunity presented itself – so, for instance, the insurgents hit a number of U.S. journalists. Parhamovich was certainly targeted because of her nationality, and therefore it is accurate to say she was deliberately targeted.

60.   The second factor is outside my area of expertise.

61.   As for the third factor, deterrence has several aspects.  One is whether the target is aware of the steps being taken.  Given that Iran for many years did not show up in U.S. courts to contest whether damages – punitive or otherwise – were to be awarded, it is not self-evident that Iranian leaders were aware about the court cases.  But in fact, despite no lawyers showing up in court to defend Iran, Iranian leaders have for years paid close attention to civil suits about terrorism. In 2000/01, the issue became a major controversy in Iran. Iran's permanent representative to the UN, Nejad Hosseinian, went on Iranian television to complain about the suits and to answer criticisms that the Iranian government had not succeeded at stopping them. Representative Golbaz, a member of the Iranian Parliament's National Security and Foreign Policy Commission, complained, "Those American courts that make such rulings do so in the absence of the defendant as there is no Iranian representative in attendance in these courts." Former Iranian President, now chairman of the powerful Expediency Council (charged with resolving disputes among the various organs of government), Ali Akbar Hashemi Rafsanjani complained at length about the suits, as did numerous members of Iran's Parliament. They were particularly upset at the large punitive damage awards, which they acknowledged exceeded a billion dollars. In late 2000, the Iranian Parliament adopted a law permitting Iranians to file suit against the U.S. government for its alleged misdeeds, such as the 1953

**PLA000232**

overthrow of Iranian Prime Minister Mussadegh (the law permits suits when damage is sustained from any action by a foreign government in contravention of international law, including interference in Iran's domestic affairs, or when damage is incurred from acts of terrorist groups backed by foreign governments).  The Iranian government has several times referred to such a lawsuit having been brought, although the situation is not entirely clear.

62.    Around the same time, Iran's lawyers expressed outrage at the suits. At the American Iranian Council's July 2000 forum on the grounds of the U.S. Capitol entitled "U.S.-Iran Relations: Financial Impediments and the Challenges of a 'Global Settlement,' Mohammad Hossein Zahedin Labbaf, Iran's chief representative before the Iran-U.S. Claims Tribunal in the Hague[1], devoted his remarks to a tirade against the American court suits regarding Iranian support for terrorism brought under the FSIA amendments. This was surprising to the American participants, who had assumed that the chief financial impediments to improving U.S.-Iranian relations related to the U.S. sanctions on Iran or the continuing disagreements at the Hague Tribunal about what Iran describes as "frozen assets."  As an example of Labbaf's rhetoric, he said of these court suits, "They are detrimental to universal legal order, to the cause of justice, to the United States' international image, and finally, to the long-term interests of both countries."  He also described them as contrary to article 11(4) of the 1955 Treaty of Amity between the United States and Iran, regarding sovereign immunity.

63.     Despite the clear indications that in 2000 Iranian leaders were paying close attention to the court judgments against Iran for its support of terrorism, the effort to dissuade Iran

---

[1] This claims tribunal was established to adjudicate claims under the 1981 Algiers Accord

from providing financial support for terrorism against Americans has not yet fully succeeded -- although such Iranian-supported attacks in recent years have been almost entirely in Iraq (with arguably a few in other war-torn countries where U.S. troops are present, e.g., Syria, plus some Americans killed in attacks in Israel that do not appear to have targeted Americans). Several significant obstacles got in the way:

- The continuing influence of the most extreme elements in Iran, who have repeatedly rebounded from setbacks such as the election of two presidents who successfully opposed hardliners (Mohammed Khatami, elected in 1997 and re-elected in 2001, and Hassan Rouhani, elected in 2013).

