**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————
)
THE ESTATE OF ANDREA S.                    )
PARHAMOVICH, *et al.*,                      )
)
        **Plaintiffs,**         )
)
        **v.**                  )       **Case No. 17-cv-61 (KBJ/GMH)**
)
THE SYRIAN ARAB REPUBLIC,                   )
*et al.*,                                   )
)
        **Defendants.**         )
—————————————————————)

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

      Plaintiffs—Vicki Parhamovich on behalf of herself and the Estate of Andrea Parhamovich, André Parhamovich, Marcella Zampini, Chris Parhamovich, and Cory Parhamovich—brought this action against the Syrian Arab Republic ("Syria") and the Islamic Republic of Iran ("Iran") (collectively, "Defendants") under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A. Plaintiffs allege that Iran and Syria provided material support and resources to the Islamic State in Iraq ("ISI"),[1] which ambushed Andrea Parhamovich's vehicle in January 2017, resulting in her death.

      Plaintiffs sue under Section 1605A(c) of the FSIA, which, in relevant part, permits United States nationals to sue foreign states designated as state sponsors of terrorism for personal injury

---

[1] Prior to 2006, the Islamic State in Iraq was called Al Qaeda in Iraq ("AQI"). *See* ECF No. 37-43 at 12 ("The main elements of the Iraqi insurgency, which began after the U.S.-led invasion, proclaimed themselves to be Al Qaeda in Iraq in September 2004 before changing their name in June 2006 to the Islamic State in Iraq."). AQI's roots "date back to the 1980s" and "[t]he central node of [AQI's] deeper history was the activities and ambition of one man: . . . Abu Musab al-Zarqawi." ECF No. 36-37 at 7. This report and recommendation and the cases cited throughout will refer interchangeably to AQI, ISI, and "Zarqawi's organization," which are all the same terrorist organization that has evolved over the decades and taken on different names.

or deaths "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A.  Plaintiffs filed a motion for default judgment as to liability after Defendants failed to appear before the Court and the Clerk of the Court entered default.[2]  After a thorough review of the record, the undersigned recommends that Plaintiffs' motion for default judgment as to liability be granted as to Syria, but denied as to Iran.[3]

## I.     BACKGROUND

Andrea Parhamovich was a United States citizen who traveled to Iraq to support its transition to democracy after the American-led invasion in 2003.  ECF No. 36-1 at 38.  After moving to Iraq in September 2006 to take a job with the International Republican Institute ("IRI"), Ms. Parhamovich applied for and received an offer to work as a communications strategist for the National Democratic Institute ("NDI").  *Id.*  Unlike her position with IRI, the job with NDI allowed her to travel outside of Baghdad's heavily fortified Green Zone.  *Id.* at 39.  On January 17, 2007, Ms. Parhamovich traveled to the Iraqi Islamic Party ("IIP") headquarters to meet with IIP officials.  *Id.* at 8.  When Ms. Parhamovich's three vehicle convoy departed IIP headquarters, armed militants attacked her vehicle and attempted to gain entry to the vehicle, presumably to take Ms. Parhamovich hostage.  *Id.*  After failing to open the door, the attackers directed small arms fire and grenades at Ms. Parhamovich's vehicle.  *Id.*  A grenade placed underneath the vehicle

---

[2] The Court granted Plaintiffs' motion to bifurcate briefing on the issues of liability and damages.  Minute Order dated Sept. 17, 2020.

[3] This case was referred to the undersigned by Judge Jackson for full case management.  The relevant docket entries are: (1) Plaintiffs' complaint (ECF No. 1); (2) Plaintiffs' motion to seal, which includes, under seal, its memorandum in support of the motion for default judgment and accompanying exhibits (ECF No. 36 to 36-38); and (3) Plaintiffs' motion for default judgment as to liability and accompanying exhibits (ECF No. 37 to 37-65). The page numbers cited herein are those assigned by the Court's CM/ECF system.

eventually caused the fuel pipe and tank to explode—catching the vehicle on fire with Ms. Parhamovich inside, leading to her death. *Id.*

## II.      LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(b)(2); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, a plaintiff must request "that the Clerk of the Court enter default against a party who has 'failed to plead or otherwise defend.'" *Bricklayers* 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P. 55(a)). Second, the plaintiff must then move for default judgment against the absent defendant. *Id.*

Default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Leopfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion for default judgment.'" *District of Columbia v. Butler*, 713 F. Supp. 2d 61, 64 (D.D.C. 2010) (quoting *Gutierrez v. Berg Contracting, Inc.*, No. 99-3044, 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000)). However, a notation of default by the Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations, accepted as true, state an adequate claim for relief. *See Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008); *Marmaras v. Marafatsos*, No. 18-1236, 2019 WL 3414363, at *2 (D.D.C. July 29, 2019). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not

sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)).  In that way, "a motion for default judgment is like a reverse motion to dismiss for failure to state a claim."  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  A court must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's unsupported allegations as true.'"  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)).  But "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true."  *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).  An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit."  *Reed*, 845 F. Supp. 2d at 212; *see also Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a prima facie showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (first alteration in original) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))).  Due to the nature of cases brought under the FSIA's terrorism exception, "[t]he testimony of expert witnesses is of crucial importance because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain."  *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017) (internal citations omitted), *vacated in part on other grounds sub nom*; *Opati v. Republic of Sudan*, __ U.S. __, 140 S. Ct. 1601 (2020).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action." *Warmbier v. Dem. People's Rep. of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)). The party seeking the judgment must demonstrate that the court has both subject-matter jurisdiction over the action and personal jurisdiction over the absent defendant. *See Mwani*, 417 F.3d at 6; *Thuneibat*, 167 F. Supp. 3d at 33. And "[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

## III.   DISCUSSION

Plaintiffs filed their complaint on January 11, 2017. ECF No. 1. After Defendants Iran and Syria failed to appear before the Court, Plaintiffs requested that the Clerk enter default. ECF No. 21. The Clerk entered both Defendants' default on January 16, 2019. ECF No. 22. Plaintiffs now move for default judgment as to liability. ECF No. 37. For the reasons that follow, the undersigned recommends granting Plaintiffs' motion for default judgment as to Syria, but denying it as to Iran.

### A.   Personal Jurisdiction

The undersigned first examines if effective service has been made pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the

district courts have jurisdiction . . . where service has been made under section 1608 of this title."

*Id.* Service is made on a foreign state under section 1608 in one of four ways:

> 1.  by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> 2.  if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> 3.  if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> 4.  if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service outlined in section 1608(a) are listed in order of preference; plaintiffs must attempt the first method before proceeding to the next. *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012). "[S]trict adherence to the terms of 1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s] under section 1608(a)(3) because Congress had mandated 'service of the ministry of foreign affairs, the department most likely to understand American procedure.'" *Barot v. Embassy of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994)). The undersigned finds that the Court has personal jurisdiction over Syria;

however, due to required strict adherence to the terms of section 1608(a), the undersigned finds that the Court does not have personal jurisdiction over Iran.

