**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE ESTATE OF | * | |
| ANDREA S. PARHAMOVICH, *et al.,* | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.  1:17-CV-00061 (FYP-GMH) |
| | * | |
| ISLAMIC REPUBLIC | * | |
| OF IRAN, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR DEFAULT JUDGMENT ON LIABILITY AS TO DEFENDANT IRAN**

**TABLE OF CONTENTS**

I.   INTRODUCTION……………………………………………………….……………..…….…..5

II.  BACKGROUND……………………………………………………………...………..….…6

    A. Procedural History……………………………………………….…..….…6

    B. Plaintiffs………………………………………………………………….……....8

    C. The Murder of Andrea Parhamovich……………………………………………..….8

    D. The Terrorist Organization the Islamic State in Iraq is Responsible for the
       Murder of Andrea Parhamovich…………………………………………………….9

    E. Iranian Material Support of Terrorism……………………………………………...10

    F. Iranian Material Support for Sunni Terrorist Groups in Iraq………………………11

    G. The History of al-Qaeda in Iraq/the Islamic State in Iraq…………..…………….......14

    H. Iran Provided Material Support to the Terrorist Group al-Qaeda and its
       Iraq-based Franchise Al-Qaeda in Iraq/the Islamic State in Iraq……...…..….…….17

III.  STANDARD OF REVIEW………………………………………….……………………24

IV.  PERSONAL JURISDICTION HAS BEEN ESTABLISHED BECAUSE
    THE DEFENDANT WAS PROPERLY SERVED UNDER
    28 U.S.C. § 1608……………………………………………….……………………25

V.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
    FSIA CASE………………………………………………………………….…………26

    A. The Jurisdictional Elements of Subject Matter Jurisdiction Have Been
       Met……………………………………………………………………….……26

       1. Money Damages Against the State for Personal Injury or Death……………….27

       2. Causation……………………………………………………………….……27

    B. The Plaintiffs Have Met the FSIA's Requirements for Having Their
       Claims Heard……………………………………………………………….………31

       1. Iran is a State Sponsor of Terrorism……………………….……………........31

       2. Plaintiffs are Nationals of the United States………………….……………....31

       3. The Arbitration Requirement is Not Applicable as the Attack Occurred in
          Iraq, Not Iran………………………………………………………………32

VI.  PLAINTIFFS HAVE STANDING AND ARE ELIGIBLE TO BRING
    THEIR CLAIMS UNDER THE PRIVATE RIGHT OF ACTION
    PROVIDED BY 1605A(c)…………..……………………….……….……………32

VII. CONCLUSION…………………………………………………………..………...33

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39 (D.D.C. 2008)……………..……...…25, 26

*Espitia v. Islamic Republic of Iran,* 2022 WL 2168355 (S.D. Tex. June 16, 2022)……….…..…12, 24

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)…………………….…..12, 18

*Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50 (D.D.C. 2018)........24

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014)…...............24

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 29 (D.D.C. 2012)………………………........27

*In re Islamic Rep. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009)………..........26, 27

*In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011)……...12, 19

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)……..…………………..…30

*Kilburn v. Socialist People's Libyan Arab Kamahiriya*, 376 F. 3d 1123 (D.C. Cir. 2004)…...……..30

*Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005)………………..………………..30

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011)………………………..……...12, 18

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)……...........10, 24, 25, 27, 28, 29, 30

*Rothstein v. UBS*, 708 F.3d 82 (2d Cir. 2013)……………………………….…….....………………..27

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010)………………………………24

**STATUTES**

22 U.S.C. § 2656f……………………………………..…………………………………..10

28 U.S.C. § 1605A………………………………………………...……..……5, 19, 24, 26, 27, 31, 32

28 U.S.C. § 1608………………………………………………..…………….…6, 7, 8, 24, 25, 26

28 U.S.C. § 1330……………………………………………………..…………………………25

8 U.S.C. § 1101……………………………………………………..…………………………..31

**OTHER AUTHORITIES**

49 Fed. Reg. 2836 (January 23, 1984)……………………………....……...…………………31

64 Fed. Reg. 55112 (October 8, 1999)…………………….…………………………….……….15

**RULES**

Federal Rules of Civil Procedure 55…………………………………...……….…………..24

**LIST OF EXHIBITS**

| Number | Exhibit Description |
|--------|---------------------|
| 1 | Expert Report of Patrick Clawson, Ph.D. |
| 2 | Excerpt, U.S. Dept. of State, *Country Reports on Terrorism 2018*, U.S. Dept. of State Website (2019) |
| 3 | Federal Research Division, *Iran's Ministry of Intelligence and Security: A Profile*, Library of Congress (2012) |
| 4 | Excerpt, National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States* ("9/11 Report") (2004) |
| 5 | Expert Report of Daveed Gartenstein-Ross, Ph.D. |
| 6 | *Remarks by President Trump on Iran Strategy*, The White House (Oct. 13, 2017) |
| 7 | U.S. Dept. of Treasury, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency*, U.S. Dept. of Treasury Press Center (Jan. 9, 2008) |
| 8 | Newsweek Staff, *Tehran's Secret 'Department 9000'*, Newsweek (Jun. 3, 2007) |
| 9 | U.S. Dept. of Treasury, *Treasury Targets Oil Smuggling Network Generating Hundreds of Millions of Dollars for Qods Force and Hizballah*, U.S. Dept. of Treasury Press Center (May 25, 2022) |
| 10 | U.S. Dept. of State, *Designation of the Revolutionary Guard Corps* (Apr. 8, 2019)) |
| 11 | U.S. Dept. of Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012) |
| 12 | U.S. Dept. of Treasury, *Treasury Designates Six Al-Qaida Terrorists*, U.S. Dept. of Treasury Press Center (Sept. 24, 2003) |
| 13 | U.S. Dept. of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (Oct. 15, 2004) |
| 14 | U.S. Dept. of State, *Foreign Terrorist Organizations*, U.S. Dept. of State Website (2022) |
| 15 | Supplemental Expert Report of Patrick Clawson, Ph.D. |
| 16 | U.S. Dept. of Treasury, *Treasury Targets al Qaeda Operatives in Iraq*, U.S. Dept. of Treasury Press Center (Jan. 16, 2000) |
| 17 | Bryce Loidolt, *Al-Qaeda's Iran Dilemma: Evidence from the Abbottabad Records*, Studies in Conflict & Terrorism (2020) |
| 18 | U.S. Dept. of Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point*, U.S. Dept. of Treasury Press Center (Jul. 28, 2011) |
| 19 | *U.S. Says Iran Harbors al Qaeda Associate*, Washington Times (Jun. 10, 2003) |
| 20 | Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S. American Defense Official Calls Release 'Obviously Troubling,'* Washington Post (Dec. 30, 2006) |
| 21 | U.S. Dept. of Treasury, *Treasury Designations Target Terrorist Facilitators*, U.S. Dept. of Treasury Press Center (Dec. 7, 2006) |

## I.      INTRODUCTION

Plaintiffs, Vicki Parhamovich, on behalf of herself and the Estate of Andrea Parhamovich, André Parhamovich, Marcella Zampini, Chris Parhamovich and Cory Parhamovich, bring this action against the Islamic Republic of Iran ("Iran") under the state sponsor of terrorism exception to the foreign sovereign immunities act ("FSIA").  28 U.S.C. § 1605A.  Iran provided material support and resources to the terrorist group al-Qaeda in Iraq ("AQI") a/k/a the Islamic State in Iraq ("ISI").  On January 17, 2007, AQI/ISI ambushed Andrea Parhamovich in her armored vehicle in an apparent kidnapping attempt, which resulted in her death.  This Court has found that AQI/ISI perpetrated the attack against Andrea Parhamovich, and that the Syrian Arab Republic ("Syria") is liable for the death of Andrea Parhamovich for its material support of AQI/ISI.  ECF Nos. 40, 51 & 52.  Plaintiffs herein will show that Defendant Iran is also liable for the death of Andrea Parhamovich for its material support of AQI/ISI.  In support for their motion for default judgment on liability against Defendant Iran, plaintiffs submit reports from expert witnesses, Patrick Clawson, Ph.D.,[1] an expert on Iran, Daveed Gartenstein-Ross, Ph.D.,[2] an expert on violent non-state actors, Charles Lister,[3] an expert on conflict and counter-terrorism issues, and documentary evidence.

