## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE ESTATE OF ANDREA S. PARHAMOVICH, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 17-cv-61 (GMH) |
| THE SYRIAN ARAB REPUBLIC, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiffs—Vicki Parhamovich on behalf of herself and the Estate of Andrea Parhamovich; André Parhamovich; Marcella Zampini; Chris Parhamovich; and Cory Parhamovich—brought this action against the Syrian Arab Republic ("Syria") and the Islamic Republic of Iran ("Iran") (collectively, "Defendants") under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"). 28 U.S.C. § 1605A. Plaintiffs allege that Iran and Syria provided material support and resources to the Islamic State in Iraq ("ISI"), which ambushed Andrea Parhamovich's vehicle in January 2017, resulting in her death. Plaintiffs sue under Section 1605A(c) of the FSIA, which, in relevant part, permits United States nationals to sue foreign states designated as state sponsors of terrorism for personal injury or deaths "caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A. This Court entered default judgment against Defendant Syria in May 2022. In August 2022, Plaintiffs filed a Motion for Default Judgment as

to Liability against Defendant Iran.  Having reviewed that motion and the entire record herein,[1] the motion will be granted.[2]

## I.    BACKGROUND

As the undersigned set forth previously concerning Defendant Syria's default, Andrea Parhamovich was a "United States citizen who traveled to Iraq to support its transition to democracy after the American-led invasion in 2003."  *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2021 WL 6843587, at *1 (D.D.C. June 23, 2021).  Ms. Parharmovich's position as a communications strategist for the National Democratic Institute ("NDI") allowed her to "travel outside of Baghdad's heavily fortified Green Zone."  *Id.*  On January 17, 2007, Ms. Parhamovich traveled to the Iraqi Islamic Party ("IIP") headquarters to meet with IIP officials outside of the Green Zone. *Id.*; *see also id.* at *9. When Ms. Parhamovich's three-vehicle convoy departed IIP headquarters, "armed militants attacked her vehicle and attempted to gain entry to the vehicle, presumably to take Ms. Parhamovich hostage."  *Id.* at *1.  After the attackers failed to open the door, they directed "small arms fire and grenades" at Ms. Parhamovich's vehicle.  *Id.*  "A

---

[1] The relevant docket entries for Plaintiffs' motion are: (1) Plaintiffs' complaint (ECF No. 1); and (2) Plaintiffs' motion for default judgment as to liability against Defendant Iran and accompanying exhibits (ECF No. 65 to 65-22). The page numbers cited herein are those assigned by the Court's CM/ECF system.

[2] On December 7, 2022, this case was referred to the undersigned for all purposes following consent by Plaintiffs. ECF Nos. 6, 69. Under the Federal Magistrate Act, magistrate judges may, with the consent of the parties, preside over "any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). A party may, through conduct, impliedly consent to a magistrate judge's jurisdiction. *Roell v. Withrow*, 538 U.S. 580, 591 (2003). On this basis, courts in this Circuit have found a party's default effected consent to a magistrate judge's jurisdiction to decide a motion for default judgment. *See Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 38 (D.D.C. 2020); *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *1 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021); *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 98 (D.D.C. 2011) ("[D]efaulting nullifies any right to argue the absence of the magistrate judge's jurisdiction . . . ."); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–86 (2015) (applying *Roell*'s implied consent standard and holding that a bankruptcy judge may enter default judgment against an absent party where their defaulting conduct evinces consent to the bankruptcy judge's jurisdiction).

.

grenade placed underneath the vehicle eventually caused the fuel pipe and tank to explode—catching the vehicle on fire with Ms. Parhamovich inside, leading to her death." *Id*.

Plaintiffs filed their complaint seeking damages arising from Ms. Parhamovich's death in January 2017.  ECF No. 1.  After Defendants Iran and Syria failed to appear before the Court, the Clerk of the Court entered both Defendants' default in January 2019 at Plaintiffs' request.  ECF Nos. 21, 22.  In March 2021, Plaintiffs filed their first motion for default judgment as to liability as to both Defendants.  ECF No. 37.  In June 2021, the undersigned recommended that Plaintiffs' motion for default judgment as to liability be granted as to Syria but denied as to Iran because of failure to serve Iran as required by 28 U.S.C. § 1608(a).  ECF No. 39.  Then-District Judge Pan adopted that recommendation as to Defendant Syria in May 2022.  ECF No. 52. Thereafter, Plaintiffs went about serving the complaint and summons on Defendant Iran pursuant to the process mandated by Section 1608(a). *See* ECF Nos. 41–50, 55–57.  After Iran failed to appear before the Court, Plaintiffs again requested that the Clerk enter default. ECF No. 58. The Clerk did so in June 2022. ECF No. 59.  Plaintiffs then renewed their motion for entry of default judgment as to liability against Defendant Iran. ECF No. 60. After a hearing on the motion in July 2022 during which the undersigned questioned the sufficiency of Plaintiffs' evidence of Iran's material support for ISI at the time of the attack in question, Plaintiffs withdrew their motion. ECF No. 64. On August 29, 2022, Plaintiffs renewed again their motion for default judgment as to liability against Iran and provided additional evidence of Iran's material support of ISI at the time

of the attack. Having reviewed that motion, and Plaintiffs' bolstered evidence of material support, the motion will be granted.