- Iran's confidence for many years that its oil income will be sufficient to finance its domestic needs and the support of terrorism, which is quite modest compared to the tens of billions in oil revenue. While this confidence was dented by the tough sanctions against Iranian oil sales adopted in 2012 by the European Union and the U.S. government, Iranian leaders soon spoke with great assurance that by successful negotiations over the nuclear impasse, they could get these sanctions reversed and regain full access to tens of billions of dollars – by some accounts, more than $100 billion -- in foreign exchange reserves to which Iran has had limited access.

- The perceived successes of major terrorist groups which receives direct and material financial support from Iran, namely, Hezbollah's performance in its 2006 confrontation with Israel, followed up by its 2009-10 success in keeping a role in the Lebanese government despite doing badly in the elections and then its battlefield successes in the Syrian civil war during 2013-19, and Hamas' 2007 takeover of Gaza plus its ability to sustain control of that territory for more than a dozen years.

- The perception that the United States was tied down by Iraqi and Afghan insurgents who deliberately targeted innocent civilians, which Iranian leaders have often proclaimed as evidence that Islamist resistance movements and their terrorist activities can defeat the United States.

64. In consideration of these factors, the financial pressure to abandon terrorism against U.S. citizens and entities as a result of past court judgments was not sufficiently powerful as to induce Iran to drop its support for such terrorist attacks. But the court judgments did

---

freeing the U.S. embassy hostages.

have an effect: they brought Iran to engage lawyers to contest in court actions regarding its support for terrorism.

65.    An early example was a claim against property held at the University of Chicago Oriental Institute. After it was filed in May 2004, the claim was ignored by Iran until the June 2009 ruling by U.S. District Judge Blanche M. Manning that the case could proceed. Iran's lawyers then intervened for the first time.   This came after the Iranian government had been for several years conducting an extensive and prolonged propaganda campaign to denounce the court decisions about the sale of ancient Iranian tablets held by the Oriental Institute in order to make partial payment of some outstanding claims from such suits.  The propaganda has played on Iranian national pride in the country's rich historical heritage, arguing that the terrorism damage suits endanger these valuable items from Iran's cultural heritage.

66.    Another example of a more active Iranian stance was a Montreal, Quebec suit seeking damages for the death under torture of a Canadian-Iranian, *Estate of the late Zahra (Ziba) Kazemi, and Stephan (Salman) Hashemi v. the Islamic Republic of Iran, et al.*, Montreal Superior Court case No. 500-17-031760-062[2], which Iran's lawyers vigorously contested after it was filed in December 2009, litigating all the way to the Supreme Court of Canada.   The most prominent case Iran has contested has been *Peterson v. Islamic Republic of Iran*, U.S. District Court, Southern District of New York, No. 13-9195, a 2010 lawsuit seeking the seizure of $1.75 billion dollars held by Citibank of funds belonging to Bank Markazi, the Iranian central bank, to partially satisfy a $2.65 billion 2007 judgement against Iran in favor of relatives of American troops killed in the 1983

---

[2] Available at https://scc-csc.lexum.com/scc-csc/scc-csc/en/item/14384/index.do

Marine Corps barracks bombing in Lebanon. Bank Markazi vigorously contested the suit, with an appeal all the way up to the U.S. Supreme Court.

67.    There are good reasons to be optimistic that Iran is more susceptible than ever to the pressure from punitive damages. Ever since its 2018 withdrawal from the nuclear deal known as the Joint Comprehensive Plan of Action (JCPOA), the U.S. government has been engaged in a campaign it describes as "maximum pressure" on Iran. Most of that pressure has been economic, such as a wide variety of sanctions actions which has reduced Iran's oil exports from over 2.5 million barrels a day to under 0.5 million barrels (the exact amount is unclear because so much of what Iran now exports it does in a clandestine manner). The United States acknowledges it has engaged in cyber retaliation for Iranian harassment of U.S. military assets. Most importantly, a December 2019 U.S. drone attack resulted in the death of the Iranian military hero, IRGC Quds Force commander Qassem Suleimani.