Beginning with Syria, on January 30, 2018, Plaintiffs filed an affidavit requesting that the Clerk of the Court mail a copy of the summons and complaint to the Ministry of Foreign Affairs of Syria in order to attempt service pursuant to 1608(a)(3).  ECF No. 11.  In support of their request for service under 1608(a)(3), Plaintiffs explained that service could not be made pursuant to section 1608(a)(1) because no special arrangement for service exists between Plaintiffs and Syria.  ECF No. 11-1 at 1.  Plaintiffs also explained that service could not be made pursuant to section 1608(a)(2) because the United States has no treaty relations with Syria that provide for service of process in civil matters.  *Id.; see also Thuneibat*, 167 F. Supp. 3d at 37–38 (recognizing that Syria has "[not] entered into any international convention governing service"); *Doe v. Syrian Arab Republic*, No. 18-cv-0066, 2020 WL 5422844, at *12 (D.D.C. Sept. 10, 2020) (same and collecting cases).  Accordingly, on February 6, 2018, the Clerk of the Court mailed "[o]ne copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of [Syria], by DHL, to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3)."  ECF No. 13.  On February 20, 2018, Plaintiffs were advised by DHL that delivery of the service documents was refused.  ECF No. 14-1 at 1; ECF No. 17 (return of unexecuted summons).  So, service under 1608(a)(3) was unsuccessful and nothing more was required under that section.  *See Doe*, 2020 WL 5422844, at *12 (concluding "[n]othing more was required for [the plaintiffs] to satisfy their obligations to attempt service under section 1608(a)(3)" after the Clerk of the Court mailed the documents and the Syrian Foreign Ministry refused delivery); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008)

(holding that service under 1608(a)(3) was not possible and plaintiff's obligations were satisfied when delivery was attempted and recipient refused delivery).

Following the attempt at service under section 1608(a)(3), on February 23, 2018, Plaintiffs requested that the Clerk of the Court mail a copy of the summons and complaint to the U.S. Department of State "for further dispatch and service upon [Syria] . . . via diplomatic service" pursuant to section 1608(a)(4). ECF No. 14. Service was executed on Syria on September 20, 2018 through a diplomatic note delivered by the Foreign Interests section of the Embassy of the Czech Republic. ECF No. 20. Accordingly, service on Syria was completed under section 1608(a)(4) and the Court should find that it has personal jurisdiction over Syria. *See Doe*, 2020 WL 5422844, at *12 (concluding that court had personal jurisdiction over Syria after "[s]ervice was executed on Syria . . . through a diplomatic note delivered by the Foreign Interests section of the Embassy of the Czech Republic"); *Ben-Rafael*, 540 F. Supp. 2d at 52 (concluding that court had personal jurisdiction over Iran after "the Swiss foreign ministry served the documents on the Iranian Ministry of Foreign Affairs" and they were returned "to the Swiss foreign ministry without comment").

Turning to Iran, the undersigned finds that Plaintiffs failed to attempt service pursuant to section 1608(a)(3) before serving Iran pursuant to section 1608(a)(4) and thus have not complied with the strict requirements of section 1608(a). On July 19, 2017, Plaintiffs requested an attempt of diplomatic service pursuant to section 1608(a)(4). ECF No. 7. In support of that request, Plaintiffs correctly explained that there was no special arrangement between Iran and Plaintiffs for service under section 1608(a)(1) and that the United States has no treaty relations with Iran that provide for service of process in civil matters pursuant to section 1608(a)(2). *Id.* at 2; *see also Ben-Rafael*, 540 F. Supp. 2d at 52 (recognizing that Iran is not a party to an international

convention on service of judicial documents, so service under 1608(a)(2) is impossible); *Roth*, 78 F. Supp. 3d at 396 (same); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 70 (D.D.C. 2010) (same). As for section 1608(a)(3), Plaintiffs sought to avoid service thereunder based on a then-current—but, as will be seen, incorrect—version of this Court's Attorney Manual for Service of Process on a Foreign Defendant ("Attorney Manual"). The Attorney Manual stated at that time that, because service by mail or courier on Iran pursuant to section 1608(a)(3) were frequently futile, Iran could be served "directly through diplomatic channels [under section 1608(a)(4)] without attempting service under any other provision first." ECF No. 7 at 1. Accordingly—and not unreasonably given the procedures suggested by this Court's Attorney Manual—Plaintiffs made no attempt to serve Iran by mail or courier pursuant to section 1608(a)(3) and instead "request[ed] service on [Iran] directly through diplomatic channels" pursuant to section 1608(a)(4). *Id.*

Pursuant to Plaintiffs' request to attempt service under section 1608(a)(4), the Clerk of the Court mailed the documents to the Department of State. ECF No. 8. In response, the Department of State contacted Plaintiffs and explained that "[w]hile [the Department's] experience has been that attempts at service of a summon and complaints on [Iran] by mail or courier pursuant to Section 1608(a)(3) are unsuccessful, [the Department] [cannot] rely on the attorney manual as an authority that Section 1608(a)(3) in inapplicable in the instate case." ECF No. 9-2 at 1–2. The Department further asked that "[i]f the court has directed service pursuant to 1608(a)(4), please provide a copy." *Id.* at 2. Interpreting the Department's response to suggest that service pursuant to section 1608(a)(3) could be skipped if authorized by a court order, on December 19, 2017 Plaintiffs filed a motion requesting to proceed with service under section 1608(a)(4), without first attempting service under section 1608(a)(3). ECF No. 9. In that motion, Plaintiffs again explained

that service was not available pursuant to sections 1608(a)(1) and (2) and that "Plaintiffs have made no attempt to serve [Iran] using procedures employed in [section 1608(a)(3)], as [Plaintiffs] relied entirely and in good faith upon the procedure outlined by this Court's Attorney Manual . . . ." *Id.* at 3.  On December 22, 2017, this Court granted Plaintiffs' motion, "permit[ing] [Plaintiffs] to proceed with service . . . through diplomatic channels, in accordance with the requirements of [section 1608(a)(4)]," and directed the Clerk of the Court to transmit the documents to the Department of State.  ECF No. 10.

That Order appears to have been in error.  In *Abedini v. Islamic Republic of Iran*, this Court explained that the "[section 1608 service] requirements are jurisdictional and strictly construed." No. 18-588, 2019 WL 3037518, at *2 (D.D.C. July 11, 2019).  Because section 1608(a)'s service requirements are jurisdictional, when serving a foreign state under section 1608(a), this Court has found that "a near miss is still a miss," and emphasized that "[c]ourt[s] [have] no authority to create equitable exceptions to jurisdictional requirements."  *Azadeh v. Islamic Republic of Iran*, 318 F. Supp. 3d 90, 100 (D.D.C. 2018) (internal quotation marks omitted) (quoting *Bowles v. Russell*, 551 U.S. 205, 214 (2007)).