---

[1] Plaintiffs' expert on Iran, Patrick Clawson, Ph.D., is an expert on Iran's sponsorship of terrorism.  He is the Director of Research at the Washington Institute for Near East Policy where he supervises a staff of about twenty senior researchers who study Middle East politics and terrorism, with focus on Iran.  Dr. Clawson has testified about Iran before the House International Relations, National Security, and Banking and Financial Services Committees, as well as the Senate Foreign Relations and Banking Committees.  He has published over forty scholarly articles.  His Ph.D. in Economics is from the New School for Social Research.

[2] Plaintiffs' expert on violent non-state actors, Daveed Gartenstein-Ross, Ph.D., is the Chief Executive Officer of Valens Global, a Non-Resident Fellow at the Foundation for the Defense of Democracies, and an Associate Fellow at the International Centre for Counter-Terrorism – The Hague.  He previously served as a Senior Advisor to the Director of the U.S. Department of Homeland Security's Office for Community Partnerships and an Adjunct Assistant Professor in Georgetown University's Security Studies Program. Dr. Gartenstein-Ross specializes in studying jihadist movements, including undertaking detailed research into Sunni terrorist groups operating in Iraq.

[3] In his June 23, 2021 Report and Recommendation, Magistrate Judge Harvey found Plaintiffs' expert Charles Lister qualified as an expert on conflict and counter-terrorism issues related to Syria.

## II.     BACKGROUND

### A.  Procedural History

Plaintiffs commenced this action on January 11, 2017, against Defendants Syria and Iran under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). ECF No. 1.    Plaintiffs first pursued service against Syria under 28 U.S.C. § 1608(a)(3), and then when unsuccessful, via diplomatic service pursuant to 1608(a)(4).  ECF Nos. 11 & 4.  Service was completed on Syria on September 20, 2018.  ECF No. 20.

When attempting service on Iran, plaintiffs relied on the then-current Court Attorney's Manual for Service of Process on a Foreign Defendant, and sought service directly through diplomatic channels pursuant to 1608(a)(4).  ECF No. 7.  The Department of State asked plaintiffs if there was a court directive for service under 1608(a)(4), and plaintiffs subsequently requested and received an order of the Court (Brown Jackson, J.) allowing plaintiffs to proceed with service under 1608(a)(4). ECF No. 9-2 at 1-2 & ECF No. 10.  Service was completed on Iran on February 25, 2018. ECF No. 18.

The Clerk entered default against both defendants on January 16, 2019.  ECF No.22.

In anticipation of filing their motion for default judgment against both defendants, plaintiffs sought leave with the court to file a memorandum in support of their motion for default judgment in excess of the 45 pages allowed under LCvR 7(e).    ECF No. 29.  In response, the Court (Brown Jackson, J.) ordered plaintiffs to file a memorandum in support of default judgment in no more than 65 pages (not including declaration and attachments).  Plaintiffs then filed a motion to bifurcate the liability and damages phases of the proceedings in order to avoid prejudice from the 65-page word limitation. ECF No. 30.  On September 17, 2020, the Court (Brown Jackson, J.) granted the motion for bifurcation.

On March 3, 2021, plaintiffs filed a motion for default judgment as to liability only against both Defendants Syria and Iran, with an accompanying memorandum of points and authorities in support of plaintiffs' motion for default judgment on liability addressing arguments relevant to personal jurisdiction, subject matter jurisdiction, and the standard for default judgment under the FSIA. ECF Nos. 36 & 37.

On June 23, 2021, United States Magistrate Judge G. Michael Harvey issued a Report and Recommendation recommending that plaintiffs' motion for default judgment as to liability be granted as to Syria. ECF No. 40 at 34.

Magistrate Judge Harvey recommended denial as to Iran for plaintiffs' court-sanctioned service of process methods pursuant to 1608(a). The Magistrate Judge's sole reason for recommending that plaintiffs' motion for default judgment on liability as to Iran be denied was due to the Magistrate's analysis that section 1608(a)'s service of process requirements are jurisdictional, and a plaintiff must attempt service under subsection (a)(3) before subsection (a)(4) in order to comply with section 1608(a). ECF No. 40 at 11. The Magistrate recognized that plaintiffs had received a Court order to serve Iran directly via 1608(a)(4) but determined that the court-sanctioned method was erroneous and fatal as to Iran.

Five days after the Magistrate's Report and Recommendation was filed, this case was reassigned to the Calendar Committee for oversight due to the elevation of the presiding judge, Judge Ketanji Brown Jackson, to the U.S. Court of Appeals for the D.C. Circuit. On October 1, 2021, this case was directly reassigned to this Court (Pan, J.).

During this time, plaintiffs re-sought service against Iran first under 1608(a)(3) on August 10, 2021, which failed. ECF No. 45. On September 17, 2021, plaintiffs then requested service again under 1608(a)(4) through the U.S. Department of State's Office of the Legal Advisor. ECF Nos. 47 & 48.

On February 16, 2022, plaintiffs filed a motion to adopt the Magistrate's recommendation to grant plaintiffs' motion for default judgment as to Syria's liability, and on March 8, 2022, this Court (Pan, J.) entered an order granting plaintiffs' motion.  ECF. Nos. 51 & 52.

On April 6, 2022, service on Defendant Iran was completed through diplomatic channels pursuant to 1608(a)(4).  ECF No. 57.  After Defendant Iran failed to enter an appearance, on June 7, 2022, the clerk entered default against Iran.  ECF No. 59.  On June 21, 2022, this Court (Pan, J.) issued an Order deeming moot the portions of the Report and Recommendation that address issues with Plaintiffs' initial attempts to effectuate service on Iran.  ECF No. 61.

### B.  Plaintiffs

Plaintiff Vicki Parhamovich is the mother of Andrea Parhamovich.  ECF No. 36-13 ¶ 3 (Declaration of Vicki Parhamovich).  Vicki brings this suit in her own capacity and in the capacity as the personal representative of the Estate of Andrea Parhamovich.  ECF Nos. 37-1 ¶ 3 & 37-2 (Andrea Parhamovich Estate Declaration and Probate Letters of Authority).

Plaintiff André Parhamovich is the father of Andrea Parhamovich. ECF No. 36-19 ¶ 2 (Declaration of André Parhamovich).

Plaintiff Marcella Zampini ("Marci") is the older sister of Andrea Parhamovich. ECF No. 36-23 ¶ 3 (Declaration of Marcella Zampini).

Plaintiff Chris Parhamovich is the younger brother of Andrea Parhamovich. ECF No. 36-29 ¶ 2 (Declaration of Chris Parhamovich).

Plaintiff Cory Parhamovich is the younger brother of Andrea Parhamovich Ex. No. 36-33 ¶ 2.

### C.  The Murder of Andrea Parhamovich

On January 17, 2007, Andrea S. Parhamovich ("Andi"), an American citizen and aid worker, was killed in a terrorist attack on her vehicle convoy in Baghdad, Iraq.  ECF No. 36-12 at 3-8 (URG

Report on Incident Facts) and 1-12 (Annex C, Detailed Sequence of Events). Andi had spent the morning at the Iraqi Islamic Party headquarters, where she met with party officials as part of her job with the National Democratic Institute. *Id*. at 3 (URG Report on Incident Facts). As Andi's three-vehicle convoy left the party headquarters, it came under a sudden and overwhelming attack by a group of gunmen armed with machine guns, pistols, and hand grenades, who ambushed the convoy in an apparent kidnapping attempt. *Id*. at 3-16 (URG Report on Incident Facts) and 1-12 (Annex C, Detailed Sequence of Events). When the kidnapping attempt failed, the gunmen rolled grenades under Andi's vehicle, causing the fuel tank to explode. *Id*. at 3-4 (URG Report on Incident Facts) and 4 (Annex C, Detailed Sequence of Events). Andi died in the explosion and the ensuing fire. *Id*. at 9 (URG Report on Incident Facts). Three private security officers were killed, and two others were injured. *Id*. at 3-8 (URG Report on Incident Facts).