## II.    LEGAL STANDARD

The Federal Rules of Civil Procedure establish a two-step process for entry of default judgment. Fed. R. Civ. P. 55(b)(2); *see also Bricklayers & Trowel Trades Int'l Pension Fund v. KAFKA Constr., Inc.*, 273 F. Supp. 3d 177, 179 (D.D.C. 2017). First, a plaintiff must request "that the Clerk of the Court enter default against a party who has 'failed to plead or otherwise defend.'" *Bricklayers* 273 F. Supp. 3d at 179 (quoting Fed. R. Civ. P. 55(a)). Second, the plaintiff must then move for default judgment against the absent defendant. *Id.*

Default judgment is available only when "the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Leopfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). "[D]efault judgment is warranted if a defendant is a 'totally unresponsive' party and its default is plainly willful, as reflected by its failure to respond, 'either to the summons and complaint, the entry of default, or the motion for default judgment.'" *District of Columbia v. Butler*, 713 F. Supp. 2d 61, 64 (D.D.C. 2010) (quoting *Gutierrez v. Berg Contracting, Inc.*, No. 99-3044, 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000)). However, a notation of default by the Clerk of the Court against an unresponsive defendant does not automatically entitle a plaintiff to default judgment. Rather, it is appropriate only if the complaint's well-pleaded allegations, accepted as true, state an adequate claim for relief. *See Jackson v. Corr. Corp. of Am.*, 564 F. Supp. 2d 22, 26–27 (D.D.C. 2008); *Marmaras v. Marafatsos*, No. 18-1236, 2019 WL 3414363, at *2 (D.D.C. July 29, 2019). In other words, entry of default "'establishes the defaulting party's liability for the well-pleaded allegations of the complaint,' but not for allegations that are not

sufficiently pleaded." *United States v. $6,999,925.00 of Funds Associated with Velmur Mgmt. Pte Ltd*, 368 F. Supp. 3d 10, 17 (D.D.C. 2019) (quoting *Boland v. Elite Terrazzo Flooring, Inc.*, 763 F. Supp. 2d 64, 67 (D.D.C. 2011)).  In that way, "a motion for default judgment is like a reverse motion to dismiss for failure to state a claim." *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015).

Before a default judgment can be entered against a foreign sovereign, the FSIA requires a plaintiff to establish his or her "claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  A court must "scrutinize the plaintiff's allegations and 'may not unquestioningly accept a complaint's unsupported allegations as true.'" *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 17 (D.D.C. 2016) (quoting *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 211 (D.D.C. 2012)).  But "[u]ncontroverted factual allegations that are supported by admissible evidence are taken as true." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 33 (D.D.C. 2016).  An evidentiary hearing is not required; rather, a "plaintiff may establish proof by affidavit." *Reed*, 845 F. Supp. 2d at 212; *see also Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005) ("In the absence of an evidentiary hearing, although the plaintiffs retain 'the burden of proving personal jurisdiction, [they] can satisfy that burden with a prima facie showing.' . . . [T]hey may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." (first alteration in original) (quoting *Edmond v. U.S. Postal Serv. Gen. Counsel*, 949 F.2d 415, 424 (D.C. Cir. 1991))).  Due to the nature of cases brought under the FSIA's terrorism exception, "[t]he testimony of expert witnesses is of crucial importance because firsthand evidence of terrorist activities is difficult, if not impossible, to obtain." *Owens v. Republic of Sudan*, 864 F.3d 751, 787 (D.C. Cir. 2017) (internal citations omitted), *vacated in part on other grounds sub nom. Opati v. Republic of Sudan*, __ U.S. __, 140 S. Ct. 1601 (2020).

Additionally, "the procedural posture of a default does not relieve a federal court of its 'affirmative obligation' to determine whether it has subject-matter jurisdiction over the action." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 42 (D.D.C. 2018) (quoting *James Madison Ltd. ex rel. Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996)).  The party seeking the judgment must demonstrate that the court has both subject-matter jurisdiction over the action and personal jurisdiction over the absent defendant. *See Mwani*, 417 F.3d at 6; *Thuneibat*, 167 F. Supp. 3d at 33.  And "[e]ven if there are sufficient contacts for a court to assert personal jurisdiction over a defendant, it lacks power to do so unless the procedural requirements of effective service of process are satisfied." *Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 514 (D.C. Cir. 2002), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021).

## III.    DISCUSSION

Plaintiffs assert that Iran is liable for the death of Andrea Parhamovich under 28 U.S.C. § 1605A, alleging that Iran provided material support to the terrorist group responsible for the attack. For the reasons set forth below, the Court finds that it has subject-matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Iran, and it finds that Plaintiffs have sufficiently established liability at the default stage.

### A.    Subject-Matter Jurisdiction

The undersigned first turns to the Court's subject-matter jurisdiction over Plaintiffs' claims against Iran.  Section 1330(a) of Title 28 of the United States Code grants district courts original subject-matter jurisdiction "without regard to amount in controversy" over (1) nonjury civil actions, (2) as to any claim for relief *in personam*, (3) against a foreign state, (4) provided that the foreign state is not entitled to immunity under Sections 1605 to 1607 of the FSIA.  28 U.S.C. §

1330(a); *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 75 (D.D.C. 2017); *Reed*, 845 F. Supp. 2d at 210.  The first three factors are easily met here. The undersigned previously found that Plaintiffs have filed a nonjury civil action, seeking *in personam* relief against a foreign sovereign, Syria. *See Parhamovich*, 2021 WL 6843587, at *7. Plaintiffs' nonjury civil action also seeks *in personam* relief against the foreign sovereign, Iran.  *See generally* ECF No. 1; *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 393 (D.D.C. 2015) (finding that a lawsuit alleging civil federal and other tort claims against Iran and seeking damages for harm caused by a suicide bombing satisfied the first three requirements for subject-matter jurisdiction under section 1330).

With respect to the fourth requirement—whether the foreign state is entitled to immunity—Plaintiffs argue that the FSIA's "terrorism exception" to sovereign immunity applies here because Iran provided material support to ISI, which killed Ms. Parhamovich.  ECF No. 65-1 at 17–46. The FSIA's "terrorism exception" will apply if the party seeking relief establishes the following: (1) "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred"; (2) "the claimant or the victim was, at the time the act . . . occurred[,] . . . a national of the United States"; (3) the plaintiffs seek monetary damages "for personal injury or death that was caused by torture, extrajudicial killing, aircraft sabotage,  hostage taking, or the provision of material support or resources for such act"; and (4) "[the] act, or the provision of material support or resources for the act, is engaged in by an official, employee, or agent of the foreign state."  28 U.S.C. § 1605A(a)(1), (2); *see also Mohammad v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015).[3]  These four requirements are addressed in turn below.