68.    The impact on Iranian policy was summarized in a May 19, 2020 *New York Times* article:

> After years of increasing tensions that nearly led to war, Iran has moderated its approach to the West, shifting from a policy of provocation to one of limited cooperation. …Diplomats, Iraqi and Iranian officials and analysts cite a combination of reasons for the change, including a fear of war with the United States. They also note that Iran is overextended — fighting a coronavirus epidemic, a tanking economy and public unrest at home — and needs to retrench….The Trump administration credits its 'maximum pressure campaign' against Iran, including sanctions and military threats, for forcing the country to rethink its strategy. 'Pressure works,' Brian Hook, the State Department's special representative for Iran policy, said Tuesday.

Alissa J. Rubin and Farnaz Fassihi, *Iran Quietly Lowers the Temperature with U.S.,*

May 19, 2020, THE NEW YORK TIMES (attached hereto as Exhibit 12).

Page 25 of 29

69.   Iranian leaders generally assume that whatever is written about Iran – whether by judges, by independent newspapers, by non-governmental organizations, or by foreign ministries – is the direct product of a unified policy by the government of the country from which the comment originates.  The Iranian leaders are well aware that punitive damages were at one time a common feature in actions against Iran for its support of terrorism against Americans but have not been common for a number of years.  Were this Court to impose punitive damages,  this would be read by Iranian government officials as indicating that the U.S. "maximum pressure" campaign against Iran is being extended and deepened. That would add to the reasons for Iran to backing off in its confrontation with the United States.   Given the vigorous U.S. reaction to the December 2019 killing of a U.S. contractor in Iraq by Iran-backed forces, the Islamic Republic of Iran might well be deterred from targeting Americans with terrorist attacks.

70.   Deterrence has two aspects: deterring Iran from continuing the actions to which the United States objects and deterring such conduct by others.  While the success on the first front has been at best modest, the substantial judicial actions against Iranian state support for terrorism has arguably deterred other states hostile to the United States from going down the same route as Iran.

71.   On the fourth factor, the Islamic Republic of Iran has significant wealth, as measured by gross domestic product (GDP), government revenue, exports, and foreign exchange reserves. In its most recent report on the Iranian economy, the International Monetary Fund (IMF) shows Iran's gross domestic product (GDP) as $404 billion at a market exchange rate or, adjusting for the differences in prices between the United States and

PLA000237

Iran by using what is called a "purchasing power parity" (PPP) exchange rate, $1.39 trillion.  IMF, Islamic Republic Iran: Article IV Consultation Staff Report press release.[3]

72.   The Central Intelligence Agency's widely consulted *World Factbook* gives slightly higher figures than the IMF with the 2017 GDP at $430 billion at a market exchange rate or $1.64 trillion at a PPP rate.  "Iran." *The World Factbook*. Central Intelligence Agency, 2018.[4]

73.   Both the IMF and CIA state that government revenue was 17.3 percent of GDP, meaning it was $70 to 74 billion at a market exchange rate and $240 to 280 billion at a PPP rate. The IMF lists exports in 2016/17 as $94 billion.  It shows Iran's foreign exchange reserves at the end of that year as $121 billion, while the CIA shows $134 billion for end-2017.

74.   Today, Iran's situation is not much below what is shown in those IMF and CIA numbers. Iran's economy grew briskly in 2017 but then did not do well for the last three years.  In particular, the U.S. "maximum pressure" campaign has led to a drop-off in oil exports and a reduction in government revenue.  That said, Iran's exports remain well above $60 billion a year and government revenue appears to be about two-thirds of what it was in 2017.

75.   In sum, in my expert opinion, Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they have shown themselves to be sensitive to the punitive damages levied against Iran.  Were courts to resume awarding punitive damages, Iran's leaders would have an additional

---

[3]  Available  at  https://www.imf.org/en/Publications/CR/Issues/2018/03/29/Islamic-Republic-of-Iran-2018-Article-IV-Consultation-Press-Release-Staff-Report-and-45767

[4] Available at https://www.cia.gov/library/publications/the-world-factbook/geos/ir.html.

reason to consider scaling back their confrontation with the United States by backing away from supporting terrorist attacks on Americans.