Plaintiffs are not the first to rely on that error in the Court's Attorney Manual to their detriment.  *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 249 F. Supp. 3d 557, 558–59 (D.D.C. 2017) (concluding that it was improper to skip service on Iran pursuant to subsection (a)(3), notwithstanding the statement from the Attorney Manual); *Estate of Hirschfeld v. Islamic Republic of Iran*, 235 F. Supp. 3d 45, 47 (D.D.C. 2017) (same).  In *Azadeh*, for example, this Court found that it lacked personal jurisdiction over Iran where the plaintiff failed to follow the strict order of preference set forth in 1608(a).  In that case, the plaintiff, relying on this Court's Attorney Manual, first served Iran pursuant to section 1608(a)(4), without attempting service under section

1608(a)(3).  *Azadeh*, 318 F. Supp. 3d at 93–95.  Later realizing that skipping section 1608(a)(3) was an error, the plaintiff attempted service under section 1608(a)(3) to cure the error.  *Id.* at 94–95.  Nevertheless, this Court concluded that it "ha[d] no choice but to conclude that [the plaintiff] ha[d] [still] not effectively served [Iran] under the FSIA, because her prior service under section 1608(a)(4) was invalid, and [ ] she ha[d] not undertaken to re-serve [Iran] under that section [after] . . . establish[ing] that service by mail under section 1608(a)(3) was ineffective in [the] case."  *Id.* at 98.  So, notwithstanding the error in this Court's Attorney Manual, the case law is clear that even in a case against Iran, a plaintiff *must* attempt service pursuant to subsection (a)(3) *before* subsection (a)(4) in order to comply with section 1608(a).  *See Estate of Hirshfeld*, 235 F. .Supp. 3d at 47–48 ("[T]he statutory scheme clearly contemplates steps that must be taken in a particular sequence in order to properly effectuate service" and that clear language "provides that service may be . . . made [on Iran] pursuant to section 1608(a)(4) *only* . . . if service cannot be made within 30 days under [section 1608(a)(3)]." (emphasis adde));  *Karcher*, 249 F. Supp. 3d at 559 ("[A]s [the plaintiffs] did not attempt service [on Iran] pursuant to section 1608(a)(3) *prior* to attempting service pursuant to section 1608(a)(4), their motion to deem service effective must be denied to the extent it is predicated on section 1608(a)(4).").

Plaintiffs may contend that they have complied with section 1608(a) by showing that service on Iran by mail, pursuant to section 1608(a)(3), is effectively unavailable because it would be futile.  *See* ECF No. 9 at 2, 4 (explaining in the motion requesting an order allowing service under section 1608(a)(4) that service under section 1608(a)(3) is "frequently futile"); *see also Ben-Rafael*, 540 F. Supp. 2d at 52 ("Plaintiffs must attempt service by the first method [prescribed by section 1608(a)] (or determine that it is unavailable) before proceeding to the second method, and so on.").  But that argument—that service by mail is unavailable as to Iran—was squarely rejected

by this Court in *Azadeh* when it noted that "[Iran] has never filed a categorical objection to service by mail" and recognized that "it has long been clear from this [Court's] case law that Iran accepts service through the procedures laid out in section 1608(a)(3) with some frequency." 318 F. Supp. 3d at 99 (citing cases where Iran has accepted service by mail). "Therefore, it cannot be said that section 1608(a)(3) is a categorically 'unavailable' method for serving Iran, which means [Plaintiffs] had an obligation to at least try to serve [Iran] under that FSIA provision for a period of thirty days prior to pursuing the method of service laid out in section 1608(a)(4)." *Id.*

Plaintiffs may also argue that given their good faith reliance on this Court's Attorney Manual, it would be inequitable to conclude that they have failed to comply with section 1608(a). This argument too was rejected by this Court in *Azadeh* when it recognized that "[i]t is truly unfortunate that the Attorney Manual published on this [Court's] website led [the plaintiff] to believe [she could skip section 1608(a)(3)] at the time she consulted it[,] [b]ut [that] fact [was] unavailing, because courts in this district have long recognized that the Manual's advice is wrong [with respect to section 1608(a)]." 318 F. Supp. 3d at 99–100 (italics omitted) (collecting cases finding that the Attorney Manual is incorrect with respect to service on Iran). Nor does it matter that Plaintiffs successfully served Iran pursuant to section 1608(a)(4), as the D.C. Circuit has "made clear that neither a plaintiff's 'substantial compliance' with the requirements of section 1608(a) nor a defendant's 'actual notice' of the pertinent lawsuit obviates the need to strictly adhere to section 1608(a)'s mandates." *Id.* at 100 (quoting *Barot*, 785 F.3d at 27); *see also Estate of Hirshfeld*, 235 F. Supp. 3d at 47–48 (refusing to find effective service where the plaintiff successfully served the foreign state under section 1608(a)(4) but did not first attempt service under section 1608(a)(3)). Last, Plaintiffs may argue that service pursuant to section 1608(a)(4) was proper here because it was authorized by a court order. But the undersigned could find no

case suggesting that the jurisdictional requirements of section 1608(a) could be circumvented by court order.  Indeed, it is well-established that courts "[have] no authority to create equitable exceptions to jurisdictional requirements," *Bowles,* 551 U.S. at 214, and "lack of personal jurisdiction over Iran [ ] is not a waivable or otherwise excusable defect in this context," *Azadeh*, 318 F. Supp. 3d at 100.

Lacking proper service on Iran under section 1608(a), this Court does not have personal jurisdiction over Iran.  Accordingly, the Court should deny Plaintiffs' motion for default judgment against Iran and direct them to serve Iran consistent with sections 1608(a)(3) and (a)(4).  To avoid further confusion regarding what "strict adherence" to section 1608(a) requires, Plaintiffs should be directed not only to attempt service on Iran pursuant to section 1608(a)(3), but if that service is ultimately unsuccessful, to re-attempt service on Iran pursuant to section 1608(a)(4), in that order. *See Azadeh*, 318 F. Supp. 3d at 100 (concluding that where a plaintiff mistakenly skipped service on Iran under 1608(a)(3), she had to first seek to effect service by mail under 1608(a)(3) to cure the error and then attempt to re-serve the foreign state under section 1608(a)(4)).

## B.    Subject-Matter Jurisdiction

Having concluded that the Court has personal jurisdiction over Syria, but not Iran, the undersigned turns to the Court's subject-matter jurisdiction over Plaintiffs' claims against Syria. Section 1330(a) of Title 28 of the United States Code grants district courts original subject-matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions, (2) as to any claim for relief *in personam*, (3) against a foreign state, (4) provided that the foreign state is not entitled to immunity under sections 1605 to 1607 of the FSIA.  28 U.S.C. § 1330(a); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *Reed*, 845 F. Supp. 2d at 210. The first three factors are easily met here:  Plaintiffs filed a nonjury civil action, seeking *in*

*personam* relief, against a foreign sovereign, Syria.  *See generally* ECF No. 1; *see also Thuneibat*, 167 F. Supp. 3d at 34 (finding that lawsuit alleging civil federal and other tort claims against Syria and seeking damages for harm caused by suicide bombing satisfied first three requirements for subject-matter jurisdiction under section 1330).  With respect to the fourth requirement—whether the foreign state is entitled to immunity—Plaintiffs argue that the FSIA's "terrorism exception" to sovereign immunity applies here because Syria provided material support to ISI, which killed Ms. Parhamovich.  ECF No. 36-1 at 41–46.  The FSIA's "terrorism exception" will apply if the party seeking relief establishes the following:  (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred"; (2) "the claimant or the victim was, at the time the act . . . occurred [ ] a national of the United States"; (3) the plaintiffs seek monetary damages "for personal injury or death that was caused by torture, extrajudicial killing, aircraft sabotage,  hostage taking, or the provision of material support or resources for such act"; and (4) "[the] act, or the provision of material support or resources for the act, is engaged in by an official, employee, or agent of the foreign state."  28 U.S.C. § 1605A(a)(1), (2); *see also Mohammad v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).[4]  These four requirements are addressed in turn below.