### D. The Terrorist Organization the Islamic State in Iraq is Responsible for the Murder of Andrea Parhamovich

The morning after Andi's death ISI claimed responsibility for the attack in a statement issued on the internet by the self-identified spokesperson for the ISI via the ISI's "Ministry of Information":

> With the blessings of Allah, two four-wheel-drive vehicles owned by the Zionist Mossad were destroyed in the Yarmouk neighborhood in the state of Baghdad. All persons boarding the car have been killed after they have been attacked by light and medium-size weapons and RBG rockets. Another third vehicle was severely damaged as well in the attack that took place on Wednesday the 28th day of Dhul Hijjah of the year 1427 which corresponds to 17/1/2007. All grace and praise are due to Allah.

ECF Nos. 37-59 & 36-37 ¶¶ 52-54 (Statement of Islamic State in Iraq January 18, 2007 and certified English translation and Statement of Expert Report of Charles Lister). The statement was published on the http://www.w-n-n.com website, an online forum commonly used by al-Qaeda affiliates at the time. ECF No. 36-37 ¶ 52. The ISI statement remains on the internet. *Id*.

In his June 23, 2021 Report and Recommendation, Magistrate Judge Harvey cited to plaintiffs' evidence provided as part of their original Motion for Default Judgment as to Liability against Defendants Syria and Iran, ECF No. 36-1, including the ISI statement claiming responsibility for the attack, ECF. No. 37-59, the expert report provided by Charles Lister, ECF No. 36-37, a U.S. intelligence report on the attack, ECF No. 37-52 at 9, and the URG incident report, ECF No. 36-12, and reasoned that "Taken together, this evidence paints a clear picture that it was ISI that perpetrated the attack that killed Ms. Parhamovich."  ECF No. 40 at 21.

### E.  Iranian Material Support of Terrorism

Iran is the "world's worst state sponsor of terrorism."  Ex. 1 Expert Report of Patrick Clawson, Ph.D. ("Clawson Report") ¶ 56 (quoting Ex. 2, Excerpt, U.S. Dept. of State, *Country Reports on Terrorism 2018* at 9, 211, U.S. Dept. of State Website (2019)[4] *available at* https://www.state.gov/wp-content/uploads/2019/11/Country-Reports-on-Terrorism-2018-FINAL.pdf).

In 1979, the Islamic Republic of Iran came to power through a popular revolution.  *Id.* ¶ 17.  Iran's political and religious institutions are overseen by a single person, "the Supreme Leader."  *Id*. ¶ 18.

Plaintiffs' expert on Iran, Dr. Patrick Clawson, explains that the Islamic Republic of Iran's political structure has both a "formal governmental structure" and a "revolutionary structure", both overseen by the Supreme Leader.  *Id.* ¶ 23.  The revolutionary structure includes entities that are "parallel to the formal government agencies." *Id.* ¶ 25.  For example, the Iranian Revolutionary Guard

---

[4] In *Sotloff v. Syrian Arab Republic*, the court held that the State Department's annual Country Reports on Terrorism "are admissible under rule 803(8) because, like 'Patterns of Global Terrorism Reports' found admissible in *Owens*, they contain factual findings and conclusions regarding terrorism in various countries compiled pursuant to 22 U.S.C. § 2656f, which requires annual reports on terrorism." *Sotloff*, 525 F. Supp. 3d 121, 130 n.10 (D.D.C. 2021) (citing *Owens v. Republic of Sudan*, 864 F.3d 751, 792 (D.C. Cir. 2017)).

Corps (IRGC) is parallel to the regular military of Iran, but the revolutionary institution is the "more powerful of the pair." *Id*.

The IRGC is "one of the major organizations through which Iran has historically carried out its support for terrorism." *Id*. ¶ 26.  The IRGC is dedicated to "the spread of fundamentalist Islamist principles through the world, and the establishments of fundamentalist Islamist governments in nations other than Iran." *Id*. ¶ 31.  The IRGC has "provided funding and/or training for terrorism operations that targeted United States and Israeli citizens" for the past twenty years. *Id*. ¶ 35.

MOIS is Iran's foreign and domestic intelligence service.  *See generally* Ex. 3, Federal Research Division, *Iran's Ministry of Intelligence and Security: A Profile*, Library of Congress (2012) *available at* https://irp.fas.org/world/iran/mois-loc.pdf.  According to a report published by the Federal Research Division of the Library of Congress, "MOIS conducts liaison with other foreign intelligence agencies as well as with organizations such as Lebanese Hezbollah that protect and promote the Islamic Republic's foreign agenda." *Id*. at 4.  Iran routinely uses MOIS to facilitate terrorist attacks. *Id*. at 9, 16, 44-51.

### F.  Iranian Material Support of Sunni Terrorist Groups in Iraq

Defendant Iran has for decades provided material support to Sunni terrorist groups that shared the goal of killing Americans, including AQI/ISI.  Although Iran, a Shia country, is ideologically at odds with Sunni groups, they share the common goal of attacking U.S. interests and expelling the U.S. from the region.  *See* Ex. 4, Excerpt, National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks upon the United States* ("9/11 Report") (2004) at 59-61[5] and 240-241, *available at* https://www.govinfo.gov/content/pkg/GPO-911REPORT/pdf/GPO-911REPORT.pdf; *see also* Ex.

---

[5] "The relationship between al Qaeda and Iran demonstrated that Sunni-Shia divisions did not necessarily pose an insurmountable barrier to cooperation in terrorist operations…al Qaeda contacts with Iran continued in ensuing years."

1, Clawson Report ¶ 43 and Ex. 5, Expert Report of Daveed Gartenstein-Ross, Ph.D. ("Gartenstein-Ross Report") at 29.  The U.S. District Court for the Southern District of New York recognized Iran's willingness to bridge the Sunni-Shia divide in its decision evaluating Iran's support to al-Qaeda and finding Iran liable, on the basis of that support, for the 9/11 attacks.  *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047 at \*10-12 (S.D.N.Y. Dec. 22, 2011).

Defendant Iran's material support for al-Qaeda generally, and later AQI, began in the 1990s. The material support included Defendant Iran providing money, weapons, training, expert advice, travel facilitation, safe passage, lodging, transportation, and safe haven. This is the same type of material support and resources Iran provided al-Qaeda, which al-Qaeda used to commit a number of terrorist attacks against Americans, including the U.S. embassy bombings in East Africa, the October 2000 suicide bombing attack on the USS Cole, the 9/11 attacks, and IED and EFP attacks against service members in Iraq. *See Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015); *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011); *Espitia v. Islamic Republic of Iran,* 2022 WL 2168355 (S.D. Tex. June 16, 2022).

Since 2003, Iran has supported both Sunni and Shia insurgent groups in Iraq as they targeted coalition forces, Iraqi security forces, and the Iraqi government itself.  *See* Ex. 1, Clawson Report ¶¶ 35-38; Ex. 5, Gartenstein-Ross Report at 32, 49.  In October 2017, the President stated:

> In Iraq and Afghanistan, groups supported by Iran have killed hundreds of American military personnel.  The Iranian dictatorship's aggression continues to this day.  The regime remains the world's leading state sponsor of terrorism, and provides assistance to al Qaeda, the Taliban, Hezbollah, Hamas, and other terrorist networks.

Ex. 6, *Remarks by President Trump on Iran Strategy*, The White House (Oct. 13, 2017), *available at* https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-iran-strategy/.