First, the United States has designated Iran as a state sponsor of terrorism continuously since 1984, including in 2007 when the attack on Ms. Parhamovich's vehicle occurred.  ECF No.

---

[3] Section 1605A(a)(2)(A)(iii) also requires that, in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant must afford the foreign state a "reasonable opportunity to arbitrate the claim

65-1 at 31; *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Dec. 27, 2022). Accordingly, "the foreign state was designated as a state sponsor of terrorism at the time the act . . . occurred." 28 U.S.C. § 1605A(a)(2)(A)(i)(I); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 358 (D.D.C. 2020) (finding Iran to be a state sponsor of terrorism under the FSIA terrorism exception when it was designated as such by the Department of State). Regarding the second and third requirements, the undersigned has previously found that Plaintiffs met the citizenship requirements and that the "coordinated ambush of a vehicle convoy [resulting] in the death of Ms. Parhamovich" qualified as an extrajudicial killing under the FSIA. *Parhamovich*, 2021 WL 6843587, at *7.

The last requirement for establishing jurisdiction under the FSIA's "terrorism exception" is that the act, or the provision of material support or resources for the act, is engaged in by an official, employee, or agent of the defendant. 28 U.S.C. § 1605A(a)(1). For this factor, "courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008).

a.    *Whether a terrorist organization carried out the attack*

With respect to the first consideration—whether "a particular terrorist group committed the terrorist act," *Gates*, 580 F. Supp. 2d at 67—the undersigned has previously found that Plaintiffs

---

in accordance with the accepted international rules of arbitration." Because the attack at issue here occurred in Iraq, Plaintiffs do not need to satisfy the arbitration requirements. ECF No. 65-1 at 32; *see also Thuneibat*, 167 F. Supp. 3d at 35 (holding that the plaintiffs did not need to satisfy the arbitration requirement because they brought suit against Syria for a terrorist attack that occurred in Jordan).

provided sufficient evidence to demonstrate that ISI perpetrated the attack that killed Ms. Parhamovich. *Parhamovich*, 2021 WL 6843587, at *9.

        *b.*        *Whether Iran provided material support or resources to ISI*

With respect to the second step in the analysis—whether "[Iran] generally provided material support or resources to [ISI]," *Gates*, 580 F. Supp. 2d at 67—material support or resources is defined under the FSIA as "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel . . . and transportation, except medicine or religious materials." 18 U.S.C. § 2339A(b)(1); *see* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18"). Although evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, "successful showings have generally focused on the foreign state's offer of haven to the terrorist group, provision of financing and weapons, assistance with recruitment, or motive to foment unrest in a particular area where the group is operating." *Parhamovich*, 2021 WL 6843587, at *8; s*ee generally W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 136 (D.D.C. 2019) (finding that Iran provided material support to the Badr Organization through support of efforts to overthrow Sunni rule in Iraq and direct funding); *Thuneibat* 167 F. Supp. 3d at 36 (finding Syria provided material support by allowing AQI to operate and plan terrorist attacks from within Syria and by providing essential financing to the group); *Gates*, 580 F. Supp. 2d at 68–69 (finding Syria provided material support to AQI by offering it a haven for its operations, and by supporting its training and recruitment

efforts); *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 54 (D.D.C. 2008) (finding that Iran provided material support to Hezbollah by funding training camps).

Here, consistent with that case law, Plaintiffs contend that Iran provided material support and resources to ISI, including "weapons, money, safe haven, popular support and senior leader guidance[,]" both prior to and at the time of the attack that led to Ms. Parhamovich's death. ECF No. 65-1 at 23. To make this showing, Plaintiffs rely primarily on the expert declarations of Dr. Patrick Clawson[4] and Dr. Daveed Gartenstein-Ross,[5] which in turn rely on open source reporting, documents published by the United States government, and other relevant scholarship. The Court finds that Plaintiffs' evidence is sufficient at the default stage to demonstrate that Iran provided material support to the terrorist organization that led to Ms. Parhamovich's death.

Before reviewing the evidence underlying that conclusion, the changing name of that terrorist organization should be addressed. The Court found previously that ISI—the Islamic State in Iraq—perpetrated the attack that killed Ms. Parhamovich in January 2007. *Parhamovich*, 2021 WL 6843587, at *9. Prior to June 2006, ISI was called al-Qaeda in Iraq ("AQI"); prior to September 2004, AQI was called Jamaat al-Tawhid wal-Jihad ("JTJ"); and for the period between 1999 and 2004, the group operated under the name Jund al-Sham. *See* ECF No. 65-6 at 14; *see*

---

[4] The Court finds that Dr. Patrick Clawson is qualified as an expert on the Islamic Republic of Iran. He currently serves as the Director for Research at the Washington Institute for Near East Policy, and has been previously qualified as an expert witness in federal court on issues related to Iran, Iran's support for terrorism, its economy, and other related issues. Dr. Clawson has testified before the House Committees on International Relations, National Security, and Banking and Financial Services on issues related to Iran. He has given presentations concerning Middle Eastern politics and security at more than 200 symposiums in more than twenty countries. ECF No. 65-2 at 2–7.

[5] The Court finds that Dr. Daveed Gartenstein-Ross is qualified as an expert on issues related to terrorist groups operating in Iraq. He currently serves as Chief Executive Officer of Valens Global, is a Non-Resident Fellow at the Foundation for the Defense of Democracies, and an Associate Fellow at the International Centre for Counter-Terrorism at The Hague. He has been qualified as an expert witness in federal court on issues related to the Zarqawi organization and other terrorist groups and related issues in federal court. Dr. Gartenstein-Ross has testified before multiple House and Senate Committees, the United Nations, European Parliament, and the Canadian House of Commons. ECF No. 65-6 at 5–12.