## VIII. Conclusions

76.   Based upon my experience, information, and belief, the sophisticated and large-scale nature of the attack, plus what appears to have been careful targeting of Americans, points to it having been carried out by a well-trained and well-organized group, such as the group which claimed the attack, namely, ISI, also known as Al Qaida in Iraq. This group was active in Baghdad at the time of the attack. At that time, all of such well-trained and well-organized groups in Iraq which were attacking Americans were receiving support from Iran. The group which claimed responsibility for the attack, ISI, was identified by many U.S. government sources as receiving Iranian material support, including arms, at the time.

77.   The material support provided by Iran to Iraqi Sunni *jihadists* is, on the present state of the record, training, including explosives training, lethal substances, weapons, personnel, and travel facilitation and safe haven. It is my opinion, based on all I have articulated in this declaration, to a reasonable degree of certainty, that Iran's material support contributed to Sunni militants' ability to carry out the attack which killed Andrea Parhamovich. Credible reports, including from the U.S. government, state that the Sunni *jihadists* that Iran assisted included Al Qaeda in Iraq, which later become the Islamic State in Iraq. While earlier punitive damages levied on Iran for its support for terrorist actions against Americans did not deter Iran for continuing to support those attacks in Iraq, there is good reason to think that punitive damages now might contribute to Iran reconsidering such attacks.

**I declare under penalty of perjury that the foregoing is true and correct.**

Executed on date: June 12, 2020

Signature:            PATRICK L. CLAWSON, Ph.D.

PLA000240

## Appendix 1: Curriculum Vitae of Patrick Clawson

Dr. Clawson is Director for Research at The Washington Institute for Near East Policy. His previous positions include five years as senior research professor at the Institute for National Strategic Studies of the National Defense University and senior economist for four years each at the Foreign Policy Research Institute, the World Bank, and the International Monetary Fund.

Dr. Clawson speaks often about Iran for U.S. government audiences, including for the Office of the Director of National Intelligence, the United States Central Command, the U.S. Army's Central Command, various offices at the State Department (including briefing U.S. ambassadors to Middle Eastern countries), and tours arranged by several U.S. embassies. He has lectured about Iran and Middle East politics in more than twenty countries, including Saudi Arabia, the U.A.E., Kuwait, Bahrain, Israel, Russia, China, Britain, France, Germany, Italy, Spain, the Netherlands, Belgium, Austria, Poland, Portugal, the Czech Republic, Australia, and Canada.

Dr. Clawson has testified often about Iran before the House International Relations, National Security, and Banking and Financial Services Committees and the Senate Foreign Relations and Banking Committees. From 2009 through 2014, he served on the Distinguished Advisory Panel of the Department of Energy's Sandia National Laboratory, which is the lead actor on many nuclear security issues. From 1994 to 2012, Dr. Clawson was senior editor of *Middle East Quarterly.* From 1990 through 1994, he was editor of *Orbis,* a foreign policy quarterly.

Dr. Clawson has written extensively about Iran, including for *The New Republic*, as well as op-ed articles in *The New York Times, The Wall Street Journal,* and *The Washington Post,* among other newspapers. He is the author of more than thirty scholarly articles in *Foreign*

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000241**

*Affairs, Survival, Washington Quarterly, International Journal of Middle East Studies, Middle East Journal, Les Cahiers de l'Orient,* and *Oxford Bulletin of Economics and Statistics,* among other journals.