    1.    State Sponsor of Terrorism

The United States has designated Syria as a state sponsor of terrorism continuously since 1979, including in 2017 when the attack on Ms. Parhamovich's vehicle occurred.  ECF No. 36-1 at 11; *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 17, 2021).  Accordingly, "the foreign state was designated as a state

---

[4] Section 1605A(a)(2)(A)(iii) also requires that, in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant must afford the foreign state a "reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration."  Because the attack at issue here occurred in Iraq, Plaintiffs do not need to satisfy the arbitration requirements.  ECF No. 36-1 at 48; *see also Thuneibat*, 167 F. Supp. 3d at 35 (holding that the plaintiffs did not need to satisfy the arbitration requirement because they brought suit against Syria for a terrorist attack that occurred in Jordan).

sponsor of terrorism at the time the act . . . occurred." 28 U.S.C. § 1605A(a)(2)(A)(i)(I); *Thuneibat*, 167 F. Supp. 3d at 34 (finding Syria to be a state sponsor of terrorism under the FSIA terrorism exception when defendant was designated as such by the Department of State).

### 2.    Plaintiffs' Citizenship

Plaintiffs meet the citizenship requirement imposed by the FSIA.  Plaintiffs submitted birth certificates, marriage certificates, and sworn declarations, which establish their status, and the status of Ms. Parhamovich, as United States citizens at the time of the attack.  *See* ECF No. 36-1 at 9–10 (noting that all plaintiffs are natural born United States citizens and immediate family members of Andrea Parhamovich); ECF Nos. 37-1, 37-2, 36-3 (declaration of the personal representative of the estate of Andrea Parhamovich, probate letters of authority, and birth certificate of Andrea Parhamovich); ECF Nos. 36-13, 36-15, 36-17, 36-19, 36-21 (declarations, birth certificates, and marriage certificate for Vicki Parhamovich and André Parhamovich, Andrea Parhamovich's parents); ECF Nos. 36-23, 36-25, 36-27 (declaration, birth certificate, and marriage certificate for Marcella Zampini, Andrea Parhamovich's sister); ECF Nos. 36-29, 36-31, 36-33, 36-35 (declarations and birth certificates for Chris Parhamovich and Cory Parhamovich, Andrea Parhamovich's brothers).

### 3.    Extrajudicial Killing

An "[e]xtrajudicial killing" is defined for purposes of the FSIA (by means of the Torture Victim Protection Act of 1991) as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Torture Victim Protection Act, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1991) (codified at 28 U.S.C. § 1350 note); *see also* 28 U.S.C. § 1605A(h)(7) (defining "torture" and "extrajudicial killing" by reference to the Torture Victim

Protection Act).  The D.C. Circuit has interpreted this definition to include three elements:  "(1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a constituted court." *Owens*, 864 F.3d at 770.  A coordinated ambush of a vehicle convoy that resulted in the death of Ms. Parhamovich would plainly meet those requirements.  ECF No. 36-1 at 59–61; *see Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 175 (D.D.C. 2019) (finding that "detonat[ing] in close proximity to a government building" a "vehicle loaded with explosives" qualifies as deliberated killing); *Thuneibat*, 167 F. Supp. 3d at 36 (finding that the plaintiffs had establish extrajudicial killing where the victims were killed in coordinated suicide bombings at hotels).

### 4.    Material Support

The last requirement for establishing jurisdiction under the FSIA's "terrorism exception" is that the act, or the provision of material support or resources for the act, is engaged in by an official, employee, or agent of the defendant.  28 U.S.C. § 1605A(a)(1).  For this factor, "courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act."  *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

Material support or resources is defined under the FSIA as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials."  18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the

purposes of the FSIA to have the "meaning given that term in section 2339A of title 18."). Although evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, successful showings have generally focused on the foreign state's offer of haven to the terrorist group, provision of financing and weapons, assistance with recruitment, or motive to foment unrest in a particular area where the group is operating. *See generally W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 136 (D.D.C. 2019) (finding that Iran provided material support to the Badr Organization through support of efforts to overthrow Sunni rule in Iraq and direct funding); *Thuneibat* 167 F. Supp. 3d at 36 (finding Syria provided material support by allowing AQI to operate and plan terrorist attacks from within Syria and by providing essential financing to the group); *Gates*, 580 F. Supp. 2d at 68–69 (finding Syria provided material support to AQI by offering it a haven for its operations, and by supporting its training and recruitment efforts); *Ben-Rafael*, 540 F. Supp. 2d at 54 (finding that Iran provided material support to Hezbollah by funding training camps).

Any material support must also act as a legally sufficient cause of the attack; however, "a plaintiff need not establish that the material support or resources provided . . . contributed directly to the act from which [the] claim arises." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998). There must only be "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered." *Owens v. Republic of Sudan,* 826 F. Supp. 2d 128, 151 (D.D.C. 2011) (quoting *Valore*, 700 F. Supp. 2d at 66). In order to establish this reasonable connection, a defendant's actions must first, "be a 'substantial factor' in the sequence of events that caused the plaintiff's injury," and second, "the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 368 (D.D.C. 2020) (quoting *Owens*, 864

F.3d at 794).  Evidence found to sufficiently prove that a foreign state's actions were a "substantial factor" in the sequence of events culminating in the plaintiff's injuries include substantial financial support, logistical support for insurgent training, provisions of weapons, and bolstering of operational capacity.  *See id.* (finding Iran's support of Hamas was a substantial factor in the terrorist attack because it provided financial and military aid crucial to the terrorist organization's operating capacity).  Evidence found sufficient to prove that a plaintiff's injury was a "reasonably foreseeable consequence" of a foreign state's actions focuses on whether the action leading to injury fits into the "broader geopolitical strategy" being advanced by the defendant state's material support.  *Force*, 464 F. Supp. 3d at 369; *see W.A.*, 427 F. Supp. 3d at 136 (finding "reasonable connection" where "[p]laintiffs presented expert testimony that Iran's support for the [terrorist organization] was provided for the purpose of allowing the [terrorist organization] to commit precisely the types of terrorist attacks at issue, so as to 'creat[e] instability inside Iraq, [and] placing the responsibility for the chaos on the United States and its Iraqi partners'" (quoting the record)).

> a.    *Whether a terrorist organization carried out the attack*

With respect to the first consideration—whether "a particular terrorist group committed the terrorist act," *Gates*, 580 F. Supp. 2d at 67—Plaintiffs assert that the attack was carried out by ISI and provide evidence sufficient at the default stage to demonstrate that ISI perpetrated the attack ECF No 36-1 at 8.  In support, Plaintiffs rely on an ISI statement claiming responsibility for the attack, an expert declaration provided by Charles Lister,[5] U.S. intelligence reports, and an incident report completed by Unity Resources Group ("URG"), NDI's private security contractor.

---

[5] The undersigned finds that Mr. Charles Lister is qualified as an expert on conflict and counter-terrorism issues related to Syria. He has been qualified as an expert witness in federal court and currently serves as a Senior Fellow and the Director of Countering Terrorism and Extremism at the Middle East Institute. Mr. Lister has testified before the House Committee on Foreign Affairs and the U.K. Parliamentary Defence Committee on issues related to Syria and Iraq. He has been a guest speaker at government agencies including the U.S. State Department, the Central Intelligence Agency, the Federal Bureau of Investigation, and the National Security Agency, among others.  *See* ECF No. 36-37 at 1–3.