The Qods Force ("IRGC-QF") is the branch of the IRGC generally charged with "foreign operations," including support for foreign insurgents and terrorists such as groups fighting U.S. forces and U.S.-backed governments in Afghanistan and Iraq.  Ex. 1, Clawson Report ¶¶ 31-32.  Ahmed Forouzandeh, a Brigadier General in the IRGC-Qods Force, provided $25,000 to two members of a Sunni terrorist organization in Iraq "to help fund military operations against Coalition Forces" in Iraq and promised "additional funds if the men would deliver videos of the attack against Coalition Forces."  *Id*. ¶ 39 (quoting Ex. 7, U.S. Dept. of Treasury, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency*, U.S. Dept. of Treasury Press Center   (Jan. 9, 2008) *available at* https://home.treasury.gov/news/press-releases/hp759).   A "super-secret" part of the Qods Force, called Department 9000, helped Sunni insurgent groups in order to "keep the Americans bogged down" in Iraq.  *Id*. ¶ 42 (quoting Ex. 8, Newsweek Staff, *Tehran's Secret 'Department 9000'*, Newsweek (Jun. 3, 2007) *available at* https://www.newsweek.com/tehrans-secret-department-9000-101761).

The IRGG-QF was designated a Specially Designated Global Terrorist ("SDGT) in October 2007.  *See* Ex. 9, U.S. Dept. of Treasury, *Treasury Targets Oil Smuggling Network Generating Hundreds of Millions of Dollars for Qods Force and Hizballah*, U.S. Dept. of Treasury Press Center (May 25, 2022) *available at* https://home.treasury.gov/news/press-releases/jy0799.  The Treasury Department's report designating the IRGC-QF as a SGDT specifically linked the group to specific groups of Iraqi militants who target and kill coalition forces.  The IRGC in its entirety was designated an FTO in April 2019, with the State Department announcing, "…the IRGC, part of Iran's official military, has engaged in terrorist activity or terrorism since its inception 40 years ago." Ex. 10, U.S. Dept. of State, *Designation of the Revolutionary Guard Corps* (Apr. 8, 2019) *available at* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html.

In February 2012, the Treasury Department designated MOIS and subjected it to economic sanctions under Executive Orders 13224, 13553, and 13572.  *See* Ex. 1, Clawson Report ¶ 40.  The Treasury Department stated, "MOIS provides financial, material, or technological support for, or financial or other services to Hizbollah…MOIS also provided money and weapons to al Qa'ida in Iraq [AQI], a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives."  Ex. 11, U.S. Dept. of Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012) *available at* https://home.treasury.gov/news/press-releases/tg1424.

### G.  The History of al-Qaeda in Iraq/Islamic State in Iraq

The United States invaded Iraq on March 20, 2003. Ex. 5, Gartenstein-Ross Report  at 13.  As U.S. and coalition forces' involvement in Iraq continued, al-Qaeda viewed the U.S.'s presence in Iraq as the opportunity to attack Americans and bog the U.S. down.  *Id*.  A major group active during the Iraq war that aligned itself with al-Qaeda in 2004 was the Zarqawi organization.  Below is the name changes it has undergone since its emergence in the early 1990s:

| Name employed | Years used |
|---|---|
| Bayat al-Imam | c. 1993-1999 |
| Jund al-Sham | c. 1999-2004 |
| Jamaat al-Tawhid wal-Jihad | 2004 |
| Tanzim Qa'idat al-Jihad fi Bilad al-Rafidayn (al-Qaeda in Iraq or AQI) | 2004-2006 |
| Majlis Shura al-Mujahedin fi-l-Iraq (Mujahedin Shura Council) | 2006 |
| Islamic State of Iraq (ISI) | 2006 – April 2013 |
| Islamic State of Iraq and al-Sham (ISIS) | April 2013 – June 2014 |
| Islamic State | June 2014 – present |

*Id.*

The founder of the terrorist organization AQI and its successor organization, ISI, was the late Abu Musab al-Zarqawi ("Zarqawi"), a Sunni Jordanian jihadist with ties to the terrorist organization al-Qaeda[6] and its leader, Osama bin Laden.  ECF No. 36-37 ¶¶ 17-22; Ex. 5 Gartenstein-Ross Report at 13-27.  After a troubled upbringing in Jordan and a stint in prison, Zarqawi travelled to Afghanistan and Pakistan where he met al-Qaeda members for the first time.  *Id*. ¶ 18; *id*. at 13-16. Zarqawi is thought to have returned to Jordan from Afghanistan in 1992, when he established "his first militant outfit," Bayt al-Imam. *Id*. ¶ 20; *id.* at 14.

In 1999, after another stay in a Jordanian prison, Zarqawi returned to Afghanistan where he met with bin Laden, who gave him $200,000 to set up a training camp in the western Afghan province of Herat.  *Id*. ¶¶ 22-23; *id*. at 15-16.  Zarqawi renamed his group Jund al-Sham, and later Jamaat al-Tawhid wal Jihad ("JTJ"), the precursor to al-Qaeda in Iraq.  *Id*. ¶ 22, 29; *id*. at 17-18.  The U.S. launched a military intervention and invasion of Afghanistan in late 2001.  *Id*. ¶ 23; *id*. at 18. Zarqawi's militants "allegedly united with al-Qaeda and units of the Taliban to combat the invasion." ECF No. 36-37 ¶ 23.  But by December 2001, Zarqawi and a number of followers relocated to Iran. *Id*.; Ex. 5, Gartenstein-Ross Report at 18.  From there, Iran allowed Zarqawi to establish new camps and safehouses for his operatives within Iran in Zahedan, Isfahan, and Tehran.  Ex. 5, Gartenstein-Ross Report at 44.  These facilities were used to send forged passports, money, and operational orders across the Middle East and into Europe, transforming Iran into a critical hub for Zarqawi's fast-growing militant network.  *Id*. at 44-45.  The organization's communications were channeled by satellite, cell phones, and landlines, and handled through middlemen – all with the IRGC's support.

---

[6] The U.S. designated al-Qaeda as a terrorist organization in 1999.  Department of State, Office of the Coordinator for Counterterrorism, Designation of Foreign Terrorist Organizations, October 8, 1999.  64 Fed. Reg.  55112.   (Designation of al Qaeda as a Foreign Terrorist Organization) *available at* https://www.govinfo.gov/content/pkg/FR-1999-10-08/html/99-26565.htm

*Id*. at 45.  When Zarqawi relocated from Iran to Iraq, Zarqawi found refuge with the jihadist group Ansar al-Islam.  ECF No. 36-37 ¶ 23; Ex. 5, Gartenstein-Ross Report at 18.

Following the U.S.-led invasion of Iraq in March 2003, an Iraq insurgency began, of which Zarqawi's JTJ was a leading component.  *Id*. ¶ 25; *id*.  Zarqawi was designated as a Specially Designated Global Terrorist by the Treasury Department on September 24, 2003.  Ex. 12, U.S. Dept. of Treasury, *Treasury Designates Six Al-Qaida Terrorists*, U.S. Dept. of Treasury Press Center (Sept. 24, 2003) *available at* https://home.treasury.gov/news/press-releases/js757.

A "broader Iraqi insurgency" began in 2003 and into 2004, and Zarqawi's JTJ "began to set itself apart through its brutal and extreme tactics, and by the graphic nature of some of its actions", including the kidnapping and beheading of American hostages, for example, Nicholas Berg in 2004.  ECF No. 36-37 ¶ 28; Ex. 5, Gartenstein-Ross Report at 13, 18.

In late 2004 Zarqawi publicly pledged allegiance to al-Qaeda and his organization renamed itself to Tanzim Qa'idat al-Jihan fi Bilad al-Rafidayn, better known as al-Qaeda in Iraq (AQI).  *Id*. ¶ 29; *id*. at 19.  Jamaat al-Tawhid wal Jihad a/k/a the al-Zarqawi network was designated as a Foreign Terrorist Organization on October 15, 2004.  Ex. 13, U.S. Dept. of State, *Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases* (Oct. 15, 2004) *available at* https://2001-2009.state.gov/r/pa/prs/ps/2004/37130.htm.  AQI was designated a Foreign Terrorist Organization by the United States Department of State on December 17, 2004.  Ex. 14, U.S. Dept. of State, *Foreign Terrorist Organizations*, U.S. Dept. of State Website (2022) *available at* https://www.state.gov/foreign-terrorist-organizations/.