*also* ECF No. 37-43 at 12. ("The main elements of the Iraqi insurgency, which began after the U.S.-led invasion, proclaimed themselves to be Al Qaeda in Iraq in September 2004 before changing their name in June 2006 to the Islamic State in Iraq."). Dr. Gartenstein-Ross describes in great detail the group's organizational continuity despite its repeated name changes. ECF No. 65-6 at 14–28. Having reviewed that evidence, the Court agrees with his conclusion that "at no point should the name changes be understood as signaling that the . . . organization had become a truly new organization with discontinuity from what came before." *Id.* at 14. Whatever its name— ISI, AQI, JTJ, or Jund al-Sham—the organization's roots date back to the 1990s and "[t]he central node of [its] deeper history was the activities and ambition of one man: . . . Abu Musab al-Zarqawi," the organization's "founding father." ECF No. 36-38 at 7; ECF No. 65-6 at 14. The rebranding of AQI as ISI following Zarqawi's death in June 2006, was no different. As Dr. Gartenstein-Ross credibly explains, ISI continued to advance the longstanding goals of both Zarqawi and ISI's predecessor organization, AQI, and ISI's senior leadership was dominated by individuals with clear ties to Zarqawi and AQI. ECF No. 65-6 at 22, 24–27. This overlap "underscores that ISI as a group was dominated by the Zarqawi organization, and hence represented organizational continuity" with the Zarqawi terrorist groups that preceded it. *Id.* at 22. For that reason, the Court will refer here to the terrorist group responsible for Ms. Parhamovich's death as the "Zarqawi organization," as Dr. Gartenstein-Ross does. *Id.*

An understanding of Iran's motivation to assist the Zarqawi organization would also be helpful to the analysis of Plaintiffs' evidence of material support. At first glance, it is perhaps odd to conclude, as Plaintiffs' experts do, that Iran, a predominately Shia country, would provide any support to the Zarqawi organization, a Sunni terrorist group that engaged in "indiscriminate violence against Shia" in Iraq. ECF No. 65-6 at 47–48 (detailing Quds Force assistance to the

Zarqawi organization); *see also* ECF No. 65-2 at 11 (Dr. Clawson noting the oddity that "at the same time that Iran was providing ample support for the Shia militias in Iraq that were fighting Al Qaeda in Iraq, Iran would also support Al Qaeda in Iraq"). But, as Dr. Gartenstein-Ross attests, "Iranian support to the al-Qaeda network and the Zarqawi organization [was] essentially a product of pragmatic expediency. While the Islamic Republic . . . never sought to consolidate an ideological alliance with the group on account of its Sunni extremist orientation, Iran has been willing to coordinate tactically when doing so further its own interests." ECF No. 65-6 at 47. Essentially, Iran supported the Zarqawi organization, despite their ideological differences, because it was fighting a mutual enemy in Iraq:  the United States.  *Id.; see also* ECF No. 65-1 at 11 ("Although Iran, a Shia country, is ideologically at odds with Sunni groups, they share the common goal of attacking U.S. interest and expelling the U.S. from the region."); ECF No. 65-5 (9/11 Commission Report).  Iran provided support to al-Qaeda, a Sunni terrorist organization, more generally, for the same reason.  As Dr. Gartenstein-Ross explains:

> [Iran's] provision of logistical and operational support has buttressed the ability of al-Qaeda to target a common enemy, the United States.  At the same time, allowing the group's cadres to shelter on its soil has afforded Iran with leverage in its dealings with Washington: restrictions on al-Qaeda's activities can be loosened to deter or retaliate against American actions, while tighter control can be exercised in exchange for concessions, or to improve bilateral relations.  Finally working with al-Qaeda provided Iran with an insurance policy that often helped to shield it from the group's attacks.

ECF No. 65-6 at 47 (footnote omitted).  This marriage of convenience between Shia-lead Iran and Sunni-dominated al-Qaeda has been recognized by other courts:

> Both Iran and al Qaeda can be ruthlessly pragmatic, cutting deals with potential future adversaries to advance their causes in the short-term.  Members of the Shiite and Sunni sects—particularly at the leadership level—often work together on terrorist operations. The religious differences, to the extent they retain any vitality

at the leadership level, are trumped by the leaders' desire to confront and oppose common enemies, particularly the U.S. . . .

*In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-1570, 2011 WL 13244047, at *12 (S.D.N.Y. Dec. 22, 2011) (internal citations omitted); *see also Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065, 2022 WL 2817730, at *10 (D.D.C. July 19, 2022) (describing Iran's "close relationship with al-Qaeda").  Indeed, federal courts including this one have repeatedly found that, despite its ideological differences with al-Qaeda, Iran has provided al-Qaeda with material support to commit terrorist attacks against the United States around the world.  *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 105–08 (D.D.C. 2015) (Iran provided material support to al-Qaeda for the 2000 bombing of U.S.S. *Cole*); *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 150 (D.D.C. 2011) (Iran provided material support to al-Qaeda for the 1998 attacks on U.S. embassies in Nairobi and Dar es Salaam); *see also In re Terrorist Attacks on Sept. 11, 2001*, No. 03-mdl-1570, 2011 WL 13244047, at *12 (Iran provided material support to al-Qaeda for the September 11, 2001 terrorist attacks).

According to Plaintiffs' experts, Iran's support of the Zarqawi's al-Qaeda affiliate[6] organization in Iraq was motivated by the same "self-interest[] . . . as its support for al-Qaeda" more generally:

> For the most part, Tehran's backing for Zarqawi's group was part of a wider strategy aimed at accelerating the eviction of U.S. troops from Iraq, while simultaneously ensuring against the emergence of a strong Shia state that could threaten the legitimacy—and predominance—of Iran's clerical regime.  This effort entailed a deliberate policy of creating instability in Iraq that would both impose

---

[6] "In October 2004, Zarqawi publicly pledged *bayah* (an oath of allegiance) to bin Laden, thus making the Zarqawi organization into al-Qaeda's first publicly announced affiliate group." ECF No. 65-6 at 20.

> political, economic and human costs on the United States and delegitimize the
> American-led coalition.