Dr. Clawson co-authored book, *The Monetary History of Iran From the Safavids to the Qajars* (I.B. Tauris, 2013), with Rudi Matthee and Willem Floor, won the Middle East Studies Association of North America's Pourshariati Award for best book about Iran. His books and monographs in the last ten years are: *Tactical Issues Surrounding a U.S. Withdrawal from the Iran Nuclear Agreement* (The Washington Institute, 2018); *Reinforcing the Role of Sanctions in Restraining Iran* (The Washington Institute, 2017, with Katherine Bauer and Matthew Levitt); *Syrian Kurds as a U.S. Ally: Cooperation and Complications* (The Washington Institute, 2016, with six institute fellows); *Energizing Policy: America and the Middle East in an Era of Plentiful Oil* (The Washington Institute, 2016, with Simon Henderson); *How Iranians Might React to a Nuclear Deal* (The Washington Institute, 2014, with Mehdi Khalaji); *Preventing an Iranian Nuclear Breakout: U.S.-Israel Coordination* (The Washington Institute, 2012, with David Makovsky); *An Iranian Nuclear Outbreak is Not Inevitable* (The Washington Institute, 2012); *The Red Line: How to Assess Progress in U.S. Iran Policy* (The Washington Institute, 2010); *The Perfect Handshake with Iran: Prudent Military Strategy and Pragmatic Policy* (The Washington Institute, 2010); *Much Traction from Measured Steps: The Iranian Opposition, the Nuclear Issue, and the West* (The Washington Institute, 2010); and *Engaging Iran: Lessons from the Past* (The Washington Institute, 2009, edited).

His earlier books and monographs about Iran include: *Engaging Iran: Lessons from the Past* (The Washington Institute for Near East Policy, 2009, edited); *The Last Resort: Consequences of Preventive Military Action Against Iran* (The Washington Institute for Near

**PLA000242**

East Policy, 2008, with Michael Eisenstadt); *Deterring the Ayatollahs: Complications in Applying Cold War Strategy to Iran* (The Washington Institute for Near East Policy, 2007, edited with Michael Eisenstadt); and *Eternal Iran: Continuity and Chaos* (Palgrave, 2005, with Michael Rubin).

In the last ten years, Dr. Clawson also wrote many shorter articles which appeared in various publications, especially in The Washington Institute for Near East Policy's Policy Watch series which live on the Institute's website, www.washingtoninstitute.org.  A complete list of those publications in the last ten years is:  *Opposing an IMF Loan to Iran: Not an Outlier, Not a Barrier to Aid* (The Washington Institute, 2020); *Don't Count Out U.S. Oil Production as a Market-Shaper* (The Washington Institute, 2020); *Soleimani's Popularity Is Largely Limited to Iran* (The Washington Institute, 2020); *Iran's New Budget Is Tight, But Not Tight Enough* (The Washington Institute, 2020); *Khamenei's Domestic and Foreign Response Options to the Protests* (The Washington Institute, 2020); *Iran's Gasoline Protests: Regime Unpopular but Resilient* (The Washington Institute, 2020); *Khamenei Will See Sanctions on Him as a Direct Challenge to the Revolution,* (The Washington Institute, 2020); *Renewing the Iran Sanctions Waivers (Part 2): Energy and Afghan Trade* (The Washington Institute, 2019); *Renewing the Iran Sanctions Waivers (Part 1): Nuclear Activities* (The Washington Institute, 2019); *IRGC Designation: From Visas to Symbolic Effects* (Iran Primer, 2019); *The Most Important Speech of the Year in Iran: Hostile to the West, No Concessions at Home* (The Washington Institute, 2019); *Iran's Economy Is Stagnating Even Before New U.S. Sanctions Hit* (The Washington Institute, 2018); *Iran's Response to Sanctions? Ignore Them* (The Washington Institute, 2018); *Iran's Vulnerabilities to U.S. Sanctions (Part 1): Finding the Weak Spots* (The Washington Institute, 2018); *The JCPOA Decision: Managing Reactions, Evaluating Sanctions* (The Washington Institute, 2018, with Katherine Bauer and Michael Singh); *The Most Important Speech of the Year in Iran* (The Washington Institute, 2018); *Protests in Iran: Why? What*