Beginning with the ISI statement, Plaintiffs explain that ISI took credit for the attack the following

day through a statement released by its "Ministry of Information" on the World News Network, a

website frequently used to make such announcements. *Id*. at 19.  The statement issued said:

> With the blessing of Allah, two four-wheel-drive vehicles owned by the Zionist
> Mossad were destroyed in the Yarmouk neighborhood in the state of Baghdad.  All
> persons boarding the car have been killed after they have been attacked by light and
> medium-size weapons and RBG rockets.   Another third vehicle was severely
> damaged as well in the attack that took place on Wednesday the 28th day of Dhul
> Hijjah of the year 1427 which corresponds to [January 17, 2007].  All grace and
> praise are due to Allah.

ECF No. 36-1 at 19 (footnotes omitted).  Plaintiffs state that this is an English-language translation

of the statement.  *Id*. at 19–20 (also explaining that "Plaintiffs' expert Charles Lister "used Arabic

language contained within the original statement, including the title, to perform an online search

for the statement, which he found on the original 'w-n-n-.com' forum and on another online forum

used by extremists").   The statement thus describes a convoy of three vehicles, the number of

vehicles included in Ms. Parhamovich's convoy,  which were  attacked  in  the  Yarmouk

neighborhood on January 17, 2007,  which  is  the  location  and  date  of  the  attack  on  Ms.

Parhamovich's convoy.  *See id*. at 8, 11.  Additionally, the attack on Ms. Parhamovich's convoy

destroyed two vehicles and damaged another vehicle, as the ISI statement describes.  ███████

███████████████████████████████████████████████

██████████████   Although the statement describes the target vehicles as belonging

to "Zionist Mossad," i.e., the Israeli intelligence service, Plaintiffs' expert, Charles Lister, explains

that that mistake was "a common one for the ISI, which viewed the presence of an American-led

'occupation' in Iraq as part of a so-called Zionist conspiracy against the Islamic world."  ECF No.

36-37 at 24.  In addition to ISI's claim of responsibility, Plaintiffs point to a U.S. intelligence report

on the attack that "described the insurgent group responsible for the attack as an Islamic jihadist

group with ties to al-Qaeda." ECF No. 36-1 at 20. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

  Plaintiffs further contend that "[t]he political and conflict context" at the time of the attack "further indicates that [ISI] perpetrated the attack." *Id.* at 24. As Mr. Lister explains, early-2007 was "an especially conflict-intense [time] in Iraq" because "Iraq['s] fledgling political system was beginning to take shape—particularly in the period preceding the January 2007 attack" and the "consolidation of parliamentary democracy in Iraq, support by the U.S. and international community was precisely the eventuality that [ISI] defined itself in existence to oppose." ECF No. 36-37 at 27–28. So, "[ISI had] even greater incentives to escalate its violence and terrorist activities . . . fueled all the more by the fact that the U.S. and allies retained tens of thousands of military troops across Iraq, some of whom were being accused in international media of criminal acts." *Id.* at 28. Mr. Lister also explains that "[g]iven the IIP's prominent involvement in Iraqi politics as an openly Islamic political party, [ISI] was almost certain to have been keeping [the IIP] headquarters under a constant watch for potential targets." *Id.* at 25. According to Mr. Lister, Ms. Parhamovich's 72-minute visit to the IIP headquarters "would have provided ample time for [ISI] operatives to have made the necessary preparation for an ambush nearby" and that the Yarmouk neighborhood "[was a] known [ISI] stronghold[ ]" at the time. *Id.*. ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

██ Nevertheless, based on all of the other evidence, as well as ISI's "clear agenda to attack Western, and particularly American 'soft' (i.e. civilian) targets" and the fact that "the NDI represented, in the eyes of [ISI], an arm of America's effort to occupy Iraq and force un-Islamic democracy upon its people" Mr. Lister concluded "with a high degree of certainty" that ISI was responsible for the attack. *Id.* at 27. Indeed, Mr. Lister stated that "[t]he attack itself, its target, methods, weapons used, and claim of responsibility all fit within [ISI's] modus operandi, and there exists no credible denial" that ISI carried out the attack. *Id.*

Taken together, this evidence paints a clear picture that it was ISI that perpetrated the attack that killed Ms. Parhamovich. *See Thuneibat*, 167 F. Supp. 3d at 36 (finding AQI responsible for a terrorist attack based on claims of responsibility it made shortly after the attack); *Gates*, 580 F. Supp. 2d at 58 (finding that al-Qaeda publishing propaganda on the Internet glorifying beheading videos indicated their responsibility for attack); *Doe,* 2020 WL 5422844, at *2, 8–11 (finding that Plaintiffs provided sufficient evidence that ISIS carried out the bombing by pointing to ISIS statements claiming responsibility and expert testimony explaining that the claim of responsibility was consistent with ISIS' past claims of responsibility).

>        b.      *Whether Syria provided material support or resources to ISI*

With respect to the second step in the analysis—whether "[Syria] generally provided material support or resources to [ISI]," *Gates*, 580 F. Supp. 2d at 67—Plaintiffs contend that Syria provided material support and resources to ISI, including haven, training, and facilitating a pipeline of fighters into Iraq, at the time of the attack that led to Ms. Parhamovich's death. The undersigned finds that Plaintiffs' proof in that regard is satisfactory at the default stage. As a preliminary

matter, this Court has found on multiple occasions that Syria provided material support to ISI's predecessor, AQI, as well as to ISI's successor, ISIS. *See Thuneibat*, 167 F. Supp. 3d at 36 ("The plaintiffs have supplied satisfactory proof that the [Syria] provided material support to Zarqawi and AQI, enabling them to perpetrate these attacks."); *Gates*, 580 F. Supp. 2d at 67 ("Syria in fact did provide material support and resources to Zarqawi and al-Qaeda in Iraq. . . ."); *Doe*, 2020 WL 5422844, at *11 ("[Plaintiff's] evidence is sufficient at the default stage to establish that Syria provided material support and resources to ISIS); *Sotloff v. Syrian Arab Republic*, __ F. Supp. 3d. __, __, 2021 WL 965882, at * 12 (D.D.C. 2021) ("[T]he Court finds that Syria, consistent with its support of ISIS's predecessor organizations, provided ISIS support through the release of prisoners, financial assistance in the form of oil purchases and access to the international financial system, and strategic military cooperation that served the needs of the Assad regime.").

In those cases, this Court described the history of Syria's support for AQI, through the 2000s. For example, in *Sotloff*, this Court explained that the "Syrian government support for the terrorist network that morphed into ISIS goes back many years" and "[t]he United States' invasion of Iraq in March 2003 opened a new chapter in Syria's role supporting Zarqawi's organization." __ F. Supp. 3d at __, 2021 WL 965882, at *1–2 (internal quotations omitted) (quoting expert testimony). Over the years, "Syria became 'a transit station for al-Qaeda foreign terrorist on their way to Iraq,' as Zarqawi facilitated the flow of 'money, of weapons, and terrorists intent on killing U.S. coalition forces and innocent Iraqis.'" *Id.* at *2 (quoting expert testimony). According to former Syrian intelligence officials, "Syria's policy toward the Zarqawi organization from 2002 to 2010 was for Syrian intelligence officers to 'not investigate, surveil, assist, or arrest such militants unless the top (officials) of the government wish[ed] it.'" *Id.* (alterations in original) (quoting affidavit). In *Doe*, this Court detailed the close relationship between certain AQI recruiters and

the Syrian government.  *Doe*, 2020 WL 5422844, at *9.  One recruiter, Abu Qaqaa, "maintained