In January 2006, AQI united with five other Sunni militant factions to form the Majlis Shura al-Mujahidin fi-l-Iraq, better known as the Mujahedin Shura Council ("MSC").  Ex. 5, Gartenstein-Ross Report at 20; ECF No. 36-37 ¶ 33.  The MSC was designed to provide cover to AQI during the Iraq-led insurgency, but AQI quietly remained the dominant player. *Id*.; *id*.

16

Zarqawi was killed in a U.S. military operation in Iraq on June 7, 2006. *Id*. at 21; *id.* ¶ 33. On October 15, 2006, the MSC announced its establishment of the Islamic State in Iraq ("ISI"). *Id*. at 21; *id*. ¶ 35. The chosen leader of ISI was Abu Umar al-Baghdadi; however, it is believed the person calling the shots was the minister of war, Abu Ayyub al-Masri a/k/a Abu Hamzah al-Muhajir. *Id*. at 23; *id*. ¶ 34-35. According to Saif al-Adl, a senior al-Qaeda leader, and author of the master plan, a highly consequential strategic document that would be used to justify al-Qaeda's cooperation with Zarqawi and the group's expansion into Iraq, establishing an Islamic state was one of Zarqawi's core goals when he relocated to Iraq, and thus, ISI's formation advanced al-Qaeda and AQI's longstanding strategic objectives. Ex. 5, Gartenstein-Ross Report at 21, 32.

### H. Iran Provided Material Support to the Terrorist Group al-Qaeda and its Iraq-based Franchise Al-Qaeda in Iraq/the Islamic State in Iraq

Despite Iran's Shia identity, Iran has provided significant material support to al-Qaeda and its Iraq-based franchised AQI. Ex. 5, Gartenstein-Ross Report. at 27, 43-49. Iran's support to al-Qaeda began in the 1990s and continued through the 9/11 attacks. *Id*. at 27; Ex. 15, Supplemental Expert Report of Patrick Clawson, Ph.D. ("Clawson Supplemental Report") ¶ 2. Between 2001 and 2004, this support not only included al-Qaeda, but the backing of the predecessor groups and individuals who would later go on to form AQI in 2004. *Id*. at 18, 30-37. Iran continued to support al-Qaeda and AQI from that time and continues to provide material support to al-Qaeda today. *Id*. at 37-41.

Iran's early support for al-Qaeda was managed by and through Hezbollah, which allowed Iran to channel support for al-Qaeda in a covert manner. Ex. 5, Gartenstein-Ross Report at 28. As discussed in *The 9/11 Commission Report*, much of this assistance was provided at Hezbollah training camps in Lebanon. Ex. 4, *9/11 Report* at 68. Al-Qaeda used the support and instruction provided by Hezbollah to carry out its 1998 bombings in Kenya and Tanzania, another court in this District found:

> Prior to their meetings with Iranian officials and agents, bin Laden and al-Qaeda did not possess the technical expertise required to carry out the embassy bombings in Nairobi and Dar es Salaam. The Iranian defendants, through Hezbollah, provided explosives training to bin Laden and al-Qaeda and rendered direct assistance to al-Qaeda operatives.

*Owens*, 826 F. Supp. 2d at 135.

Iran's support facilitated al-Qaeda's activities in the Arabian Peninsula.  Ex. 5, Gartenstein-Ross Report at 29.  Iran helped transform al-Qaeda's influence in the region into a more potent operation by serving as a transit route for al-Qaeda members to and from the Gulf.  *Id*.  The groundwork for this travel facilitation was laid in the mid-90s, when a senior al-Qaeda leader "negotiated a secret relationship between Usama Bin Laden and Iran, allowing many al Qaida members safe transit through Iran to Afghanistan."  *Id*. (quoting Ex. 16, U.S. Dept. of Treasury, *Treasury Targets al Qaeda Operatives in Iraq*, U.S. Dept. of Treasury Press Center (Jan. 16, 2000) *available at* https://home.treasury.gov/news/press-releases/hp1360).  To hold up its end of the bargain, Iran allowed al-Qaeda to "establish a series of guest houses for its fighters making the long journey through [Iranian] territory."  Ex. 5, Gartenstein-Ross Report at 29-30 (quoting *Flanagan*, 87 F. Supp. 3d at 20). During the late 90s through 2000, Iran was the "common route" that al-Qaeda members used when traveling between Afghanistan and Yemen.  *Id*. at 30 (quoting *Flanagan*, 87 F. Supp. 3d 93 at 21).

In *Flanagan v. Islamic Republic of Iran*, the Court held that Iran, "through the provision of material support and resources (the financial support, support for training, and facilitation of travel) to Bin Laden and Al-Qaeda, facilitated the planning and execution" of the October 2000 suicide bombing attack on the USS Cole.  87 F. Supp. 3d 93, 115 (D.D.C. 2015).  The *Flanagan* court further determined that "Iran took primary responsibility for transferring, via Lebanese Hizballah, extensive technical expertise to Al-Qaeda and other terrorist organizations."  *Id*. at 117.  Moreover, in the "years

leading up to the Cole bombing, Iran was directly involved in establishing Al-Qaeda's Yemen network and supported training and logistics for Al-Qaeda in the Gulf region." *Id.*

The travel facilitation Iran provided to al-Qaeda helped it commit the 9/11 attacks.  Ex. 5, Gartenstein-Ross Report at 30; Ex. 15, Clawson Supplemental Report ¶ 2.  As many as eight to ten of the 9/11 Saudi hijackers passed through Iran while en route to Afghanistan between October 2000 and February 2001.  *Id.* (citing Ex. 4, *9/11 Report* at 240); *id.*  This was a preferred route for moving al-Qaeda operatives during this period, as Iran directed its border guards not to stamp their passports, effectively cloaking their movements.  *Id*; *id.*  The District Court for the Southern District of New York found these avenues of support constituted material support to al-Qaeda, and therefore, held Iran liable for the 9/11 attacks:

> [T]he Islamic Republic of Iran provided material support and resources to al Qaeda for acts of terrorism, including the extrajudicial killing of the victims of the September 11, 2001 attacks.  The Islamic Republic of Iran provided material support or resources, within the meaning of 28 U.S.C. § 1605A, to al Qaeda generally.  Such material support or resources took the form of, *inter alia*, planning, funding, facilitation of the hijackers' travel and training, and logistics, and included the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation.

*In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047 at *39 (S.D.N.Y. Dec. 22, 2011).

Iran's support for al-Qaeda continued after the 9/11 attacks.  Ex. 5, Gartenstein-Ross Report at 31; Ex. 15, Clawson Supplemental Report ¶ 5 (citing Ex. 17, Bryce Loidolt, *Al-Qaeda's Iran Dilemma:  Evidence from the Abbottabad Records*, Studies in Conflict & Terrorism (2020)).  A deal brokered by an al-Qaeda leader with the IRGC-QF gave safe passage and sanctuary to hundreds of jihadists fleeing Afghanistan in the wake of the U.S.-led invasion to overthrow the Taliban.  *Id*. at 31.  General Qassem Suleimani, the former head of the IRGC-QF, personally helped bin Laden's family and senior al-Qaeda members fleeing from Afghanistan.  *Id*.

Iran provided safe haven to some of al-Qaeda's highest-ranking members, including but not limited to: Saif al-Adl (explosives expert and high-ranking member of al-Qaeda), Abu Muhammad al-Masri (a leading al-Qaeda figure who was involved in the 1998 East African embassy attacks), Abu Musab al-Suri (one of al-Qaeda's most influential strategic voices), Sa'ad and Hamza bin Laden (Osama's sons), Abu Musab al-Zarqawi (the future leader of AQI), Atiyah Abd al-Rahman (a key al-Qaeda manager, responsible for maintaining communications between al-Adl in Iran and bin Laden in Pakistan), Thirwat Saleh Shihata (a former deputy to Zawahiri), and Muhammad Islambouli (an Egyptian fighter who was a prominent al-Qaeda member). *Id*. at 30-31.