ECF No. 65-6 at 48 (footnotes omitted); *see also* ECF No. 65-2 at 15 (Dr. Clawson opining that

Iran's support of Al Qaeda in Iraq "fits the pattern of Iran's relationships with Al-Qaeda" more

generally and quoting an alleged Iraqi militant's view that Iran did "not care about the fight

between Shi'a and al Qaeda, Iran just want[ed] to force CF [Coalition Forces] out of Iraq because

Iran [was] afraid CF [would] use Iraq as a base for an attack in the future"). Such evidence of

Iran's "motive to foment unrest in a particular area where the [terrorist] group is operating"—here,

Iraq—itself lends credence to Plaintiffs' evidence of Iran's material support of the Zarqawi

organization. *Parhamovich* , 2021 WL 6843587, at *8 (citing *W.A.,* 427 F. Supp. 3d at 136).

Whatever Iran's motivation, the Court finds Plaintiffs' evidence that the Islamic Republic

provided material support to the Zarqawi organization during the relevant time period more than

sufficient at the default stage. With respect to Iran more generally, it has, as noted, been a

designated State Sponsor of Terrorism since 1984. ECF No. 65-3 at 3; *see also* U.S. Dep't of State,

State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Dec.

22, 2022). According to United States Department of State, Iran is "the world's worst state sponsor

of terrorism," as measured by its extensive support of terrorist organizations around the world,

including in Iraq, that are hostile to the United States and its allies. ECF No. 65-2 at 20 (citing

ECF No. 65-3 at 2 (Department of State 2018 Country Reports on Terrorism)). According to

Plaintiffs' experts, the Islamic Republic's political structure is bifurcated into a "formal

government structure" and a "revolutionary structure," both of which are overseen by Iran's

Supreme Leader. ECF No. 65-2 at 9–10. The Iranian Revolutionary Guard Corps ("IRGC") is

part of the revolutionary structure that operates parallel to the Iranian military. *Id.* at 10. The IRGC,

has "provided funding and/or training for terrorism operations that targeted United States and

Israeli citizens" for the past twenty years. *Id.* at 12. In particular, the Quds (or Qods) Force is a "branch of the IRGC generally charged with 'foreign operations.'" *Id.* at 11; ECF No. 65-6 at 32, n.141 (the Quds Force is a branch of the IRGC performing "extraterritorial covert and military operations"). As the Southern District of New York has found, the Quds Force "has a long history of engaging in coups, insurgencies, assassinations, kidnappings, bombings and arms dealing, and it is one of the most organized, disciplined, and violent terrorist organizations in the world." *In re Terrorist Attacks on Sept. 11, 2001*, 2011 WL 13244047, at *5. According to Plaintiffs' experts, the Quds Force's "foreign operations" included providing material support to Zarqawi and his terrorist organization to assist in their fight against a mutual enemy: the United States. ECF No. 65-2 at 11; *see also* ECF No. 65-6 at 45-47.

Iran's support of Zarqawi dates back to prior to 9/11, when Zarqawi and his associates "took advantage of Iran's permissive attitude towards Sunni jihadist during this period," specifically through a "network of safe houses in the Iranian cities of Tehran and Mashhad" prior to him and his associates entering Afghanistan following al Qaeda's attacks on the World Trade Center. ECF No. 65-6 at 44–45. Citing to multiple examples of Iran providing safe-passage and refuge to al-Qaeda operatives and Zarqawi associates, Dr. Gartenstein-Ross concludes that "Iran's permissiveness was an explicit and deliberate policy" of the Islamic Republic. *Id.* at 32–42, 44–45 (citing Brian Fishman, *The Master Plan: ISIS, al-Qaeda, and the Jihadi Strategy for Final Victory* (2016)). In late 2001, for instance, after the United States invasion of Afghanistan to eradicate al Qaeda and oust the Taliban, Zarqawi and a cohort of Arab mujahedin he had commanded in Afghanistan "reverse[d] course" and fled to Iran where they again found refuge and were permitted "to establish new camps and safe houses for his operatives in Zahedan, Isfahan, and Tehran." *Id.* at 45; (citing Urs Gehriger, *Abu Musab al-Zarqawi: From Green Man to Guru*,

http://www.signandsight.com/features/449.html, (Sept. 11, 2005); Dan Darling, *The Cicero Articles*, Long War Journal, https://www.longwarjournal.org/archives/2005/10/the_ciceroarti.php (Oct. 30, 2005)).  Dr. Gartenstein-Ross explains that these facilities in Iran were used to send "forged passports, money, and operational orders . . . transforming Iran into a critical hub for [Zarqawi's] fast-growing militant network." *Id.* at 45–46.  More, the organization's communications were "channeled by satellite, cell and land phones, and handled through middlemen with the IRGC's support." *Id.* at 46.

Thereafter, Zarqawi, with the assistance of the IRGC's Quds Force, traveled to Iraqi Kurdistan, where he organized JTJ, the group that became AQI, and later, ISI. *Id.* at 45.  Once in Iraq, Zarqawi continued to rely on logistics networks in Iran to procure weapons and to use safehouses in different parts of Iran. *Id.* at 46.  In 2004, for example, Iran provided Zarqawi with "mines and weapons at his strongholds in Fallujah and elsewhere in the Anbar province." *Id.* at 46, 49 (citing Bill Roggio, *Iran and al Qaeda in Iraq*, The Long War Journal, https://www.longwarjournal.org/archives/2007/01/iran_and_alqaeda_in.php (Jan. 6, 2007)). Additionally, in late December 2006, mere weeks before the attack on Ms. Parhamovich, two IRGC Quds Force operatives were arrested in Baghdad possessing "weapons lists, documents pertaining to shipments of weapons into Iraq, organizational charts, telephone records and maps, among other sensitive intelligence information," including information related to "importing modern, specially shaped explosive charges into Iraq, weapons that have been used in roadside bombs to target U.S. military armored vehicles." ECF No. 65-6 at 46 (quoting Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S.*, Wash. Post, Dec. 30, 2006); *see also* ECF No. 65-21. According to a U.S. intelligence official, the information gleaned from the Iranian operatives showed "how the Quds Force [was] working with individuals affiliated with [AQI] and

Ansar al-Sunna," again, just weeks prior to the attack on Ms. Parhamovich. ECF No. 65-6 at 47

(quoting Eli Lake, *Iran's Secret Plan for Mayhem*, The New York Sun, January 3, 2007). In 2008,

a leading Sunni militant and principal al Qaeda fundraiser who had sent money to the Zarqawi

organization, reported in an interview that "Iran was both providing [AQI] with money and

weapons and facilitating the movement of its fighters across the Middle East and South Asia" with

the goal of "'deter[ring] the United States, in order for [the U.S.] not to give its entire attention to

Iran.'" *Id.* at 47 (quoting *Kuwaiti Cleric Admits Sending Mujahedin to Iraq, Afghanistan, Argues

Iran Involved*, Al-Qabas, May 7, 2008).