3

*Impact? How Should the U.S. Respond?* (The Washington Institute, 2018, with Michael Singh, Michael Eisenstadt, Hanin Ghaddar, and Mehdi Khalaji); *December 13 Is an Iranian Nuclear Trifecta* (The Washington Institute, 2017); *JCPOA Under the Gun (Part 2): A Middle Course?* (The Washington Institute, 2017, with Katherine Bauer); *What To Expect After Iran's Election* (The Washington Institute, 2017, with Patrick Clawson, Nader Uskowi, Farzin Nadimi, and Katherine Bauer); *How Much Has the Trump Presidency Influenced Iran's Election?* (The Washington Institute, 2017, with Nader Uskowi and Elham Gheytanchi); *Iran's Presidential Election: The Economic Situation* (The Washington Institute, 2017); *Iran's Economy Post-Nuclear Deal: A Misleading IMF Scorecard* (The Washington Institute, 2017); *Why Trump and Netanyahu Might Keep Iran Nuclear Deal After All* (The Hill, with Matthew Levitt and Katherine Bauer, 2017); *More Information Is Needed to Evaluate Implementation of the Iran Nuclear Deal* (The Washington Institute, 2017, with Katherine Bauer); *Obama Team Makes Defensible Actions on Iran Look Suspicious* (The Washington Institute, 2016); *Energy and U.S. Middle East Policy in an Era of Plentiful Oil* (The Washington Institute, 2016, with Simon Henderson and Helima Croft); *Why Iran Will Never Proceed with the Proposed Plane Purchases* (The Washington Institute, 2016); *Iran's Modest Economic Changes Since JCPOA Implementation* (The Washington Institute, 2016); *Misleading Claims About U.S. Barriers to Iran-Europe Financial Ties* (The Washington Institute, 2016); *Iran Locks Itself Out of the International Financial System While Blaming Washington* (The Washington Institute, 2016); *Third Time the Charm for Reform in Iran?* (The Washington Institute, 2016); *Sanctions Relief Is Not the Key to Iran's Economy* (The Washington Institute, 2015); *Iran's Post-Deal Economic Stagnation Challenges Rouhani* (The Washington Institute, 2015); *Beyond the Vote (Part 4): Challenges for the Sanctions Regime* (The Washington Institute, 2015, with Chip Poncy and

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000244**

Matthew Levitt); *Iran's 'Frozen' Assets: Exaggeration on Both Sides of the Debate* (The Washington Institute, 2015); *Will the Obama Administration Implement the Stringent Sanctions Authorized Under the Iran Agreement?* (The Washington Institute, 2015); *How Iran's Economic Gain from a Nuclear Deal Might Affect Its Foreign Policy* (The Washington Institute, 2015); *Iranians Debate: What Next with the United States?* (The Washington Institute, 2015, with Mehdi Khalaji); *Khamenei's Silence: Iranian Reactions to the Nuclear Framework* (The Washington Institute, 2015, with Mehdi Khalaji); *Potential Economic Impact of an Iran Deal* (Wilson Center Viewpoints, 2014); *What Difference Would an Iran Deal Make?* (The Washington Institute, 2014, with Mehdi Khalaji); *Iran Can Afford to Say No to a Nuclear Deal* (The Washington Institute, 2014); *Why Are Congressional Democrats Considering New Iran Sanctions?* (BBC News, 2014); *Making the Iran Nuclear Deal Work* (The Washington Institute, 2013); *Iranian Consensus Does Not Necessarily Mean a Good Deal for the West* (Washington Post, 2013, with Mehdi Khalaji); *Sanctions Relief for Iran Without Congressional Approval* (The Washington Institute, 2013); *Talk Is Cheap* (Foreign Affairs, 2013); *Stalemate's End?* (Foreign Policy, 2013); *Rouhani's Nuclear Views: An Open Book?* (The Washington Institute, 2013); *The Iranian Nuclear Crisis: A Memoir* (Middle East Quarterly, 2013); *Iran Beyond Oil?* (The Washington Institute, 2013); *Iran Talks: Is New Momentum Enough?* (The Washington Institute, 2013); *Iran Can't Agree to a Damn Thing* (Foreign Policy, 2013); *Obama, Offer Iran a Generous Deal* (The Atlantic, 2013); *Will Iran Weather the Economic Storm?* (Foreign Policy, 2012); *How to Build U.S.-Israeli Coordination on Preventing an Iranian Nuclear Breakout* (The Washington Institute, 2012, with Dennis Ross and David Makovsky); *Tehran Adds to the Pressure on Iran's Economy* (The Washington Institute, 2012); *New U.S. Tone on Iran* (The Washington Institute, 2012); *Iran Confident As Sanctions Tighten* (The Washington Institute,