[such] a strong relationship with the Syrian regime" that "by the time of his assassination in 2007

he was considered 'to be an agent of the Syrian state.'"  *Id.* (quoting expert declaration).  And that

relationship ultimately "allowed for the rise in status and sophistication of modern-day ISIS."  *Id.*

at *10 ("Over the past decade, the Assad regime's permissive attitude towards al-Qa'ida and their

terrorist groups' foreign terrorist fighter facilitation efforts during the Iraq conflict in turn fed the

growth of al-Qa'ida, ISIS, and affiliated terrorist networks inside Syria." (quoting motion for

default judgment)).  In *Thuneibat*, this Court, relying on an expert declaration of David Schenker,

the Director of the Washington Institute's Program on Arab Politics at the time, explained that the

Syrian government

> provided crucial 'material support' to AQI . . . by (1) providing an established and
> stable 'transit pipeline' such that foreign fighters from other countries were able to
> enter target countries through Syria, (2) allowing AQI supporters and deputies to
> operate in Syria unmolested despite government awareness of their presence and
> terrorist activities, and (3) providing essential financial services to Zarqawi, who
> financed [ ] attacks using funds 'that moved through Syria.

*Thuneibat*, 167 F. Supp. 3d at 36 (internal citations omitted).  Thus, the cases in this district

sufficiently establish Syria's longstanding material support for AQI and its successors over the

years, including ISI and ISIS.  *Cf. Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 33 (D.D.C.

2020) (relying on "the voluminous evidentiary records compiled by other courts in related cases

in this Circuit" to conclude that a foreign state provide material support to a terrorist organization);

*Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214, 2019 WL 3037868, at *4 (relying on

"the reasoning of this district's prior decisions" regarding a foreign state's material support to a

terrorist organization "to be persuasive").

     In any event, Plaintiffs have also offered evidence of their own that is sufficient to show

Syria provided material support to ISI.  Plaintiffs provide expert testimony to explain the context

of that material support, as well as expert testimony and government reports regarding the type of material support provided.  Plaintiffs contend that "during the period of time leading up to the attack," Syria (1) provided haven for ISI in Syria; (2) helped provide passports and medical assistance; (3) "facilitate[ed] recruitment and reception of jihadist volunteers"; and (4) facilitated the "transportation [of those recruits] to the Iraqi border."  ECF No. 36-1 at 29.  To establish this, Plaintiffs rely heavily on Mr. Lister's expert declaration, which in turn relies on extensive open-source reporting, including news articles and documents published by the United States government.  ECF No. 36-37 at 36–52.

To provide context for Syria's support of ISI, Mr. Lister explains that Syria began supporting jihadist groups in the 1990s to weaken its regional foes, but Syria's support for these groups increased substantially after the American invasion of Iraq in 2003.  *Id.* at 5.  After the United States invaded Iraq, Syrian officials publicly stated a "desire to foster an armed insurgency against the United States next-door in Iraq."  *Id.*  In furtherance of Syria's goal to foster that armed insurgency, Mr. Lister testifies that Syria provided a safe haven for ISI jihadists, including senior ISI leadership figures.  For example, Abu Ghadiya, the chief of logistics for ISI, would often meet with the chief of Syria's Intelligence Directorate.  *Id.* at 44.  In his role as chief of logistics, Abu Ghadiya would, according to U.S. intelligence, "obtain[ ] false passports for foreign terrorists, provided passports, weapons, guides, safe houses and allowances for foreign terrorists in Syria" and "played a crucial role in AQI and then the ISI's establishment and maintenance of global[ ]networks."  *Id*. at 44–45.  Additionally, "[a]ccording to Iraqi intelligence, a series of high-level meetings convening Syrian Military Intelligence, [ISI] and Iraqi Baathists in which some of the largest bomb attacks of the Iraq war were planned, were held in Zabadani [,Syria]—likely in what had been Abu Ghadiya's headquarters."  *Id.* at 45.  Also during this time, "AQI and ISI jihadists

injured in Iraq [would] often receive[ ] medical assistance at al-Nur Hospital in Damascus." *Id.* at
48.  And in a public address in September 2004, Ahmed Hassoun, the Syrian Grand Mufti, "lauded
the efforts of '[their] brothers' in AQI and call[ed] on them to 'kill Americans.'" *Id.* at 45.
Following an attack that killed Abu Ghadiya, "the U.S. military officer in charge of operations in
Iraq's western Anbar province, Major General John Kelly, declared that 'the Syrians clearly have
harbored [the ISI] . . . it is a 'sanctuary.'" *Id.* at 46 (alterations in original) (quoting Alex
Kingsbury, *Syrians 'Clearly Have Harbored Al Qaeda in Iraq,' Says U.S. General*, U.S. News &
World Report (Oct. 27, 2008), https://www.usnews.com/news/iraq/articles/2008/10/27/syrians-
clearly-have-harbored-al-qaeda-in-iraq-says-us-general?context=amp   (last   visited   June   23,
2021)).  Similar evidence has been found sufficient in FSIA cases to demonstrate Syria's material
support of terrorist organizations.   *See Gates*, 580 F. Supp. 2d at 69 (finding that
Syria materially supported AQI by providing a logistical hub for its operations and supporting its
recruitment efforts by including one AQI leader on the Syrian payroll); *Wyatt v. Syrian Arab
Republic*, 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (finding Syria provided material support to the
Kurdistan Workers Party ("PKK"), including "safe haven and shelter in Syria to PKK leadership").

Mr. Lister further contends that, according to U.S. Central Command, there were "multiple
[ISI] training camps [ ] in operation on Syrian territory" that sent jihadists into Iraq.  ECF No. 36-
37 at 48.  One U.S. intelligence report stated that one of the camps "may have been run by a
notorious al-Qaeda jihadist, Shaker al-Absi, who among many other things, had allegedly been
centrally involved in the killing of American citizen Laurence Foley . . . from his then base in
Syria" and "[a]fter being sentenced to death in absentia by Jordanian authorities, the Syrian
government claimed it had placed [al-Absi] in prison, but he was in fact thought to have been
released to run AQI and ISI training camps in Syria, preparing jihadists for their transit into Iraq."

*Id.* (citing Michael Weiss and Hassan Hassan, *ISIS: Inside the Army of Terror* 106 (2015)).  And according to records recovered following an attack on an ISI leader in Syria (the "Sinjar Records"), "at least 700 foreign jihadist militants crossed into Iraq from just one ISI crossing point with Syria between August 2006 and August 2007." *Id.* at 49.  Mr. Lister contends that that volume of fighters crossing into Iraq "reveal[s] the scale of the Syrian-based facilitation network" and the "substantial infrastructure that would have had to have been in place inside Syria, the like of which would not feasibly have been invisible or a challenge to disrupt for Syrian authorities." *Id.*  Mr. Lister explains that, in response to "U.S. launched anti-AQI/ISI campaigns in Baghdad . . . Syria escalated its material support to AQI/ISI" and "[b]y 2007, more than 100 jihadists were entering Iraq every month via Syria." *Id.* at 6–7, 47.  Indeed, Syria's support to ISI was at its "highest recorded levels" during "late-2006 and early-2007" when the attack on Ms. Parhamovich occurred. *Id.* at 55.  According to Mr. Lister, Syria's support during this time "was crucially important in invigorating [ISI] in terms of both its military capabilities and internal confidence to counter-American led campaigns in the period immediately leading up to and during the attack on Ms. Parhamovich." *Id.*  Again, similar evidence has been found sufficient in FSIA cases to demonstrate Syria's material support of AQI and ISIS.  *See Thuneibat*, 167 F. Supp. 3d at 36 (relying on an expert declaration and government reports to find that Syria materially supported AQI through establishing a transit pipeline for foreign fighters and allowing AQI to operate unmolested within Syria); *Doe*, 2020 WL 5422844, at *9–11 (relying on an expert declaration and government reports detailing the "significant history of Syria's support for ISIS' predecessor, AQI," as well as Syria's involvement in "smuggling jihadist volunteers into Iraq from Syria after the 2003 invasion," the fact that "Syria's government has allowed ISIS to operate unmolested within Syrian borders," and Syria's "release of jihadists from a prominent Syrian prison" as evidence that Syria provided

material support to ISIS); *Sotloff*, __ F. Supp. 3d at __, 2021 WL 965882, at *12 (finding Syria provided material assistance to ISI, including in the form of training and transportation).