In late 2002 and early 2003, U.S. government officials held face-to-face discussions with Iranian officials demanding the regime deport al-Qaeda leaders to their countries of origin. *Id*. at 32 (quoting Seth G. Jones, *Al Qaeda in Iran: Why Tehran is Accommodating the Terrorist Group*, Foreign Affairs (Jan. 29, 2012)). Iran refused, but around the same time, MOIS took control of al-Qaeda members and their families. *Id*. Despite placing further restrictions on al-Qaeda's members' movements and residences, Iran provided al-Qaeda operatives wide latitude to carry out their roles. *Id*. at 32. Iran's provision of safe haven to al-Qaeda's core leadership allowed the organization to operate even when senior leaders were physically separated from field operatives. *Id.* at 35.

Saif al-Adl was "living freely in Shiraz when the United States invaded Iraq," and "he continued to play a key role in al-Qaeda's broader command structure." *Id*. (quoting Brian Fishman, The Master Plan: ISIS, al-Qaeda, and the Jihadi Strategy for Final Victory (2016)). Al-Adl's "captors clearly gave him leeway to remain a productive member of al-Qaeda's leadership" during this period. *Id*. Saif al-Ad's "house arrest" in Iran gave him the space to produce and disseminate the "master plan," a highly consequential strategic document that would be used to justify al-Qaeda's cooperation with Zarqawi and the group's expansion into Iraq. *Id*. Al-Adl's master plan is considered one of the most consequential jihadist strategic documents ever produced. *Id*. at 35. Al-Adl's ability to

conceive, write, and distribute some of his most influential jihadist writings during his time in Iran signifies the wide latitude provided to him and to other al-Qaeda leaders, as well as the substantial benefit safe haven conferred upon them.

In 2011, the U.S. Treasury Department formally accused Iran of forging an alliance with al-Qaeda and moving money and recruits from the Persian Gulf to the group's leadership in Afghanistan, Pakistan, and Iraq, with the recruits and assets moving through Iran. *Id.* at 37. The Treasury Department press release states, "Iranian authorities maintain a relationship with" Ezedin Abdel Aziz Khalil, a prominent al-Qa'ida facilitator, "and have permitted him to operate within Iranian borders since 2005." *Id.* at 38 (quoting Ex. 18, U.S. Dept. of Treasury, *Treasury Targets Key Al-Qa'ida Funding and Support Network Using Iran as a Critical Transit Point*, U.S. Dept. of Treasury Press Center (Jul. 28, 2011) *available at* https://home.treasury.gov/news/press-releases/tg1261); *see also* Clawson Expert Supplement Decl. ¶ 8. Then-Under Secretary for Terrorism and Financial Intelligence, David S. Cohen, underscored the benefits al-Qaeda reaped from Iran in the press release by stating, "Iran's secret deal with al-Qa'ida" allowed the group "to funnel funds and operatives through" Iran territory, which is "yet another aspect of Iran's unmatched support for terrorism." *Id.*; *id*. Under Secretary Cohen further identified the deal between al-Qaeda and Iran as providing a "key network" and "much-needed support" to al-Qaeda's senior leadership. *Id.*; *id*. In 2012, when the U.S. designated Iran's MOIS for its ongoing and systematic sponsorship of a variety of terrorist organizations, the U.S. listed AQI as a direct recipient of Iranian money and weapons. Ex. 11, U.S. Dept. of Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism*, U.S. Dept. of Treasury Press Center (Feb. 16, 2012) *available at* https://home.treasury.gov/news/press-releases/tg1424.

Shortly after the U.S. invaded Iraq, U.S. intelligence officials were openly acknowledging and discussing Iran's support for al-Qaeda inside Iraq. Ex. 5, Gartenstein-Ross Report at 35. As one

news report published in June 2003 noted, "American intelligence officials said that Iran's Ministry of Intelligence and Security and the Qods Division of the Islamic Revolutionary Guards Corps…are deeply involved in supporting terrorists, including al Qaeda." *Id*. (quoting Ex. 19, *U.S. Says Iran Harbors al Qaeda Associate*, Washington Times (Jun. 10, 2003) *available at* https://www.washingtontimes.com/news/2003/jun/10/20030610-125659-6237r/).   The   U.S. intelligence officials were specifically aware that the Iranian government was protecting senior al-Qaeda leaders like Zarqawi.  Ex. 19 at 1.

Iran had direct contact with AQI and provided financial and logistical assistance for AQI's campaign of violence in Iraq.  Ex. 5, Gartenstein-Ross Report at 43.  During this time, and in support of the organizations' terror campaign, Zarqawi and his supporters enjoyed the permissive travel environment in Iran.  *Id*.  For instance, Muhammad Khalil al-Hakaymah, a Zarqawi loyalist who would later rise to prominence within the al-Qaeda organization, was able to transit through Iran en route to Afghanistan after 9/11.  *Id*.  With the knowledge and assistance from the IRGC-QF, al-Hakaymah, "like so many Zarqawi supporters before him, he would travel across Iran..." *Id*.  (quoting Brian Fishman, The Master Plan:  ISIS, al-Qaeda, and the Jihadi Strategy for Final Victory (2016)).

Even as Zarqawi's targeting in Iraq took on a sectarian bent, and he became notorious for attacks on Iraq's Shia population, Iran continued supporting AQI.  Ex. 5, Gartenstein-Ross Report at 45.  This was because Iran's greatest priority was destabilizing the American efforts in Iraq.  *Id*.  Iran funneled weapons and mines to Zarqawi strongholds in Fallujah and elsewhere in the Sunni-dominated Anbar Province.  *Id*.  Iran continued to permit Zarqawi recruits to travel across Iranian territory, use safe houses in different parts of the country, and harbor facilitators with links to AQI. *Id*.

Further evidence of Iran's support to AQI emerged when two IRGC-QF operatives were arrested in Baghdad in December 2006.  *Id*.  According to U.S. defense officials, the operatives

possessed "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information." *Id*. (quoting Ex. 20, Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S. American Defense Official Calls Release 'Obviously Troubling,'* Washington Post (Dec. 30, 2006) *available at* https://www.washingtonpost.com/archive/politics/2006/12/30/iraq-expels-2-iranians-detained-by-us-span-classbankheadamerican-defense-official-calls-release-obviously-troublingspan/f9f56a51-bd96-418f-9267-e8d63d7d80b8/).    The operatives "had information about importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles." *Id*.  The information derived from the two operatives showed "how the Quds Force [was] working with individuals affiliated with Al Qaeda in Iraq and Ansar al-Sunna." *Id*. at 45-46 (quoting Eli Lake, *Iran's Secret Plan for Mayhem*, New York Sun (Jan. 3, 2007)).

In 2008, a leading Sunni militant named Mubarak Mushakhas Sanad al-Bathali admitted Iran was providing AQI with both money and weapons and facilitating the movement of AQI fighters across the Middle East and South Asia. *Id*. at 46.  This admission was significant given that al-Bathali was one of al-Qaeda's longtime principal fundraisers and was known to have sent money to AQI between 2003 and 2004. *Id*. (citing Ex. 21, U.S. Dept. of Treasury, *Treasury Designations Target Terrorist Facilitators*, U.S. Dept. of Treasury Press Center (Dec. 7, 2006) *available at* https://home.treasury.gov/news/press-releases/hp191).  He was added to the U.S. Treasury Department's list of Specially Designated Global Terrorists in 2006. *Id*.

In sum, Iran's material support to Al-Qaeda and AQI was critical for the organization to function in Iraq.  Iran ultimately provided and/or empowered AQI to obtain weapons, money, safe haven, popular support and senior leader guidance.  In a June 16, 2022 opinion from the United States District Court, S.D. Texas, Brownsville Division, the Court held that Iran materially supported AQI operatives that detonated multiple explosive devices near a U.S. Army combat engineer while he was

on active duty in Iraq between May and June 2003. *Espitia v. Islamic Republic of Iran,* 2022 WL 2168355 (S.D. Tex. June 16, 2022).