Based on evidence similar to that presented here, a court in this District recently found that

Iran provided material support to the Zarqawi organization with respect a July 2007 grenade attack

on a U.S. service member in Iraq. *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193, 2022

WL 17370239, at *7, 10 (D.D.C. Sept. 8, 2022) (finding that Iran provided material support

through "financial support, logistical assistance, weaponry, and safe haven to the Zarqawi

organization for its campaign of violence between 2003 and 2010" (citing expert report by Dr.

Gartenstein-Ross), *report and recommendation adopted*, No. 16-cv-2193, 2022 WL 17370160

(D.D.C. Sept. 30, 2022). Similarly, the District Court for the Southern District of Texas found that

Iran provided material support to Zarqawi's organization by "harboring Zarqawi and other AQI

operatives in a 'safe haven,' as well as providing funds, training[,] and weapons to al Qaeda

operatives . . . [in] Iraq" with respect to an attack on a U.S. service member in Iraq in 2003. *Espitia

v. Islamic Republic of Iran*, No. 21-cv-123, 2022 WL 2168355, at *2, 5 (S.D. Tex. June 16, 2022)

(quoting the record).

After consideration of the record evidence, as well as the findings in *Neiberger* and *Espitia,*

of which the Court takes judicial notice, *cf. Barry v. Islamic Republics of Iran,* 437 F. Supp. 3d

15, 33 (D.D.C. 2020) (relying on the "the voluminous evidentiary records complied by other courts in related cases in this Circuit" to conclude that a foreign state provided material support to a terrorist organization), the Court finds that Plaintiffs has sufficiently demonstrated at the default stage that Iran was providing material support to the Zarqawi organization—including ISI —by providing funding and weaponry, as well as facilitating travel and the use of safe houses throughout Iran, during the period relevant to the ISI attack that led to Ms. Parhamovich's death.  The Court further finds that Plaintiffs have demonstrated that Iran's material support was provided at the direction of Iranian officials or agents acting within the scope of their "office, employment, or agency," 28 U.S.C. § 1605A(a)(1), specifically, the Quds Force. As demonstrated above, and as other courts have found, "[t]he Quds Force is part of the IRGC, which is, in turn, an arm of the Islamic Republic of Iran.  Those findings are sufficient to satisfy the scope of office requirement." *Fritz v. Islamic Republic of Iran,* 320 F. Supp. 3d 48, 85 (D.D.C. 2018); *see also Karcher v. Islamic Republic of Iran,* 396 F. Supp. 3d 12, 55 (D.D.C. 2019) (same).

### c.    Causation

Plaintiffs have also shown that Iran's material support was a legally sufficient cause of the attack on Ms. Parhamovich's convoy.  To be actionable under the FSIA, a "plaintiff need not establish that the material support or resources provided . . . contributed directly to the act from which [the] claim arises." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 18 (D.D.C. 1998). Nor may a foreign sovereign "avoid liability [under the FSIA] for supporting known terrorist groups by professing ignorance of their specific plans for attacks."  *Owens,* 864 F.3d at 799. Rather, there must only be "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  *Owens,* 826 F. Supp. 2d at 151 (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010)). In order to establish this reasonable connection, first a defendant's actions must "be a 'substantial factor' in

the sequence of events that caused the plaintiff's injury," and second, "the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the defendant's conduct." *Force*, 464 F. Supp. 3d at 368 (quoting *Owens*, 864 F.3d at 794). "In assessing reasonable foreseeability, moreover, the Court must consider 'the broader context' of Iran's conduct." *Fritz*, 320 F. Supp. 3d at 86 (quoting *Owens*, 864 F. 3d at 797).

Here, Plaintiffs have made a sufficient showing of causation at the default stage. As set forth more fully above, Iran provided material resources and sanctuary to the Zarqawi organization in its early years, then continued to facilitate travel and provide funding and weaponry when it relocated to Iraq and rebranded itself AQI and later ISI. Dr. Gartenstein-Ross opines that Iran's support was exactly what the Zarqawi organization needed "to function as an insurgent group in Iraq" and to perpetrate attacks like the one that killed Ms. Parhamovich. ECF No. 65-6 at 48–49. Iran's supply of "safe havens, routes of communication, . . . travel and supply routes, [and] the weapons and munitions that they employed in Iraq", were "critical to [the Zarqawi organization's] survival and growth," "significantly increased [its] capabilities," and "helped [it] to become a lethal and formidable insurgent force." *Id.* at 50. Such evidence is sufficient to show that a foreign state's actions were a "substantial factor" in the sequence of events culminating in a plaintiff's injuries. *See Neiberger*, 2022 WL 17370239, at *10 (finding Iran's support of AQI to be a substantial factor in a terrorist attack because Iran provided weapons, safe haven, and financing); *Doe v. Syrian Arab Republic*, 18-cv-66, 2020 WL 5422844, at *11 (D.D.C. Sept. 10, 2020) (finding Syria's support of ISIS to be a substantial factor in terrorist attack because the country provided financing, safe haven, and facilitated prisoner release); *Force*, 464 F. Supp. 3d at 368

(finding Iran's support of Hamas to be a substantial factor in a terrorist attack because the country provided financial and military aid crucial to the Hamas' operating capacity).