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000245**

2012, with Mehdi Khalaji); *Prospects for Success in the Iran Nuclear Negotiations* (The

Washington Institute, 2012, with Mehdi Khalaji); *Sanctions Are Only a Stop-Gap* (Foreign

Affairs, 2012); *Don't Throw Iran's Democrats under the Bus* (Foreign Policy, 2012); *What Iran*

*Might Gain from a Nuclear Deal* (The Washington Institute, 2012); *Post-Asad Syria:*

*Opportunity or Quagmire?* (Strategic Forum, 2012); *Calculating Victory: How Iran Views*

*Confronting the United States* (The Washington Institute, 2012); *Impact of Sanctioning Iran's*

*Central Bank* (The Washington Institute, 2011, with Simon Henderson); *Iran Makes Itself More*

*Vulnerable to Outside Pressure* (The Washington Institute, 2011); *Is the Palestinian Authority*

*Ready for Statehood?* (The Washington Institute, 2011, with Michael Singh); *No Good Options*

*for Iranian Dissidents in Iraq* (The Washington Institute, 2011); *Implementing Obama's*

*Message Supporting Iranian Human Rights* (The Washington Institute, 2011, with Mehdi

Khalaji); and *Ahmadinezhad's Bomb Rhetoric: Opportunities for U.S. Policy* (The Washington

Institute, 2010).

 Dr. Clawson has been an expert witness about Iran in more than thirty federal court cases,

mostly about Iran's support for terrorism. The cases in which he has been an expert witness in

the last five years are: *Kaplan v. Central Bank of Iran* [D.D.C. November, 2015, No. 10-483

(RCL)]; *Lelchook v. Islamic Republic of Iran* [D. Mass. May, 2016, No. 15-13715 (PBS)]; *Braun*

*v. Islamic Republic of Iran* [D.D.C. May, 2016, No. 15-01136 (BAH)]; *Hirshfeld v. Islamic*

*Republic of Iran* [D.D.C. December 27, 2016, No. 15-cv-2272 (RBW)]; *Force v. Islamic*

*Republic of Iran* [D.D.C. January, 2017, No. 16-01468 (RDM)]; *Parhamovich, et al. v. Islamic*

*Republic of Iran, et al* [D.D.C. April 2017, No. 1:17-cv-00061]; *Allan, et al. v. Islamic Republic*

*of Iran* [D.D.C. May, 2017, No. 1:17-cv-00338-RJL]; *Havlish v. Islamic Republic of Iran* [BCSC

October, 2017, No. S-168272]; *Hake, et al v. Bank Markazi Jomhouri Islami Iran, et al.* [D.D.C.,

PLA000246

May 2018, No. 17-cv-114 (TJK)]; *Weinstock v. Islamic Republic of Iran* [S.D. Fla. October, 2018, No. 1:17cv23272]; *Christine Levinson, et al. v. Islamic Republic of Iran* [February 2019, Civil Action No. 1:17-cv-00511-RBW]; Supplemental Declaration for *Christine Levinson, et al. v. Islamic Republic of Iran* [February 2019, Civil Action No. 1:17-cv-00511-RBW]; *Ilana Schertzman Cohen, et al. v. Islamic Republic of Iran and Islamic Revolutionary Guard Corps* [D.D.C., February 2019, No. 1:17-cv-01214-JEB].; and *Ruth Schwartz, et al. v. Iran* [D.D.C. 2019, No. 18-cv-1349 (RDM).