Plaintiffs have also shown that Syria's material support was a legally sufficient cause of the attack on Ms. Parhamovich's convoy.  Recall that Plaintiffs need not demonstrate that Syria specifically intended to cause the attack on Ms. Parhamovich; they need only establish a reasonable connection by showing that Syria's actions were a "substantial factor" resulting in Ms. Parhamovich's death and that Ms. Parhamovich's death was "reasonably foreseeable or anticipated as a natural consequence" of Syria's conduct.  *Force*, 464 F. Supp. 3d at 368.  Here, as mentioned above, Syria's support to ISI was at its "highest recorded levels" during "late-2006 and early-2007" when the attack against Ms. Parhamovich occurred.  ECF No. 36-37 at 55.  And that support "was crucially important to invigorating AQI/ISI . . . in the period immediately leading up to and during the attack on Ms. Parhamovich."  *Id.*  Such evidence is sufficient to show that a foreign state's actions were a "substantial factor" in the sequence of events culminating in the plaintiff's injuries.[6]  *See Doe*, 2020 WL 5422844, at *11 (finding that Syria's support to ISIS was legally sufficient cause of bombing where "Syria's aid to ISIS was essential to strengthening the group's operating capacity"); *Thuneibat*, 167 F. Supp. 3d at 36–37 (finding Syria's material support to AQI was legally sufficient cause of attack where expert declaration "conclu[ded] that '[w]ithout Syria, there would not have been a developed foreign fighter transit pipeline and an advanced funding network undwriting terrorist operation in Iraq. . .'" (quoting an expert declaration); *Force*, 464 F. Supp. 3d at 368 (finding Iran's support of Hamas was a substantial factor in the terrorist attack

---

[6] Importantly, unlike Plaintiffs' evidence with respect to Iran's material support, Plaintiffs have proffered evidence of Syria's material support that predates the attack on Ms. Parhamovich's convoy.  *Compare* ECF No. 36-37 at 36–52, 55 (discussing history of Syria's material support for ISI's predecessor, AQI, as well as the material support provided to ISI in the years and months leading up to the attack on Ms. Parhamovich's convoy), *with* ECF No. 37-43 at 12–14 (citing news articles and Treasury Department press releases that post-date the attack on Ms. Parhamovich's convoy as evidence that Iran provided material support to ISI as of the time of the attack).

because the country provided financial and military aid crucial to the terrorist organization's operating capacity); *Salzman v. Islamic Republic of Iran*, No. 17-2475, 2019 WL 4673761, at *13–14 (D.D.C. Sept. 25, 2019) (finding Iran's support of Hamas to be a substantial factor in a suicide bombing because it provided financial support and support of Hamas' training efforts); *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 48 (D.D.C. 2019) (finding Iran's support of Saraya al-Salam to be a substantial factor in a hostage-taking because it provided weapons, money, and training).

Ms. Parhamovich's death was also a reasonably foreseeable consequence of Syria's actions supporting ISI. *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 394 (D.D.C. 2015) (stating that the FSIA sets a relatively low bar for proximate cause). As explained above, after the U.S. invaded Iraq, Syrian officials publicly stated a "desire to foster an armed insurgency against the United States next-door in Iraq" and by late 2006 and early 2007, in response to "U.S. launched [ ] anti-AQI/ISI campaigns in Baghdad," Syria "escalat[ed] its material support to AQI/ISI" and, as a consequence, "[b]y 2007, more than 100 jihadists were entering Iraq every month via Syria." ECF No. 36-37 at 5, 47, 55. According to Mr. Lister, "attacks on American interests and citizens (like Ms. Parhamovich, for example) were a natural consequence of Syrian policy" during this time. *Id.* at 7. Such evidence is sufficient to establish reasonable foreseeability. *See Roth*, 78 F. Supp. 3d at 394 (finding injuries as a result of a bombing were a foreseeable result of Iran's material support of a terrorist organization because Iran encouraged an increase in terrorist activities); *Wyatt*, 908 F. Supp.2d at 228 (finding injuries as a result of a kidnapping were a foreseeable result of Syria's support of PKK because Syria provided funding to the organization, knowing that they utilized violent tactics).

Accordingly, the undersigned finds that Plaintiffs have shown that Syria provided material support to ISI and the Court has subject-matter jurisdiction over Plaintiffs' claims against Syria.

## C.    Liability

Having addressed personal and subject-matter jurisdiction, the Court must determine whether Plaintiffs have established Syria's liability under a viable cause of action. *See Valore*, 700 F. Supp. 2d at 73. While section 1605A(c) offers a general private right of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force*, 464 F. Supp. 3d at 361. Rather, FSIA plaintiffs are also required "to prove a [specific] theory of liability." *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if plaintiffs have properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA).

The estate of a decedent may bring a wrongful death action, as well as "survival actions." "A survival action is one that accrued in a decedent's favor before [her] death that may be brought after [her] death by [her] estate; in other words, it is a claim that could have been brought by the decedent, had [she] lived to bring it." *Valore*, 700 F. Supp. 2d at 77. Immediate family members of a victim—spouses, parents, siblings, and children—may bring claims for intentional infliction of emotional distress. *Id.* at 78–79. Here, Ms. Parhamovich's Estate pleads three theories of civil tort liability: (1) wrongful death, (2) assault, (3) battery, and Ms. Parhamovich's family members

plead one theory of civil tort liability:  intentional infliction of emotional distress ("IIED")/solatium.  The viability of each is addressed below.

        1.      Wrongful Death

Ms. Parhamovich's Estate alleges that Syria is responsible for the wrongful death of Ms. Parhamovich.  ECF No. 36-1 at 53.  In this district, "a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under section 1605A(c) 'for economic losses which result from a decedent's premature death.'"  *Roth*, 78 F. Supp. 3d at 400 (quoting *Valore*, 700 F. Supp. 2d at 78).  "[A] plaintiff may recover for wrongful death upon a showing that the defendant caused the plaintiff's death."  *Barry*, 437 F. Supp. 3d at 46; *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d at 400 ("Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held 'liable for the economic damages caused to decedents' estates.'" (quoting *Valore*, 700 F. Supp. 2d at 78)); *see also* Restatement (Second) of Torts § 925. Here, Plaintiffs have established that Syria's provision of material support to ISI was a legally sufficient cause of Ms. Parhamovich's death; thus, Plaintiffs satisfy the elements necessary for wrongful death.  *See Roth*, 78 F. Supp. 3d at 400 (finding the defendants liable for wrongful death where the extrajudicial killing was the result of a terrorist bombing for which the foreign state provided material support).