### III.    STANDARD OF REVIEW

In FSIA cases, courts may enter default judgment against foreign sovereign defendants that fail to appear if plaintiffs have established their claim "by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). The standard for default judgment under the FSIA is identical to the standard for entry of default judgments against the United States under Federal Rule of Civil Procedure 55(d). *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017).

The standard for default judgment may be met "through uncontroverted factual allegations, which are supported by … documentary and affidavit evidence." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (internal quotation marks omitted).  Section 1608(e) "does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required." *Owens*, 864 F.3d at 785.

In determining whether a plaintiff has met the standard for default judgment, the court "must be mindful that Congress enacted Section 1605A, FSIA's terrorism exception, and Section 1608(e) with the 'aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins.'" *Friends of Mayanot Inst., Inc. v. Islamic Republic of Iran*, 313 F. Supp. 3d 50, 56 (D.D.C. 2018) (quoting *Han Kim*, 774 F.3d at 1047-48). The Court of Appeals for the D.C. Circuit observed that a "district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism." *Owens*, 864 F.3d at 785-86. The nature of acts of terrorism also lend themselves to this discretion and "[t]his lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand

evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Id.* 864 F.3d at 785.

## IV.    PERSONAL JURISDICTION HAS BEEN ESTABLISHED BECAUSE THE DEFENDANT WAS PROPERLY SERVED UNDER 28 U.S.C. § 1608

Service under the FSIA is sufficient to establish personal jurisdiction over Defendant Iran. "The district court shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state…as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement."  28 U.S.C. §1330(b).

Plaintiffs have complied with all the requirements for service on Defendant Iran under 28 U.S.C. § 1608(a), which provides for service over a foreign sovereign and its political subdivisions in one of four ways. The first, by 1) "special arrangement for service between the plaintiff and the foreign state," and 2) "in accordance with an applicable international convention on service of judicial documents," are inapplicable here.  *See Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008) (recognizing that Iran is not a party to an international convention on service of judicial documents, so service under 1608(a)(2) is impossible).    Section 1608(a)(3), requiring attempted service "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," was attempted here.[7]  *See* ECF Nos. 47 & 48 (requesting service under 28 U.S.C. §1608(a)(4) because service under (a)(3) could not be completed).

---

[7] As discussed in Sec. II.A., *supra*, Plaintiffs originally erroneously relied on the Court's Attorney Manual for Service of Process on a Foreign Defendant and skipped first attempting to serve Defendant Iran under 1608(a)(3) before (a)(4).  Plaintiffs have since cured this error.

If service cannot be made pursuant to any of the first three subdivisions of Section 1608(a), after the lapse of at least 30 days, subdivision (a)(4) of that provision authorizes "diplomatic service" by requesting the Clerk of Court to send two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, to "the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services – and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when papers were transmitted." The State Department has sent to the Clerk of the Court a letter attesting to the transmission of the required papers through diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4), and a certified copy of the diplomatic note attesting to transmission of the required papers to the foreign minister of Iran on April 6, 2022. ECF No. 57.

Since service was successfully accomplished pursuant to Section 1608(a)(4), the Court has personal jurisdiction over Defendant Iran. *See Ben-Rafael*, 540 Supp. 2d at 52 (concluding that court had personal jurisdiction over Iran after "the Swiss foreign ministry served the documents on the Iranian Ministry of Foreign Affairs" and they were returned "to the Swiss foreign ministry without comment").

## V.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS FSIA CASE

### A.   The Jurisdictional Elements of Subject Matter Jurisdiction Have Been Met

"The FSIA is the sole basis for jurisdiction over foreign states in our courts." *In re Islamic Rep. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009). Pursuant to the Foreign Sovereign's Immunity Act's terrorism exception to the jurisdictional immunity of a foreign state, 28 USC §1605A, Plaintiffs must initially establish that this Court has jurisdiction to hear their claims and that the defendants are not immune from suit.

Judge Lamberth of this District Court has explained the five elements that must be met for jurisdiction under §1605(A):

> (1) money damages are sought (2) against that state for (3) personal injury or death that (4) was "caused by" (5) an act of torture, extrajudicial killing ... or the provision of material support of resources for such an act if such act or provision of material support or resources is engaged in by an official, employee or agent of such foreign state while acting within the scope of his or her office, employment or agency." . . . With regard to § 1605A's causation requirement, in this Circuit there must be some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 29 (D.D.C. 2012) (internal quotations and citations omitted).

### 1.    Money Damages Against the State for Personal Injury or Death

The first two elements are met here because plaintiffs seek solely "money damages" against Iran. 28 U.S.C. § 1605A(a)(1). Plaintiffs meet the third element because they have all presented claims for damages resulting from personal injury or wrongful death.

### 2.    Causation

The FSIA requires that the extrajudicial killing be "caused by" the provision of material support.  "But-for" causation is not required for claims brought under the FSIA.  *In re Islamic Rep. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 39.  The FSIA does not require "a greater showing of intent than proximate cause."  *Owens*, 864 F.3d at 798.

Proximate cause has two elements.  *Id*.  First, the defendant's material support must be a "substantial factor in the sequence of responsible causation" that led to the terrorist act.  *Id*., 864 F.3d at 798 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (holding material support of al-Qaeda by Sudan from 1992-1996 was proximate cause of embassy bombings that occurred in 1998).

Second, the terrorist act must have been "reasonably foreseeable or anticipated as a natural consequence" of the defendant's material support.  *Id*.

To show proximate cause, it is not required that the defendant had intent to cause or "directly advance" the specific terrorist act.  *Id*. at 799.  "Neither specific intent nor direct traceability" are required to establish a foreign state's liability for material support of terrorism, *id*., because "material support is fungible and terrorist organizations can hardly be counted on to keep careful bookkeeping records."  *Id*. (internal quotation and citation omitted).

Iran's provision of material support to AQI/ISI was the proximate cause of the act of attempted hostage taking and extrajudicial killing of Andrea Parhamovich, resulting in her death and the damages that plaintiffs have suffered, satisfying the fourth element.  Plaintiffs' expert reports and evidence establish that Defendant Iran provided material support to the terrorist group AQI/ISI, that defendant's material support was a "substantial factor" enabling AQI/ISI to perpetrate the attack on Andrea Parhamovich, and that the attack was "reasonably foreseeable" or "anticipated" as a "natural consequence" of Iran's material support for AQI/ISI.  *Owens*, 864 F.3d at 798.

As set forth in Sec. II.F. and Sec. II.H., *supra*, Defendant Iran's material support for al-Qaeda and AQI began as early as the 1990s and continued as that organization evolved to eventually become the Islamic State of Iraq.  Dr. Gartenstein-Ross and Dr. Clawson discuss and identify the following forms of material support Defendant Iran provided to al-Qaeda and AQI/ISI, including 1) safe haven, 2) transportation and travel facilitation; 3) false documentation; 4) lodging; 5) facilities; 6) weapons; 7) explosives; 8) personnel; 9) smuggling services; 10) money; 10) financial services; and 11) expert advice and assistance. *See* Ex. 5, Gartenstein-Ross Report; Ex. 1, Clawson Report, Ex. 15, Clawson Supplemental Report.

Dr. Gartenstein-Ross concludes that the following categories of material support: money and weapons, sanctuary, safe houses, travel facilitation, and MOIS' provision of intermediary services to

negotiate the release of Zarqawi organization prisoners, "helped the Zarqawi organization to become a lethal and formidable insurgent force." Ex. 5, Gartenstein-Ross Report at 48-49.  Moreover, "Iranian material support was critical for the Zarqawi organization to function as an insurgent group in Iran…[and] the Zarqawi organization required weapons, money, safe haven, popular support, and senior leader guidance. Tehran ultimately either provided or otherwise empowered the Zarqawi organization to obtain all of these various needs." *Id*. at 48.  Dr. Gartenstein-Ross also confirms that this support was "critical to the survival and growth" of AQI/ISI; prevented the capture or killing of its members, is "connected to these groups' ability to obtain, assemble and/or utilize the weapons and munitions that they employed in Iraq, including rockets, mortars, improvised explosive devices, small arms, and other equipment and material vital to their operations;" and "significantly enhanced" and "significantly increased" AQI/ISI's ability to conduct operations in Iraq.  *Id*.