Ms. Parhamovich's death was also a reasonably foreseeable consequence of Iran's material support of the Zarqawi organization. Prior to Ms. Parhamovich's murder, the Zarqawi organization had established a "reputation[] for brutality" and a "'clear precedent for conducting attacks specifically targeting citizens of the United States or allied nations' in Iraq." ECF No. 65-1 at 29 (quoting ECF No. 36-37 at 13–14). Such attacks included the kidnapping and beheading of U.S. citizen Nicholas Berg in May 2004 and the June 2006 attack on a U.S. military checkpoint that left one soldier dead and led to the abduction, torture, and execution of two others. ECF No. 36-38 at 13. These attacks, and others, by the Zarqawi organization, were "notorious" and well-known at the time. *Id.* at 14. Iran certainly knew of them and yet its support of the Zarqawi organization continued. Such evidence is sufficient to demonstrate that Ms. Parhamovich's death was a reasonable consequence of Iran's support of Zarqawi's brutal organization. *See Owens*, 864 F.3d at 798 (finding that Sudan's "general awareness of the group's terrorist aims" satisfies the causation element of a FSIA terrorism claim); *Fritz,* 320 F. Supp. 3d at 86 (finding the causation requirement satisfied where Iran provided material support to a terrorist organization and had knowledge of the organization's intent to carry out attacks on coalition forces); *Wyatt v Syrian Arab Republic,* 908 F. Supp. 2d 216, 228 (D.D.C. 2012) (finding injuries as a result of a kidnapping were a foreseeable result of Syria's support of PKK because Syria provided funding to the organization, knowing that they utilized violent tactics); *see also Kilburn v. Socialist People's Libyan Arab Kamhiriya,* 376 F.3d 1123, 1127–30 (D.C. Cir. 2004) (rejecting argument that "a state's material support must go directly for the specific act" giving rise to the claim to establish causation). This is especially so given how the attack on Ms. Parhamovich's convoy fit within "the

broader context" of Iran's geopolitical strategy of supporting Sunni militant groups—and Zarqawi's organization in particular—for the purpose of "creating instability in Iraq that would both impose political, economic and humans costs on the United States" in an effort to "delegitimize the American-led coalition."  ECF No. 65-6 at 48; *see also* ECF No. 65-2 at 15; *Fritz,* 320 F. Supp. 3d at 86 ("In assessing reasonable foreseeability, moreover, the Court must consider 'the broader context' of Iran's conduct.") (quoting *Owens,* 864 F. 3d at 797); *see also W.A.*, 427 F. Supp. 3d at 136 (finding a "reasonable connection" where the "[p]laintiffs presented expert testimony that Iran's support for the [terrorist organization] was provided for the purpose of allowing the [terrorist organization] to commit precisely the types of terrorist attacks at issue, so as to 'creat[e] instability inside Iraq, [and] placing the responsibility for the chaos on the United States and its Iraqi partners'" (quoting the record)).  By killing a United States citizen who was supporting America's efforts to transition Iraq to democracy following the American-led invasion in 2003, the attack succeeded in Iran's mission of creating chaos in Iraq and weakening the United States.

Accordingly, the Court has subject-matter jurisdiction over Plaintiffs' claims against Iran.

## B.    Personal Jurisdiction

Having found that this Court may exercise subject matter jurisdiction, the undersigned next examines if effective service has been made on Iran pursuant to 28 U.S.C. § 1330(b), which governs personal jurisdiction over foreign states. That section provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have

jurisdiction . . . where service has been made under section 1608 of this title." *Id.* Service is made

on a foreign state under section 1608 in one of four ways:

> 1.    by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or

> 2.    if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or

> 3.    if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or

> 4.    if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a). The methods of service outlined in section 1608(a) are listed in order of

preference; a plaintiff must attempt the first method before proceeding to the next. *Angellino v.*

*Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012). "[S]trict adherence to the terms of

1608(a) is required" and "neither substantial compliance, nor actual notice, suffice[s] under section

1608(a)(3) because Congress had mandated 'service of the ministry of foreign affairs, the

department most likely to understand American procedure.'" *Barot v. Embassy of Zambia*, 785

F.3d 26, 27 (D.C. Cir. 2015) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148,

154 (D.C. Cir. 1994)).  The Court finds it has personal jurisdiction over Iran.

On August 10, 2021, Plaintiffs filed an affidavit requesting that the Clerk of the Court mail a copy of the summons and complaint to Iranian Minister of Foreign Affairs in order to attempt service pursuant to 1608(a)(3). ECF No. 43. In support of their request, Plaintiffs explained that service could not be made pursuant to section 1608(a)(1) because no special arrangement for service exists between Plaintiffs and Iran, nor could service be made pursuant to section 1608(a)(2) because the United States has no treaty relations with Iran that provide for service of process in civil matters. ECF No. 43-1 at 1; *see also Ben-Rafael*, 540 F. Supp. 2d at 52 (recognizing that Iran is not a party to an international convention on service of judicial documents, so service under 1608(a)(2) is impossible); *Roth*, 78 F. Supp. 3d at 396 (same); *Valore*, 700 F. Supp. 2d at 70 (same).  On August 12, 2021, the Clerk of the Court mailed "[o]ne copy of the summons, complaint, and notice of suit, together with a translation of each into the official language of the foreign state, by FedEx, to the head of the ministry of foreign affairs, pursuant to the provisions of 28 U.S.C. § 1608(a)(3)." ECF No. 44. FedEx was "unable to deliver or serve the service documents," which were returned on August 18, 2021. ECF No. 46-1 at 1; *see also* ECF No. 46-2 at 1 (FedEx return label, containing tracking number of 1608(a)(3) service attempt). Accordingly, service under 1608(a)(3) was unsuccessful, and Plaintiffs met their obligations under that section. *Ben-Rafael*, 540 F. Supp. 2d at 52 (holding that service under 1608(a)(3) was not possible and plaintiff's obligations were satisfied when delivery was attempted, and recipient refused delivery).