Additional cases in which Dr. Clawson has been an expert witness include: *Cicippio v. Islamic Republic of Iran*, 18 F. Supp. 2d 62, 64 (D.D.C. 1998) (five Americans held hostage in Beirut for several years); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8-9 (D.D.C. 1998) (suicide bombing of bus); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 228 (D.D.C. 2002) (American student held hostage in Beirut for four days); *Higgins v. Islamic Republic of Iran*, 2000 U.S. Dist. LEXIS 22173 at *14 (D.D.C. 2000) (American marine held hostage in Lebanon for 18 months and murdered); *Stethem v. Islamic Republic of Iran*, 201 F. Supp. 2d 78 (2002) (hijacking of TWA Flight 847); *Hegna v. Islamic Republic of Iran*, 2002 U.S. Dist. LEXIS 27544  (D.D.C. 2002) (hijacking of KAC Flight 221); *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 112-113 (D.D.C. 2000) (American journalist held hostage for seven years in Beirut); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000) (suicide bombing of bus); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 100 (D.D.C. 2000) (state-sponsored assassination); *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 132 (D.D.C. 2001) (suicide bombing of U.S. Embassy in Beirut); *Polhill v. Islamic Republic of*

**PARHAMOVICH V. IRAN**
**1:17-CV-00061 (KBJ)**

**PLA000247**

*Iran*, 2001 U.S. Dist. LEXIS 15322 at *9 (D.D.C. 2001) (American professor held hostage in

Beirut for three years); *Mousa v. Islamic Republic of Iran*, 238 F. Supp. 2d 1, 3-4 (D.D.C. 2001)

(suicide bombing of bus); *Rafii v. Islamic Republic of Iran*, No. 01-850 (D.D.C. Dec. 2, 2002)

(state-sponsored assassination); *Kerr v. Islamic Republic of Iran*, 245 F. Supp. 2d 59 (D.D.C.

2003) (murder of American University President in Beirut); *Surette v. Islamic Republic of Iran*,

231 F. Supp. 2d 260, 262 (D.D.C. 2002) (American C.I.A. agent held hostage in Lebanon for

fourteen months and murdered); *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19

(D.D.C. 2002) (suicide bombing of bus); *Ungar v. Islamic Republic of Iran*, 211 F. Supp. 2d 91,

93 (D.D.C. 2002) (machine gun attack); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286,

288 (D.D.C. 2003) (suicide bombing of marketplace); *Regier v. Islamic Republic of Iran*, 281 F.

Supp. 2d 87, 90 (D.D.C. 2003) (American professor held hostage for sixty five days in Beirut);

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003) (suicide

bombing of pedestrian mall); *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 96

(D.D.C. 2006) (suicide bombing of restaurant); *Owens v. Republic of Sudan, et al.*, 2011 U.S.

Dist. LEXIS 135961 (D.D.C. 2011) (suicide bombings of U.S. Embassies in Kenya and

Tanzania); : *Levin v. Islamic Republic of Iran*, 529 F. Supp. 2d 1, 7 (D.D.C. 2007), on Hezbollah,

its structure, financial support, membership, agents, and its relationship to Iran; *In Re Terrorist

Attacks on September 11, 2001*, 2011 U.S. Dist. LEXIS 155899 at *84 (S.D.N.Y. 2011) (terrorist

attacks on September 11, 2001), and *In Re: 650 Fifth Avenue and Related Properties*, 2013 U.S.

Dist. LEXIS 132119 at *32 (D.D.C. 2013) (forfeiture actions against assets of partnership

assisting Iran), among others.

Dr. Clawson's Ph.D. in economics is from the New School for Social Research and his B.A. is from Oberlin College.  He speaks Persian and French fluently, as well as some Hebrew, Spanish, and German.

9