        2.      Assault

Ms. Parhamovich's Estate also alleges, as a survival action, that Ms. Parhamovich was assaulted.  ECF No. 36-1 at 54.  Liability for assault requires showing two elements:  "(1) [the defendants] acted 'intending to cause a harmful contact with . . ., or an imminent apprehension of such a contact' by, those attacked, and (2) those attacked were 'thereby put in such imminent apprehension.'"  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 35 (D.D.C. 2012) (second

alteration in original) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010)) (citing Restatement (Second) of Torts § 21(1)).  The acts which led to Ms. Parhamovich's death were committed with intent to cause harmful contact and put Ms. Parhamovich in imminent apprehension of such contact; indeed, such intent and apprehension "is the entire purpose of terrorism," which Syria sponsored.  *Schertzman Cohen*, 2019 WL 3037868, at *5; *see also Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 36 (D.D.C. 2018) ("'[T]errorism' is defined to mean 'the use of violent acts to frighten the people in an area as a way of trying to achieve a political goal.'") (citing Terrorism, Merriam-Webster Dictionary Online, http://www.merriam-webster.com/dictionary/terrorism).   As Ms. Parhamovich's vehicle was leaving the IIP headquarters, ISI militants opened fire on the car, attempted to gain entry, and rolled a grenade under the vehicle.  ECF No. 36-1 at 8.  This type of contact necessarily results in apprehension of harmful contact.  Based on these facts, Syria's liability for assault has been sufficiently established at this stage.  *See Braun*, 228 F. Supp. 3d at 80 (where a foreign state "provide[s] material support and resources for [an] [a]ttack, they act[ ] 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such contact' with those attacked." (ellipses in original) (quoting Restatement (Second) of Torts § 21(1) (1979))).

3.    Battery

Ms. Parhamovich's Estate also alleges, as a survival action, that Syria is liable for Ms. Parhamovich's injuries under a battery theory.  ECF No. 36-1 at 55.  Syria is liable for battery if, through its material support to ISI, Syria acted "[(1)] 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  *Wultz*, 864 F. Supp. 2d at 36 (second and third alterations in original) (quoting Restatement (Second) of Torts § 13).

Suffering "severe injuries" from an attack qualifies as battery, *see Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017), as does presence at a bombing where the bomb results in "some harmful physical contact," *see Christie v. Islamic Republic of Iran*, No. CV 19-1289, 2020 WL 3606273, at *17 (D.D.C. July 2, 2020).   Again, "[a]cts of terrorism are, by their very nature, intended to harm." *Id.* (quoting *Murphy*, 740 F. Supp. 2d at 73).   As a result of the attack, for which Syria provided material support, Ms. Parhamovich suffered severe injuries when her vehicle exploded.   ECF No. 36-1 at 56.   Ms. Parhamovich's injuries resulted in her death. *Id.*   Accordingly, Plaintiffs have satisfied the elements required for battery. *See Roth*, 78 F. Supp. 3d at 379 (finding plaintiffs stated a valid theory of recovery for battery, brought as a survival action, where Iran provided material support to terrorist organization and victim was killed in terrorist bombing ).

### 4.      Intentional Infliction of Emotional Distress/Solatium

Last, Ms. Parhamovich's immediate family members—her parents and siblings—allege that Syria is liable for their injuries under an IIED/solatium theory.   "Under the FSIA, a solatium claim is indistinguishable from an IIED claim" because "[s]olatium is awarded to compensate 'the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort.'" *Valore*, 700 F. Supp. 2d at 85 (second and third alterations in original) (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)).   Syria is liable for IIED if, through the provision of material support, it "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress," either to the primary victim or "to a member of such person's immediate family who is present at the time." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46).   Although traditionally IIED requires the family member to be present at the event

32

that resulted in the emotional distress, the Restatement "suggests that . . . '[i]f the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person which is not present, no essential reason of logic or policy prevents liability,'" simply because the person was not present.  *Valore*, 700 F. Supp. 2d at 80 (alterations in original) (quoting *Heiser*, 659 F. Supp. 2d at 27).  This Court has found that acts of "[t]errorism, unique among the types of tortious activities in both its extreme methods and aims, passes [that] test easily."  *Id.* (first alteration in original) (quoting *Heiser*, 659 F. Supp. 2d at 27).  So, Plaintiffs may state a claim for IIED even though they were not present at the attack.

Here, Plaintiffs include Ms. Parhamovich's mother, father, sister, and two brothers.  ECF No. 36-1 at 9–10; *Valore*, 700 F. Supp. 2d at 79 (finding that "immediate family" includes "one's spouses, parents, siblings, and children").  Each of Ms. Parhamovich's family members experienced severe emotional distress as a result of the attack and death of Ms. Parhamovich, as detailed in the declarations they submitted in support of their motion for default judgment.  Ms. Parhamovich's mother, Vicki Parhamovich, explains that her daughter's death has "left a void in [her] life that will never be filled" and that "[t]here is a sadness that . . . if [she] allowed [her]self to go [to] [she] might not return."  ECF No. 36-13 at 4.  ███████████████████████████ ████████████████████████████████████  Ms. Parhamovich's father, André Parhamovich, says that he has told his wife ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████  He says that his daughter's death has "altered [him] and [his] family completely."  *Id.* at 4.  Ms. Parhamovich's older sister, Marcella Zampini, explains that she was the first member of the family to learn of her sister's death and that she "had the duty to tell the rest of the family what had

happened." ECF No. 36-23 at 4. Ms. Zampini details the difficult calls she had to make to each member of the family to tell them what had happened to Ms. Parhamovich. *Id.* at 4–6. Ms. Zampini still has nightmares about her sister's death. *Id.* at 9. Ms. Parhamovich's younger brothers, Chris and Cory Parhamovich detail the emotional toll that learning of their older sister's death had on them. Chris Parhamovich states that his sister's death ██████████████████

████████████████████████████████████████████████████████████

████████ Chris Parhamovich explained that ████████████████████████████

████████████████ ████ Cory Parhamovich details having to watch his family, and his parents in particular, suffer and says that he "suffered daily as well." ECF No. 36-33 at 5. ████

████████████████████████████████████████████████████████████

████████████████████ Thirteen years later, Cory Parhamovich says that he still ████████

████████████████████████████ These declarations, describing the emotional toll of Ms. Parhamovich's death on her family, are sufficient to satisfy the elements required for IIED.

In sum, Plaintiffs should be deemed to have sufficiently established all four theories of tort liability at the default stage.

## IV.   CONCLUSION

Given Defendants' failure to respond to the Complaint and the adequacy of the Plaintiffs' Motion for Default Judgment, the undersigned **RECOMMENDS** that the motion for default judgment on liability (ECF No. 37) be **GRANTED** as to Defendant Syria. Due to Plaintiffs' failure to serve Iran in compliance with section 1608(a), the undersigned further **RECOMMENDS** that the motion for default judgment on liability (*id.*) be **DENIED** as to Defendant Iran.

\*     \*     \*     \*

The parties are hereby advised that, under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the report and/or recommendation to which objection is made and the basis for such objections.  The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985).

Digitally signed
by G. Michael
Harvey

Date:  June 23, 2021

G. Michael Harvey
United States Magistrate Judge