Iran's material support for AQI/ISI was therefore a "substantial factor" in the attack on Andrea Parhamovich.  *Owens*, 864 F.3d at 798.

The terrorist attack that killed Andi was also a "reasonably foreseeable" consequence of Defendant Iran's material support for AQI/ISI.  *Owens*, 864 F.3d 798.  It was foreseeable, indeed anticipated, that AQI/ISI would engage in terrorist attacks on civilians in Iraq to destabilize the government of Iraq and the American-led presence there.  Plaintiffs' expert Charles Lister describes AQI/ISI's "clear precedent for conducting attacks specifically targeting citizens of the United States or allied nations" in Iraq, including suicide bombings, "spectacular attacks in urban, heavily populated areas," kidnappings, and "yet more videotaped beheadings."  ECF No. 36-37 ¶ 30.

AQI/ISI's violent attacks on civilians in Iraq were well-known. AQI/ISI had such a "notorious reputation" for brutality that al-Qaeda's central leadership had called upon AQI's Zarqawi in 2006 to "restrain himself" and avoid killing civilians.  *Id*. ¶ 31.  The Iranian government's public declarations of hostility to America's presence in Iraq, combined with their material support to AQI/ISI, meant

that AQI/ISI attacks on American interests and citizens like Andrea Parhamovich were not only foreseeable but were a natural and intended consequence of Iranian policy. Iran must have known of AQI/ISI's terrorist activities in Iraq, and, in fact, those terrorist activities were the reason for Defendant Iran's support.

Courts have had little difficulty finding that a reasonably foreseeable consequence of supporting a terrorist organization is terrorism. *See Kilburn v. Socialist People's Libyan Arab Kamahiriya*, 376 F. 3d 1123, 1127-1130 (D.C. Cir. 2004) (finding that Sudan's "general awareness of the group's terrorist aims" satisfies the proximate cause element of a FSIA terrorism claim); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C. 2019) ("It is enough, the D.C. Circuit held [in Kilburn], to show that the material support or resources went to the terrorist organization that perpetrated the attack, and that the support was the 'proximate cause' of the terrorist act.") (quoting *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 13 (D.D.C. 2005)).

In *Owens*, for example, the court found that, as Sudan's "relationship with al Qaeda deepened, Sudan undoubtedly became aware of al Qaeda's hostility to the United States and its intention to launch attacks against American interests." 864 F.3d at 798. The court further found evidence of Sudan's knowledge because, although al-Qaeda openly boasted about attacking Americans, "Sudan continued to assist the group in moving people and resources throughout the region." *Id*. A defendant need not have awareness of specific attacks: "Sudan's claimed ignorance of al Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events; Sudan could not help but foresee that al Qaeda would attack American interests wherever it could find them." *Id*.

The subject attack in Iraq was foreseeable to Defendant Iran. As founded by the *Karcher* court, "[a]mong Iran's foreign activities, its campaign in Iraq figures prominently." 396 F. Supp. 3d at 22. The *Karcher* court noted, "[t]he 2003 invasion therefore provided Iran with a historic opportunity to reshape its relationship with Iraq, and in the process, increase its influence in the

region.  To that end Iran employed an 'all elements of national power' approach in exploiting the outcome of this seminal event.  This included both soft and hard power, from the use of political, economic, religious, and cultural leverage to the support of militant proxies."  396 F. Supp. 3d at 22-23.

### B.  The Plaintiffs have met the FSIA's Requirements for Having their Claims Heard

The FSIA further provides that courts shall hear a claim under § 1605A where 1) "the foreign state was designated a state sponsor of terrorism at the time of the act…and…either remains so designated when the claim is filed under this section or was so designated within the 6-month time period before the claim is filed under this section," 2) "the claimant or the victim was, at the time of the act…a national of the United States [or] a member of the armed forces [or] otherwise an employee of the Government of the United States…acting within the scope of the employee's employment" and 3) "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim."  28 U.S.C. §1605A(a)(2)(i)-(iii).

### 1.  Iran is a State Sponsor of Terrorism

Iran has been designated a state sponsor of terrorism by the U.S. Secretary of State continuously since January 19, 1984 pursuant to section 6(j) of the Export Administration Act of 1979, U.S. Department of State, *Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836, Jan. 23, 1984.

### 2.  Plaintiffs are Nationals of the United States

The United States Code defines a "national of the United States" as "(A) a citizen of the United States, or (B) a person who, though not a citizen of the United States, owes a permanent allegiance to the United States."  8 U.S.C. § 1101 (a)(22).  Andrea Parhamovich, the decedent, was born in the United States and was at all times of her life an American citizen.  ECF Nos. 37-1, 37-2,

36-3 (Andrea Parhamovich Estate Declaration, Probate Letters of Authority, and Birth Certificate of Andrea Parhamovich). Plaintiffs, who are her immediate family members, were also each born in the United States and have been throughout their lives American citizens. ECF Nos. 36-13, 36-15, 36-17, 36-19, 36-21 (declarations, birth certificates, and marriage certificate for Vicki Parhamovich and André Parhamovich); ECF Nos. 36-23, 36-25, 36-27 (declaration, birth certificate, and marriage certificate for Marcella Zampini); ECF Nos. 36-29, 36-31, 36-33, 36-35 (declarations and birth certificates for Chris Parhamovich and Cory Parhamovich).   In his June 23, 2021 Report and Recommendation, Magistrate Judge Harvey found Plaintiffs met the citizenship requirement imposed by the FSIA.  ECF No. 40 at 15.

### 3. The Arbitration Requirement is Not Applicable as the Attack Occurred in Iraq, Not Iran

As for the arbitration requirement under § 1605A(a)(2)(A)(iii), Plaintiffs were not required to extend an offer to Iran to arbitrate because this requirement applies only when the terrorist act occurred in the foreign state against which the claim is brought.  Since the attack occurred in Iraq, not in Iran, the arbitration provision does not apply.

## VI. PLAINTIFFS HAVE STANDING AND ARE ELIGIBLE TO BRING THEIR CLAIMS UNDER THE PRIVATE RIGHT OF ACTION PROVIDED BY 1605A(c)

The private federal cause of action provided by Section 1605A provides that a state sponsor of terrorism shall be liable to a U.S. national for "personal injury or death" caused by an act of "torture, extrajudicial killing…hostage taking, or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1),(c).  A foreign state is "vicariously liable for the acts of its officials, employees, or agents."  28 U.S.C. § 1605A(c).  In their original Motion for Default Judgment as to Liability against Defendants Syria and Iran, ECF Nos. 36 & 37, Plaintiffs asserted, and incorporate herein, the following theories of tort liability, 1) wrongful death 2) assault 3) battery and 4) intentional infliction of emotional distress/solatium.   Magistrate Judge Harvey found in his Report and

Recommendation that Plaintiffs properly asserted a substantive basis of liability for their claims under the four theories of civil liability.  ECF No. 40 at 29-34.  Subsequently, this Court (Pan, J.) adopted the portion of Magistrate Judge Harvey's Report and Recommendation finding that Plaintiffs "sufficiently established all four theories…at the default stage." *Id*. at 34; ECF No. 52 at 2-3.

## VII.    CONCLUSION

       For the reasons stated above, plaintiffs respectfully request the court to enter default judgment on liability against Defendant Iran for the attempted kidnapping and extrajudicial killing of Andrea Parhamovich.

Respectfully submitted,

/s/ Joshua M. Ambush
Joshua M. Ambush (Bar No. MD27025)
Law Offices of Joshua M. Ambush, LLC
106 Old Court Road
Suite 303
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
Email:  joshua@ambushlaw.com
*Counsel for Plaintiffs*

Dated:  August 29, 2022