Following the attempt at service under section 1608(a)(3), Plaintiffs pursued service under section 1608(a)(4).  On August 29, 2021, they requested that the Clerk of the Court mail a copy of the summons and complaint to the "'Secretary of State . . . to the attention of the Director of Special Consular Services[.]' The Secretary of State shall then take steps to effect service through

diplomatic channels."[7]  ECF No. 46-1 at 2 (second alteration in original) (quoting 28 U.S.C. § 1608(a)(4)).  On September 17, 2021, the Clerk of the Court mailed the relevant documents to the Department of State. ECF No. 48. Service was executed on Iran on April 6, 2022, through a diplomatic note delivered by the Foreign Interests Section of the Embassy of Switzerland.  ECF Nos. 55, 55-1, 57.  The "reception of the . . . documents was refused the same day by the Iranian Ministry of Foreign Affairs." ECF No. 57 at 7. Accordingly, service on Iran was completed under section 1608(a)(4) and the Court finds that it has personal jurisdiction over Iran.  *See Panahi v. Islamic Republic of Iran*, No. 19-cv-0006, 2020 WL 6591425, at *4, 6 (D.D.C. Nov. 10, 2020) (concluding that court had personal jurisdiction over Iran after "Swiss diplomats sent the documents, along with a diplomatic note, to the Iranian Ministry of Foreign Affairs, and the Ministry refused to receive the documents."); *Force*, 464 F. Supp. at 371 (same); *Est. of Hirshfeld v. Islamic Republic of Iran*, No. 15-cv-1082, 2017 WL 11581757, at *2 (D.D.C. Oct. 10, 2017) (same).

---

[7] Plaintiffs attempted service under 28 U.S.C. § 1608(a)(3) on August 10, 2021. ECF No. 43. Nineteen days later, on August 29, 2021, Plaintiffs requested the Clerk of Court to mail the documents to the Department of State under 28 U.S.C. § 1608(a)(4). ECF No. 46.  However, "the statute permits plaintiffs" to request service under Section 1608(a)(4) "if mailed service cannot be accomplished within thirty days." *Valore*, 700 F. Supp. 2d at 69 (quoting *Ben–Rafael*, 540 F. Supp. 2d at 52)). Put another way, "Section 1608(a)(4) . . . only presents itself as an option to plaintiffs 'if service cannot be made within 30 days under [Section 1608(a)(3)].'" *Ayres v. Islamic Republic of Iran*, No. 18-cv-265, 2020 WL 7260445, at *2 (D.D.C. Feb. 3, 2020) (quoting 28 U.S.C. § 1608(a)(4)). While "[s]trict adherence to the terms of 1608(a) is required," *Transaero*, 30 F.3d at 154, at least one court in this Circuit has held that where service itself was not executed until after the thirty days had expired, the "delay between mailing and execution" rendered any "impatience" in requesting service under Section 1608(a)(4) "harmless." *Ayres*, 2020 WL 7260445, at *2. In this case, the Clerk of Court did not initiate the process by mailing the materials to the State Department until September 17, 2021, more than thirty days after Plaintiff's attempt under Section 1608(a)(3). ECF No. 48. Then, the documents were not served under Section 1608(a)(4) until April 6, 2022, 239 days after Plaintiffs' attempt under Section 1608(a)(3). ECF No. 55. Therefore, although diplomatic service was not available to Plaintiffs on August 29, 2021, it was available at the time the Clerk of Court mailed the documents to the Department of State, and it was available at the time that service was executed. In sum, even though "Plaintiffs made their request too early," any "error was rendered harmless." *Ayres*, 2020 WL 7260445, at *2.

C.      Liability

Having addressed subject-matter and personal jurisdiction, the Court finds that Plaintiffs have established Iran's liability under a viable cause of action.  *See Valore*, 700 F. Supp. 2d at 73. While section 1605A(c) offers a general private right of action, it "does not itself provide the 'substantive basis' for claims brought under the FSIA."  *Force*, 464 F. Supp. 3d at 361 (quoting *Maalouf v. Islamic Republic of Iran*, No. 16-cv-280, 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020)).  Rather, FSIA plaintiffs are also required "to prove a [specific] theory of liability."  *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability.").  To determine if plaintiffs have properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such as those found in Restatement (Second) of Torts."  *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA).

The estate of a decedent may bring a wrongful death action, as well as "survival actions." "A survival action is one that accrued in a decedent's favor before [her] death that may be brought after [her] death by [her] estate; in other words, it is a claim that could have been brought by the decedent, had [she] lived to bring it."  *Valore*, 700 F. Supp. 2d at 77.  Immediate family members of a victim—spouses, parents, siblings, and children—may bring claims for intentional infliction of emotional distress.  *Id.* at 78–79.

Here, the undersigned has previously found that Ms. Parhamovich's Estate sufficiently pled three theories of civil tort liability: wrongful death, assault, and battery; and Ms. Parhamovich's

family members pled one theory of civil tort liability: intentional infliction of emotional distress /solatium. *Parharmovich*, 2021 WL 6843587, at *13–15. For the same reasons, having found that Plaintiffs have established that Iran's provision of material support to the Zarqawi organization was a legally sufficient cause of Ms. Parhamovich's death, Plaintiffs similarly satisfy the elements necessary for their four theories of civil liability against Defendant Iran.

In sum, the Court finds that Plaintiffs have sufficiently established all four theories of tort liability at the default stage.

## IV.    CONCLUSION

Given Iran's failure to respond to the Complaint and the sufficiency of the Plaintiffs' Motion for Default Judgment as to Liability against it (ECF No. 65), the motion is **GRANTED**. It is further

**ORDERED** that Plaintiffs' original motion for default judgment on liability, ECF No. 37, is **DENIED AS MOOT.** It is further

**ORDERED** that a status conference in this matter is scheduled for Friday, January 20, 2023, at 10:00 a.m.


Date:  December 28, 2022

_____

G. Michael Harvey
United States Magistrate Judge