**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE ESTATE OF | * | |
| ANDREA S. PARHAMOVICH, *et al.,* | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.  1:17-CV-00061 (GMH) |
| | * | |
| ISLAMIC REPUBLIC | * | |
| OF IRAN, *et al.*, | * | |
| | * | |
| Defendants. | * | |

********************************************************************************

### MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS TO DAMAGES AGAINST DEFENDANTS THE SYRIAN ARAB REPUBLIC AND THE ISLAMIC REPUBLIC OF IRAN

REDACTED

**TABLE OF CONTENTS**

I.    INTRODUCTION……………………………………..……….……………..……………7

II.    DAMAGES…..………………………………………………....………..……………8

    A.  The Plaintiffs are Entitled to Recover Damages Pursuant to Section 1605A(c)….…..8

       1.  The Estate of Andrea Parhamovich is Entitled to Recover Economic Damages, Damages for Pain and Suffering, and Punitive Damages…………..……..9

         a.  Andi Parhamovich and Her Brutal Murder—a Brief Background…………..9

         b.  The Estate of Andrea Parhamovich is Entitled to Recover Economic Damages……………………………………………………………………10

         c.  The Estate of Andrea Parhamovich is Entitled to Recover Damages for Pain and Suffering under a Survival Action…………..…………………………12

            i.  The Circumstances of Andi's Death…………….………………12

            ii.  Damages for Andi's Pain and Suffering……………………...……..17

       2.  Immediate Family Members are Entitled to Solatium Damages…………..……22

         a.  Vicki Parhamovich is Entitled to Recover Solatium Damages for the Emotional Pain & Suffering She Endured and Continues to Endure as a Result of Her Daughter Andi's Murder……………………………...……...22

         b.  André Parhamovich is Entitled to Recover Solatium Damages for the Emotional Pain & Suffering He Endured and Continues to Endure as a Result of His Daughter Andi's Murder …………………………………25

         c.  Marci Zampini is Entitled to Recover Solatium Damages for the Emotional Pain & Suffering She Endured and Continues to Endure as a Result of her Sister Andi's Murder ……………………………...………………………28

         d.  Cory and Chris Parhamovich are Entitled to Recover Solatium Damages for the Emotional Pain & Suffering they Endured and Continue to Endure as a Result of their Sister Andi's Murder……………………………..30

       3.  Upward Departures for Solatium Award Amounts are Warranted for Andi's Family Members ……………………….………………………………….34

         a.  Medical Proof of Severe Pain, Grief or Suffering………..…………….....37

2

REDACTED

b.  How the Family Members Learned of Andi's Death…………..………..39

c.  Whether There Was an Opportunity for Andi's Family to Say Good-Bye to Her or to View Her Body………..……………………………………39

d.  Andi's Family Unit was Destroyed, and their Suffering was Particularly Acute and Agonizing.…………………………………………………40

e.  The Circumstances Surrounding the Terrorist Attack Perpetrated against Andi……………..……………………………………...…………40

f.  The Nature of the Relationship between Andi and Her Family Members was Particularly "Strong and Close"………………………………41

4.  Punitive Damages………………………….……………………………………43

a.  Punitive Damages Should be Awarded against Syria and Iran because Andi's Brutal Murder Was a Targeted Killing of a Civilian Aid Worker Involved in Pro-Democracy Work……………………………………43

b.  Plaintiffs Request an Award of Punitive Damages in the Amount of $300 Million…………………………………..…………………………47

III.  POST-JUDGMENT INTEREST……………………………………………………48

IV.  CONCLUSION…………………………………………..………….……………..49

3

REDACTED

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ackley v. Islamic Republic of Iran*, 2022 WL 3354720 (D.D.C. August 12, 2022)………………...48

*Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48 (D.D.C. 2011)……....20, 47

*Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15 (D.D.C. 2020)……………..35, 36, 37, 39, 41

*Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8 (D.D.C. 2009)………………………………11

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017)…………………………..8, 47

*Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19 (D.D.C. 2017)……………………………..43

*Colvin v. Syrian Arab Republic,* 363 F. Supp. 3d 141 (D.D.C. 2019)…………………………..47, 48

*Eisenfeld v. Islamic Republic of Iran*, 172 F Supp. 2d 1 (D.D.C. 2000)……………………………17

*Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000)……………………………...37

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009)………35, 36, 37, 42

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)………………...………36, 49

*Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153 (D.D.C. 2017)………………………………17

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018)…………………………..20, 21

*Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008)………....…11, 17, 19, 46, 47, 48

*Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012)……………………………43

*Miller v. Cartel*, 2022 WL 2286952 (D.N.D. June 24, 2022)………………………………18, 19, 21

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015)…………………………22, 35

*Opati v. Republic of Sudan*, 590 U.S. __ , 140 S.Ct. 1601, 1609 (2020)…………………………...43

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011)………………..35, 36, 40, 42

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007)…………………………..17

*Pugh v. Socialist People's Libyan Arab Jamahiriya,* 530 F. Supp. 2d 216 (2008)…………19, 20, 21

*Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015)……………………………8, 35

*Sheikh v. Republic of the Sudan*, 485 F.Supp.3d 255 (D.D.C. 2020)……………………………..10

REDACTED

*Smith v. Islamic Emirate of Afghanistan* 262 F. Supp. 2d 217 (S.D.N.Y. May 16, 2003)………......21

*Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286 (D.D.C. 2003)………………………..…12

*Thuneibat v. Syrian Arab Republic*,167 F. Supp. 3d 22 (D.D.C. 2016)………………...35, 37, 44, 47

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012)………………………...17

*Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216 (D.D.C. 2012)……………………….....47

**STATUTES**

28 U.S.C. § 1605A……………………………………………………..7, 8, 10, 11, 12, 22, 43, 47

28 U.S.C. § 1961(a)………………………………………………………………………48, 49

REDACTED

**LIST OF EXHIBITS**

| Number | Exhibit Description |
|--------|--------------------|
| 1 | Expert Report of  Larry H. Pastor, MD, FAPA, DABAM |
| 2 | Expert Report of Steven A. Wolf |
| 3 | Expert Report of Sebastian D. Schubl, MD |

REDACTED

Plaintiffs, by and through undersigned counsel, submit the following Memorandum of Points and Authorities in Support of their Motion for Default Judgment as to Damages against Defendants, the Syrian Arab Republic (hereinafter "Syria") and the Islamic Republic of Iran (hereinafter "Iran").

## I.      INTRODUCTION

On January 17, 2007, Andrea S. Parhamovich ("Andi"), an American citizen and aid worker, was killed in a terrorist attack on her vehicle convoy in Baghdad, Iraq, perpetrated by al-Qaeda in Iraq ("AQI"), a/k/a the Islamic State in Iraq ("ISI") (hereinafter "AQI/ISI"). Plaintiffs brought this case against Defendants Syria and Iran, under the private cause of action provided by the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A(c).

The terrorist attack that brutally killed Andi was perpetrated by AQI/ISI with the material support of Defendants Syria and Iran. *See* June 23, 2021 Report and Recommendation of Magistrate Judge G. Michael Harvey, ECF No. 40 at 21-27, and December 28, 2022, Memorandum Opinion and Order of Magistrate Judge G. Michael Harvey, ECF No. 70 . By Order dated March 8, 2022, District Judge Florence Y. Pan granted plaintiffs' Motion to Adopt Magistrate Judge Harvey's Report and Recommendation as to Liability against Defendant Syria.  ECF No. 52 at 2-3.  By Memorandum Opinion and Order dated December 28, 2022, Magistrate Judge G. Michael Harvey granted plaintiffs' Motion for Default Judgment as to Liability against Defendant Iran. ECF No. 70.  This Court found Defendants Syria and Iran liable for Andi's death.

Plaintiffs, the Estate of Andrea Parhamovich, Vicki Parhamovich, André Parhamovich, Marcella ("Marci") Zampini, Chris Parhamovich and Cory Parhamovich, now move for compensatory and punitive damages against Defendants Syria and Iran under 28 U.S.C. § 1605A(c).

REDACTED

## II.    DAMAGES

### A.  The Plaintiffs are Entitled to Recover Damages Pursuant to Section 1605A(c)

Section 1605A(c) provides that foreign states "shall be liable" for money damages, including "economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C § 1605A(c), and for "personal injury or death" caused by that state's provision of material support for an act of terrorism.  "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.,* more likely than not) to occur, and must prove the amount of damages by a reasonable estimate consistent with this [Circuit]'s application of the American rule on damages."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)) (internal quotations omitted and alteration in the original).  "In determining the 'reasonable estimate,' courts may look to expert testimony and prior awards for comparable injury." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 82 (D.D.C. 2017) (internal citations omitted).

Plaintiffs have submitted substantial evidence that Andi's brutal murder and the grief that her family suffered were reasonably certain and were actually the intended consequences of both Defendant Syria's and Defendant Iran's material support of AQI/ISI.  The defendants knowingly provided funds, assistance with recruitment, and transit to terrorists entering Iraq.  AQI/ISI demonstrated their willingness to plan attacks with the intent of injuring and killing civilians. Consequently, defendants' conduct in supporting AQI/ISI was likely, and intended, to result in the killing of civilians such as Andi, and to devastate the families of their victims. The plaintiffs' evidence has established that the consequences of Syria's and Iran's conduct were reasonably certain to occur. ECF No. 40 at 27-29; ECF No. 52 at 2-3; ECF No. 70 at 18-21. The Plaintiffs are, therefore, entitled to damages.

REDACTED

**1. The Estate of Andrea Parhamovich is Entitled to Recover Economic Damages, Damages for Pain and Suffering, and Punitive Damages[1]**

**a.   Andi Parhamovich and Her Brutal Murder--a Brief Background**

As will be described in detail below and in subsection "c", Andi's brutal murder began as an attempt by AQI/ISI to violently take her hostage from the vehicle she was travelling in, and ended with her horrific death by immolation inside of the vehicle.

At the time of her death, Andi was 28 years old. ECF No. 37-1 ¶ 4 (Andrea Parhamovich Estate Declaration). After college, Andi worked in Boston, including as a speechwriter for the Governor of Massachusetts, and as a communications aid for the Massachusetts Department of Economic Development. *Id.* ¶¶ 8-12.  Andi moved to New York City in 2003, first working in the publicity department of Miramax Films, and later in the public relations department of Air America Radio, where her annual salary was $85,000. *Id.* ¶¶ 13–15.

Andi  applied for jobs abroad with non-governmental organizations, with the goal of obtaining foreign policy experience that she hoped would help her get a job with a presidential campaign. *Id.* ¶ 16.  Her ideal job would have been  to work in the White House as a senior communications director. *Id.* ¶ 42.

Andi arrived in Baghdad in September 2006. In December 2006, she began working for the National Democratic Institute ("NDI"), a non-governmental organization in Baghdad, teaching classes in democracy to Iraqi political parties. *Id.* ¶¶ 17-18; ECF No. 36-13 ¶ 12 (Declaration of Vicki Parhamovich).

Andi met her fiancé, Michael Hastings, a Newsweek reporter, in New York, in 2005. While Andi and Michael were working overseas they got engaged. ECF No. 36-13 ¶¶ 11; 15.

---

[1] The right to recover punitive damages in this case as to all plaintiffs is addressed in Section II, sub-section 4.

REDACTED

On January 17, 2007, after attending a consultation regarding media training in Baghdad, the vehicle in which Andi was being transported, along with the vehicles that drove in front of and behind that vehicle, were ambushed by AQI/ISI in an attempted kidnapping. *Id.* ¶ 16; *see*, generally, ECF No. 36-12 at 3-8 (URG[2] Report on Incident Facts) and 1-12 (Annex C, Detailed Sequence of Events)[3]. Andi, and others, including the vehicle commander, and the driver of the vehicle in which she was travelling, were violently and brutally killed during the ambush. *Id.*; *id*. Due to the intermingling of Andi's remains with the remains of the Hungarian vehicle commander who had thrown himself on top of her to protect her during the attempted kidnapping, their bodies burned together; and because their remains could not be separated, their remains were cremated together, and the ashes were divided between the two families.  Ex. 1, Expert Report of  Larry H. Pastor, MD, FAPA, DABAM ("Pastor Report") ¶ 15.[4]

### b.  The Estate of Andrea Parhamovich is Entitled to Recover Economic Damages

The Estate of Andrea Parhamovich[5] is entitled to recover economic damages from Defendants Syria and Iran for her wrongful death. 28 U.S.C.§ 1605A(c). Economic damages "typically include lost wages, benefits and retirement pay, and other out-of-pocket expenses", *Sheikh v. Republic of the Sudan*, 485 F. Supp. 3d 255, 267 (D.D.C. 2020), and can be based on past activities and forward-looking projections that take into account personal planning, prior professional success,

---

[2] URG is the acronym for Unity Resources Group. ECF No. 37-1 ¶ 36 (Andrea Parhamovich Estate Declaration).
[3] The URG Report and Annex C thereto will be discussed at pp. 11-13.
[4] Dr. Larry Pastor, plaintiffs' expert psychiatrist, is a physician specializing in psychiatric fields including psychological stress, trauma, and resiliency.  His professional experience includes over twenty-two years as a psychiatrist for the federal government.  He currently works in the Office of Medical Services of the Central Intelligence Agency, where his work includes the support of individuals exposed to high threat environments, armed conflict, hostile captivity, and acts of terrorism.  He also serves an as emergency services psychiatrist for Fairfax County, Virginia, where he is responsible for the diagnosis and management of patients with acute or high-risk clinical issues, psychological trauma, acute exacerbation of pre-existing medical illness, and suicidal or homicidal ideation.   He has also provided staff training in emergency evaluation, mental status examination, risk assessment, medical screening, and psychopharmacology. Dr. Pastor was engaged by plaintiffs to render opinions regarding the mental health impact of Andi's death on her family members. Appendix A (Resume of Dr. Pastor) to Exhibit 1.
[5]Vicki Parhamovich, Andi's mother, as Personal Representative of the Estate of Andrea Parhamovich, has filed the claims in this case on behalf of the Estate. ECF No. 37-1 ¶¶ 2-3 & 37-2 (Andrea Parhamovich Estate Declaration and Probate Letters of Authority).

REDACTED

industry standards, and other similar factors. This Court has stated that the economic damages associated with a plaintiff's death under Section 1605A(c) may be computed by a court based on a report from a forensic economic expert. Such a report should base its calculations on reasonable and well-founded assumptions about the likely earnings of the deceased plaintiff had he/she survived and life expectancy. Based upon this forensic evidence, the lost wages of the deceased plaintiff should be reduced to present value. *See Belkin v. Islamic Republic of Iran,* 667 F. Supp. 2d 8, 24 (D.D.C. 2009) (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 69 (D.D.C. 2008)).

Plaintiffs' expert, Steven A. Wolf,[6] has provided an estimate of the present value of economic losses, including lost earnings and benefits, of approximately $4,126,000 before consideration of personal maintenance expenditures, and approximately $2,238,000 after consideration of personal maintenance expenditures. The latter amount reflects the reduction of the estimate of lost earnings in order to reflect the expenditures which Andi would have presumably incurred for her personal maintenance. Ex. 2, Expert Report of Steven Wolf ("Wolf Report") ¶ 38 .

Andi's income loss was calculated primarily from lost wages and lost employee fringe benefits. The methodology used to calculate Andi's economic loss was to quantify the projected income had the terrorist attack that killed her not occurred. The economic loss includes both past lost income from January 2007 through April 2020, and future lost income through her anticipated work life expectancy in 2043. Historical wage and benefit history, labor and economic statistics, and representations of her family, were considered to project income. Annual income was projected based on her earnings history and anticipated annual future income through her work life expectancy. Ex. 2, Wolf Report ¶¶ 13-18.

---

[6] Plaintiffs' expert on economic damages, Steven A. Wolf, is a forensic economist who is a certified public accountant with an MBA in Business Administration. Mr. Wolf is the Managing Director of Wolf Forensics, a forensic advisory service, and a Partner at Cherry Bekaert, LLP. He has taught at Georgetown University as an Adjunct Professor in the School of Business. He is an Accredited Senior Appraiser in Business Valuation, a Certified Fraud Examiner, and holds the Certified Financial Forensics and Accredited in Business Valuation credentials. Mr. Wolf's Curriculum Vitae is attached as Appendix A to his Declaration, attached hereto as Exhibit 2.

REDACTED

The report used conservative financial and economic assumptions such that her employment status and income level would not change over the course of her life but only adjust for moderate inflation. *Id.* ¶ 21.

Based on the foregoing, Plaintiff, the Estate of Andrea Parhamovich, requests an award of $2,238,000, *as economic damages.*

### c. The Estate of Andrea Parhamovich is entitled to Recover Damages for Pain and Suffering under a Survival Action

The Estate of Andrea Parhamovich is entitled to recover pain and suffering damages. In Section 1605A cases, courts have "routinely awarded survival damages to the deceased's estate for the physical and emotional pain and suffering endured by the victim in the moments before death." *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 300 (D.D.C. 2003).

### i. The Circumstances of Andi's Death

As will be demonstrated below, Andi's brutal murder began as an attempt by AQI/ISI to violently take her hostage from the vehicle she was travelling in, and ended in her vicious death by immolation inside of the vehicle. Andi suffered extreme mental anguish and anticipation of death prior to her brutal killing by the AQI/ISI terrorists. Plaintiffs' expert witness Dr. Sebastian Schubl[7], a trauma surgeon and burn expert, and the Medical Director for Surgical Services for the University of California at Irvine Medical Center, explains                     REDACTED

---

[7] Dr. Sebastian Schubl, plaintiffs' expert on conscious pain and suffering (both physical and mental), is a trauma surgeon and burn expert. Dr. Schubl is a graduate of the University of Michigan School of Medicine and was a resident at New York Presbyterian Hospital/Weill Cornell Medical Center in New York City. He served as a member of the faculty of the Department of Surgery at Weill Cornell Medical Center from 2011 to 2016 while also serving as the Trauma Medical Director at Weill Cornell's trauma affiliate in Queens, Jamaica Hospital, an ACS verified and New York State Designated Level 1 Trauma Center. In 2016-2017, Dr. Schubl served as a Clinical Fellow in Surgical Critical Care and Trauma at the University of California at Irvine Medical Center. He has remained at UC-Irvine since his fellowship holding various positions relating to his specialties in surgery and trauma care, and as of January 2022, he holds the position of Medical Director for Surgical Services for the University of California at Irvine Medical Center. Dr. Schubl's Curriculum Vitae is attached as Appendix A to his Report, attached hereto as Exhibit 3.

REDACTED

REDACTED

The "Detailed Sequence of Events" attached as Annex C to the URG Report on Incident Facts, ECF No. 36-12 at 1-12, provides a minute-by-minute timeline of the events of January 17, 2007, when Andi was being escorted from the headquarters of the Iraqi Islamic Party ("IIP"), where she had attended a consultation regarding media training.  ECF No. 36-12 at 3 (URG Report on Incident Facts) and 2-12 (Annex C, Detailed Sequence of Events).

REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

.

16

REDACTED

REDACTED

Ex. 3, Schubl Report at 5.

### ii. Damages for Andi's Pain and Suffering

In FSIA cases involving bombings, terrorist attacks, or death after a brief period of time, the amount of damages for the pain and suffering is based on multiple factors including the duration of the pain and suffering, the nature and extent of the injuries, the fear and terror experienced by the victim, and the circumstances surrounding the death. *See Eisenfeld v. Islamic Republic of Iran*, 172 F Supp. 2d 1, 5, 8 (D.D.C. 2000) (award of $1 million for pain and suffering endured in the several minutes between the suicide bombing of a passenger bus and the victim's death); *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 53 (D.D.C. 2007) (award of $7 million for pain and suffering for victim who was not held captive but suffered burns and traumatic skull injury in an attack and remained alive for 7 days); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 38 (D.D.C. 2012) (award of $8 million for pain and suffering for victim injured in a bombing attack and who lived for four weeks); *Foley v. Syrian Arab Republic*, 281 F. Supp. 3d 153, 156 (D.D.C. 2017) (award of $30 million for pain and suffering where victim was captive for approximately three days and suffered "various blunt force injuries, strangulation, and removal of his eyes and tongue before his death"); *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d at 72-74 (D.D.C. 2008) (award of $50 million for pain and suffering to each of two victims kidnapped and publicly decapitated soon thereafter).

REDACTED

In *Miller v. Cartel*, 2022 WL 2286952 (D.N.D. June 24, 2022), a case recently decided under the Antiterrorism Act of 1990 in the District Court for the District of North Dakota, a mother and her children suffered the same horrific fate as Andi.  The mother and her four children were assaulted in their vehicle by cartel members.  The cartel members surrounded the family's vehicle and shot hundreds of bullets into the rear part of the vehicle, and then set the car on fire.  *Miller*, 2022 WL 2286952, at *4-7.  The mother and her children ultimately burned to death in the fire.  *Miller*, 2022 WL 2286952, at *4-7. Plaintiff's expert witness Dr. Sebastian Schubl provided expert medical testimony at trial on the victims' conscious pain and suffering. He explained "that being *just* burned alive does not provide a:

> real summary of what the terror these inhabitants of this car had to deal with on that day.  You have to look at it from the start to the finish of the entire assault.  So these assailants discharged 900-and-some rounds at the car.  Even if there were 20 or 30 of them, they were reloading multiple times and emptying their weapons and reloading again.  This stretched on for minutes, many minutes.  That…covers the car in bullet holes.  The car can't move any more, the inhabitants are inside.  They have total panic.  They can't get out of the car because the attackers are right outside.
>
> Then this group decides to wander down this hill, training their weapons at the vehicle, shooting a video, surrounding the car, possibly shooting more.  That takes time just to get the 200 meters from the top of this steep incline all the way down to the car.  The family's sitting there.  They see these people coming; they're all carrying weapons.  *They know what's going to happen.*
>
> After they surround the car…[t]hey get on the car.  They douse the car….[T]hey actually opened the door and threw the gasoline in the car.  But, again, you can't escape because they're surrounding your car and they have guns, so stretching on for even longer…*You're hurt; you're terrified, and there's nothing you can do.*
>
> And then they set the car on fire.  You're talking about extreme heat.  The human body, unfortunately, is actually fairly resistant to burns….[P]atients sometimes [] have 90 or nearly 100 percent of their bodies burnt and they still manage to make it to the hospital and some of them still manage to make it through months in the burn ICU and survive. But that doesn't mean its painless.  Certainly not.  And in an enclosed space, if you can't get the person out, it's even worse because the air becomes super heated and now you're breathing in fire.  So not only are you burning from the outside, you're burning from the inside.  The oxygen gets completely consumed. So not only

18

REDACTED

are you burning to death after being shot, but you're also suffocating. You're asphyxiating because there's no oxygen left in the air. It's just fire. *So your sensation is intact. There's nothing you can do. You just hear and feel what's going on around you.*

*Miller*, 2022 WL 2286952, at *6-7. Dr. Schubl went on to further testify that, "if you start when the first bullet was shot until the last person in that car took their last breath, that must have been close to an hour, maybe, 45 minutes of just total terror…it must be the most frightening thing that anyone has ever experienced." *Miller*, 2022 WL 2286952, at *7.

The court assessed that the suffering the cartel victims endured was most similar to the *Gates v. Syrian Arab Republic* case, where two U.S. civilian contractors were beheaded by al-Qaeda in Iraq and "suffered unimaginable mental and physical agony" as "[e]ach man was alive throughout a significant portion of the beheading and knew his death was upon him, with pain and blood and indescribable suffering." *Miller*, 2022 WL 2286952, at *21-22 (quoting *Gates*, 580 F. Supp. 2d at 69 (D.D.C. 2008)). The *Miller* court applied a 30% downward departure from the $50 million pain and suffering amount awarded in *Gates* for the mitigating circumstances in the case: that the victims had been held hostage for multiple days, and that the executions were broadcast for the world to see. *Miller*, 2022 WL 2286952, at *22. The *Miller* court initially awarded the cartel victims $35 million in pain and suffering damages, but then applied inflationary calculations from the *Gates* decision date of September 26, 2008 through February 2022, ultimately awarding $45,390,000 to each of the cartel victims' estates for their pain and suffering. *Miller*, 2022 WL 2286952, at *22-24.

In *Pugh v. Socialist People's Libyan Arab Jamahiriya,* 530 F. Supp. 2d 216 (2008), seven Americans perished in an in-air bombing. A suitcase bomb exploded in the right forward lower baggage hold of the aircraft 45 minutes into the flight when they had climbed to 35,000 feet. The Court made findings of fact which included the following:

1. Even if some passengers temporarily passed out after the explosion, they would have likely regained consciousness as they fell.

REDACTED

2. A surviving passenger would have experienced the disorienting experience of feeling the temperature instantly drop.  The atmospheric change has a very painful physiological effect on the body – the body gases expand and cause extreme discomfort.

3. Some people caught on fire and burned alive as they fell to earth. **Burning to death is extremely painful and does not happen at once.**

4. Those that did not die from fire died from impact of ground velocity of 150 to 160 miles per hour. It took between **one and a half to three minutes** for passengers to hit the ground following the explosion.

5. All 170 people aboard [UTA Flight 772] died a horrific death. **The many passengers who likely survived the mid-air explosion experienced horrific terror and excruciating pain for as long as three minutes as they were burned alive and tumbled to the earth.** The explosion decompression, fire, and mid-air break-up of the aircraft caused the passengers to suffer extreme terror, painful bodily injury, choking and suffocation, and the tragic realization that their lives would soon terminate.

*Pugh,* 530 F. Supp. 2d at 220-21. The *Pugh* Court awarded $18 million for pain and suffering to several of the deceased victims' estates that perished within minutes on the flight. *Id*. at 265-66.

In *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018), three soldiers[9] were abducted from the Provincial Joint Coordination Center in Karbala, Iraq, and, shortly thereafter, murdered by their captors by execution-style gunshot wounds.  *Fritz,* 324 F. Supp. 3d at 58. This Court awarded $5 million in pain and suffering damages to each of the estates of three soldiers, notwithstanding the fact that the duration of the pain and suffering of the three soldiers was relatively short. *Fritz,* 324 F. Supp. 3d at 61.

The *Fritz* Court noted that this Court has:

> …provided compensation for the extreme fear and distress a victim experiences knowing his death is imminent. *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 81-82 (D.D.C. 2011) ("Courts have been influenced not only by the length of time that the victim endured physical suffering, but by the victim's mental anguish stemming from the knowledge that death was imminent…")

*Fritz,* 324 F. Supp. 3d at 60.

---

[9] A fourth soldier was abducted in Baghdad and held captive.

REDACTED

Using the above analysis, the *Fritz* Court recognized that the facts in that case mandated an upward departure from the standard $1 million award for pain and suffering damages when the duration of pain and suffering is short, to an award of $5 million. The *Fritz* Court explained, "Weighing the brutality of the injuries against the short time period, the Court concludes that an award of the baseline $5 million is appropriate for each of the Karbala victims. Indeed, this is the award that plaintiffs themselves had requested in their submission to the special master." *Fritz,* 324 F. Supp. 3d at 61.

In *Smith v. Islamic Emirate of Afghanistan*, the court awarded $2.5 million for pain and suffering to the estate of a victim who realized he was trapped and doomed in the North Tower of the World Trade Center and likely experienced a very painful death from being crushed or burned.  262 F. Supp. 2d 217, 238-239 (S.D.N.Y. May 16, 2003).

It is clear from the records referenced above, that Andi's suffering mimicked the suffering endured by the *Miller*, *Pugh, Fritz* and *Smith* victims.  REDACTED

In the cases set forth above, the amounts awarded for the victims' pain and suffering range from $2.5 million in *Smith* to $45,390,000 in *Miller*. Andi suffered the same terrifying and painful death as the *Miller* victims, though a mitigating circumstance is that the *Miller* cartel victims also had to endure witnessing their family members' deaths, while anticipating and suffering their own.

REDACTED

Based on the foregoing, plaintiff, the Estate of Andrea Parhamovich, requests an award of no less than $20,000,000 *as pain and suffering damages*.

### 2. Immediate Family Member Plaintiffs are Entitled to Solatium Damages[10]

The private right of action provided by Section 1605A expressly provides for solatium damages. 28 U.S.C. §1605A(c). A claim for solatium refers to the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience ... as well as the harm caused by the loss of the decedent's society and comfort." *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015).

> **a. Vicki Parhamovich is Entitled to Recover Solatium Damages for the Emotional Pain & Suffering She Endured and Continues to Endure as a Result of Her Daughter Andi's Murder**

Vicki Parhamovich is the mother of Andi Parhamovich. ECF No. 36-13 ¶ 3 (Declaration of Vicki Parhamovich). Vicki is entitled to an award of solatium damages for the mental anguish caused by her daughter's murder.

Vicki remembers Andi's birth as a time of joy and excitement. *Id.* ¶ 7. Remembering her daughter, Vicki writes, "Andi was an amazing daughter. She was caring, inquisitive, and accomplished. We had a wonderful relationship and her death has caused me permanent grief and loss." *Id.* ¶ 6. When Andi went away to college in Marietta, Ohio, Vicki and Andi remained close "by talking on the phone or texting and visiting." *Id.* ¶ 9. When Andi moved to Boston after college, the family took vacations to Boston to spend time with her. *Id.* ¶ 10. When Andi moved to New York City, Vicki drove to Boston and helped her move to her first apartment in Hoboken, New Jersey and later, to Manhattan; and they continued "to talk and text all the time." *Id.* ¶ 10.

At the time of her death, Andi had just become engaged to Michael Hastings, a *Newsweek* reporter. Andi had emailed Michael her ring size and they had hoped to be able to travel to Paris in

---

[10] In Section II, sub-section 3, plaintiffs will demonstrate that "upward departures" are warranted in this case.

REDACTED

February so Michael could formally propose on Valentine's Day. Andi had been planning to marry Michael within a year of their engagement. Andi had always planned to have two children. ECF No. 37-1 ¶ 39 (Andrea Parhamovich Estate Declaration).

On January 17, 2007, Vicki had met a friend for breakfast on the way to her job as a surgical nurse when she learned that Andi had been killed in Iraq.  "While we were at the restaurant my daughter Marci called to tell me Andi had been killed. I remember just crying and saying 'No, please, no' over and over. After that everything was like a dream or trance." ECF No. 36-13 ¶ 17 (Declaration of Vicki Parhamovich). When Vicki arrived at the family home, she wasn't able to exit the car.  Her knees buckled and her twin sons, Andi's brothers, Chris and Cory, had to walk her to the house. Ex. 1, Pastor Report ¶ 14.

Vicki had to plan Andi's funeral when she thought she would be planning Andi's wedding. Ex. 1, Pastor Report ¶ 15. Adding to Vicki's grief was the fact that the family didn't have a casket at Andi's funeral, but an urn, because Andi's remains had been cremated at Dover Air Force Base in Delaware. Moreover, the entire family was acutely aware that the remains were not solely Andi's, due to the intermingling of Andi's remains with the remains of the Hungarian vehicle commander who had thrown himself on top of her during the attack in an attempt to protect her.  Their bodies burned together and because their remains could not be separated, their remains were cremated together and the ashes were divided between the two families. Ex. 1, Pastor Report ¶ 15.

Because Andi had said that "someday she wanted to live in Paris" the family commemorated her birthday in June 2007 by taking a trip to Paris,  organized by Andi's fiancé Michael Hastings, to spread her ashes on the river Seine.  When Andi's fiancé was killed in a fiery car crash in California in 2013, it added "to the sequence of tragedy and sudden death."  Ex. 1, Pastor Report ¶ 15.

REDACTED

23

REDACTED

# REDACTED

REDACTED

# REDACTED

In Vicki's own words,

> How I miss her. I am reminded of Andi and her death in some way every day. If I am alone I cry. If I am at work or with friends I usually tear up and try to change the subject. If I am with family it depends on what memory we were talking about. Tears are usually involved. The pain is always there and raw.

> I know I will never be the person I was before her death. I feel cheated that I didn't get to see Andi and Michael get married. Andi will never be able to share in special family occasions or special memories. I will never hold my grandchildren or share in Andi's happiness.

ECF No. 36-13 ¶¶ 23-24 (Declaration of Vicki Parhamovich).

**b. André Parhamovich is Entitled to Recover Solatium Damages for the Emotional Pain & Suffering He Endured and Continues to Endure as a Result of His Daughter Andi's Murder**

André Parhamovich is the father of Andi Parhamovich. ECF No. 36-19 ¶ 2 (Declaration of André Parhamovich). André is entitled to an award of solatium damages for the mental anguish caused by his daughter's murder.

André and Andi had a very close relationship. *Id.* ¶ 8. André and Andi both loved sports; and André remembers their many practices together and how proud he was when Andi became a high

REDACTED

school volleyball, soccer and softball player. *Id.* Watching Cleveland Indians and Browns games together was a regular family event. *Id.*

As André explains, Andi "was my namesake and my first born. I suffered profound grief after Andi's death from which I have never recovered." *Id.* ¶ 5. André was an elementary school gym teacher and worked in the same school that Andi attended. *Id.* ¶ 13. They lived within walking distance of the school and they "used to walk hand in hand each day to school." *Id.* Andi was even a student in André's gym class. *Id.*

On January 17, 2007, André was called out of the elementary school gym class that he was teaching to take a call from his daughter Marci.[11] Marci called to tell him that Andi had been killed, but the secretary had to relay the news to him because with his hearing deficiency he could not hear Marci's rapid high-pitched speech. Ex. 1, Pastor Report ¶ 30; ECF No. 36-23 ¶ 21 (Declaration of Marcella Zampini). André's principal had a staff member drive him home. André thought to himself, "I will never be the same again." ECF No. 36-19 ¶ 13 (Declaration of André Parhamovich). André was driven to Marci's home, where he collapsed in the hallway. He couldn't stop crying and asking "Why?" ECF No. 36-23 ¶ 22 (Declaration of Marcella Zampini).

André remembers the days after Andi's death as being "so very, very sad and depressing, with much crying. The crying would never stop." ECF No. 36-19 ¶ 14 (Declaration of André Parhamovich). In fact, André was crying while writing his Declaration. *Id.*

André doesn't remember much about Andi's funeral. *Id.* ¶ 15. He is still disappointed in himself for not speaking at the funeral. *Id.* The fact that they only had an urn at the funeral was extremely painful for André who wishes he could have hugged her casket; but there was no casket

REDACTED

26

REDACTED

because Andi's burned remains were fused with the burned remains of the bodyguard who threw himself on top of her to protect her during the attack. Ex. 1, Pastor Report ¶ 34.

REDACTED

André retired from his job as an elementary school teacher in 2012. Ex. 1, Pastor Report ¶ 32. Andi does not have a grave that André can visit, but almost daily he goes to a local park on Lake Erie where the family dedicated a bench to Andi with a memorial plaque inscribed, " Dedicated to Andi PARHAMOVICH. GAVE HER LIFE to promote peace. Now WALKS with Angels." André estimates he has visited the bench approximately "2300 times." It is a source of "sanctuary" to him. ECF No. 36-19 ¶ 19 (Declaration of André Parhamovich).           REDACTED

André has written and published essays and poems about his grief over Andi's death. [12]  ECF No. 36-19 ¶¶ 20, 25 (Declaration of André Parhamovich) .

André no longer enjoys his old hobbies and pursuits.  He used to love baseball and had been a star right fielder on a champion amateur baseball team, but he doesn't "get any pleasure out of it any more." Ex. 1, Pastor  Decl. ¶ 33.

---

[12] "Grief is like wearing invisible clothing.
   No one else can see it, and only I can feel it.
   Some days it is heavy, some days light.
   But I know that it will be with me-For the rest of my life."

REDACTED

# REDACTED

 

 

 

 

 

 

 

 

   c.   **Marci Zampini is Entitled to Recover Solatium Damages for the Emotional Pain**
        **& Suffering She Endured and Continues to Endure as a Result of Her Sister**
        **Andi's Murder**

   Marci Zampini is the sister of Andi Parhamovich. ECF No. 36-23 ¶ 3 (Declaration of

Marcella Zampini). Marci is entitled to an award solatium damages for the mental anguish caused by

her sister's murder.

   In her Declaration, Marci describes the very close relationship she shared with Andi. ECF No.

36-23 ¶¶ 6-10. Marci was almost seven years old when Andi was born. *Id.* ¶ 6. The sisters shared a

REDACTED

bedroom growing up. *Id.* Marci remembers riding bikes together, playing on swings, and reading books in the back of the car for hours. *Id.* ¶¶ 7–9.

Marci recalls planning her wedding with Andi, who was her bridesmaid. "We laughed at the old guard that had to have things just so. She told me several times that I should have eloped, although she secretly wanted a big traditional wedding herself." *Id.* ¶ 11. Andi "thrived" as an aunt to Marci's two girls; "she loved spoiling my daughters." *Id.* ¶ 12. Even after Andi left Ohio, "[i]f she was home and the girls happened to get in trouble and needed to visit the time-out corner, Aunt Andi would sit with them so they 'wouldn't have to face the injustice alone.'" Andi loved to bake with them. My oldest daughter is really quite a good baker now. Andi often referred to her as her little protégé, in more than just in baking." *Id.*

When Andi left the family home for college and later for Boston and New York, the two sisters remained close through phone calls and regular postcards. There were "quite a few girls' trips" to New York for visits. *Id.* ¶ 13. Marci still recalls that Andi "couldn't believe I dragged a baby in a stroller to New York City." *Id.*

When Andi was killed in Iraq, Marci was the first family member contacted, and was forced to convey the news of Andi's death to the rest of her family. *Id.* ¶ 16-21. According to Marci, "I had to call all the family members. It was tough, I called someone to care for my kids [ages 4 and 8 at the time]…It was hard for me to deliver all the news to everyone." Ex. 1, Pastor Report ¶ 50. <sup>REDACTED</sup>

REDACTED

REDACTED

# REDACTED

Marci misses her sister Andi "terribly" and is raising her daughters to be like her, "decent and responsible young women." *Id.* ¶ 51.

> **d. Cory and Chris Parhamovich are Entitled to Recover Solatium Damages for the Emotional Pain & Suffering they Endured and Continue to Endure as a Result of their Sister Andi's Murder[13]**

Cory and Chris Parhamovich are the younger twin brothers of Andi Parhamovich. ECF No. 36-33 ¶ 2 (Declaration of Cory Parhamovich); ECF No. 36-29 ¶ 2 (Declaration of Chris Parhamovich); Ex. 1 Pastor Report ¶ 55. Cory and Chris are each entitled to an award of solatium damages for the mental anguish caused by their sister's murder.

Andi was ten years old when her twin brothers Cory and Chris were born. ECF No. 36-33 ¶ 5; ECF No. 36-29 ¶ 5. She took on the role of taking care of her younger brothers and was always dressing, feeding, and playing with them. ECF No. 36-13 ¶ 8 (Declaration of Vicki Parhamovich).

---

[13] The Declarations of Cory and Chris are discussed together in this sub-section because the Expert Report of Dr. Pastor, with respect to the emotional suffering of Cory and Chris, are discussed together in his report.

REDACTED

Cory remembers Andi as an "awesome" older sister. ECF. No. 36-33 ¶ 6 (Declaration of Cory Parhamovich). Cory says she "was amazing in every sense. She was so funny and enjoyable to be around. She literally went about life the right way and put other people first. She was a great mentor. She was an awesome role model to have." *Id.* Cory remembers that "whenever she was home I'd spend as much time with her as I could… We were all so close and loved one another so much…Andi always looked out for me and Chris and for our parents." *Id.* ¶ 7. Andi went to college when Cory and Chris were eight years old. *Id.* ¶ 9; ECF No. 36-29 ¶ 8 (Declaration of Chris Parhamovich). They made sure to keep in touch daily with Andi through AOL messaging and phone calls when she went to college and even after she moved to Boston and thereafter to New York City. *Id.* ¶ 9; *id.* ¶ 8.

Chris remembers Andi always trying to protect him and Cory. Andi helped Chris, "by showing me how to be fearless in life and to live the right way, to live a life worth living that would leave the world a better place when our time was done on earth." ECF No. 36-29 ¶ 6 (Declaration of Chris Parhamovich).

Cory and Chris were in their senior year of high school when Andi was killed. Ex. 1, Pastor Report ¶ 58. Marci called home to tell her brothers what had happened to Andi and they both collapsed to their knees crying. ECF No. 36-33 ¶ 12 (Declaration of Cory Parhamovich): ECF No. 36-29 ¶ 12 (Declaration of Chris Parhamovich). Cory remembers screaming and not being able to stand up. ECF No. 36-33 ¶ 12. Cory recalls that he and his family were "devastated" by the news of Andi's murder. *Id.* Chris writes, "Thinking about the way she was killed ravaged me. I knew that my life would never be the same and that I never truly would enjoy another day on this earth because of how much I loved my sister." ECF No. 36-29 ¶ 12.

Andi's funeral was especially traumatic for Cory and Chris because there was no body, only an urn. ECF No. 36-33 ¶ 14: ECF No. 36-29 ¶ 13. For Chris, that experience erased any hope that she was still alive and there had been a mistake. ECF No. 36-29 ¶ 13.

REDACTED

# REDACTED

REDACTED

# REDACTED

REDACTED

# REDACTED

3.   **Upward Departures for Solatium Award Amounts are Warranted for Andi's Family Members**

Initially, plaintiffs note, "The manner of the death-intentionally and violently inflicted by human malice – heighten the pain and horror experienced by the bereaved." Ex. 1, Pastor Report ¶ 13. The medical testimony referred to above, Section II, subsections 2a-d, demonstrates the "heighten[ed]… pain and horror experienced by" Andi's family as a direct result of her "intentiona[l] and violen[t] [murder] inflicted by human malice."

REDACTED

Because "[s]olatium damages, by their nature, are unquantifiable. . . this Court has developed a commonly-accepted standardized framework, known as the *Heiser*[14] damages framework, for solatium damages, which awards, as a baseline, $5 million to parents of deceased victims and $2.5 million to siblings." *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 51 (D.D.C. 2016) (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72 (D.D.C. 2015)). The *Thuneibat* Court noted that the dollar amounts of the *Heiser* framework "serve only as a baseline from which the Court may deviate in order to compensate for specific circumstances." *Thuneibat* 167 F. Supp. 3d at 51. That Court explained:

> For example, enhancements [*i.e,* upward departures], may be awarded where "'evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is present]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing.'" *Roth*, 78 F. Supp. 3d at 403 (quoting *Oveissi*, 768 F. Supp. 2d at 26-27) (alterations in the original).

*Id.* The *Thuneibat* Court also noted that the negative impact on a plaintiff's development caused by the death is also a factor to consider in increasing the damages beyond the *Heisler* framework. *Thuneibat*, 167 F. Supp. 3d at 52-53. The Court awarded a 25 percent upward departure from the *Heiser* baseline to family members who were "devastated" by the death of their daughter and sister in a terrorist attack. *Thuneibat*, 167 F. Supp. 3d at 51-52.

In *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15 (D.D.C. 2020), the Court provided additional guidance as to upward departures from the *Heiser* framework:

> …an upward adjustment may be appropriate in cases 'with aggravating circumstances,' indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Valore*, 700 F. Supp. 2d at 85-86 (first quoting *Greenbaum*, 451 F. Supp. 2d at 108, then quoting *Flatow*, 999 F. Supp. at 31). Whether such an adjustment is in order is a fact-specific inquiry that "cannot be defined through models and variables." *Fraenkel v. Islamic Republic of Iran, Ministry of Foreign Affairs, et al.*, 892 F.3d 348, 356-57, 436 U.S.

---

[14] *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009).

REDACTED

App. D.C. 99 (D.C. Cir. 2018) (quoting *Flatow*, 999 F. Supp. at 29-30). For instance, for a claim made by the family member of a decedent victim, a court may take into account, *inter alia*, "[h]ow the claimant learned of [the] decedent's death, and whether there was an opportunity to say good-bye or view the body;" "[t]he nature of the relationship between the claimant and the decedent," particularly if it was "strong and close;" and the "decedent's position in the family birth order relative to the claimant." *Id.* (quoting *Flatow*, 999 F. Supp. at 31-32). In parsing the relevant facts, a district court is to bear in mind that "past solatium awards from comparable cases are appropriate sources of guidance," but "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards." *Id.* at 362; *see also Schooley*, 2019 U.S. Dist. LEXIS 108011, 2019 WL 2717888, at *77 (citing *Fraenkel*, 892 F.3d at 362).

*Barry,* 437 F. Supp. 3d at 54.

In *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011)*,* the Court emphasized that "Factors pertinent to the determination of damage enhancements are largely derived from common sense[.]" In that case, the grandson of the decedent, who upon the loss of his father figure at a young age, "changed significantly, turning from a happy and outgoing boy to a withdrawn and solemn figure," afflicted with "fits of anger". As time went on, the grandson "grew more and more depressed, and turned to alcohol in a misguided attempt to cope with the pain of his loss and the subsequent trauma from which he suffered." *Oveissi*, 768 F. Supp. 2d at 29. The *Oveissi* Court stated:

> This lifetime of suffering constitutes the exact sort of acute feeling of "permanent loss or change caused by decedent's absence" that warrants an upward departure from the standard *Heiser* valuation.

*Oveissi*, 768 F. Supp. 2d at 29-30. The *Oveissi* Court awarded a 50 percent solatium damages upward departure to the grandson. *Oveissi*, 768 F. Supp. 2d at 30.

In *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) the decedent's family member plaintiffs were awarded an upward departure of 25 percent from the *Heiser* baseline where "the violent nature in which he [their decedent son/brother] died further exacerbated [their] grief and mental suffering, with several of his family members tortured by the fact that he may have suffered before he died." *Flanagan,* 87 F. Supp. 3d at 118. Additionally, expert witness medical

REDACTED

evidence "show[ed] that each plaintiff experienced extraordinarily severe pain and suffering following his death." *Id.* And in *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97 (D.D.C. 2000) the Court increased the plaintiffs' baseline award from $2.5 million to $5 million for each sibling based on the "special bond" with the decedent, extreme sorrow at his death, and noting the "attendant horrific surrounding circumstances" of death by violent attack. *Elahi*, 124 F. Supp. 2d at 111-12.

The facts delineated above in Section II, subsections 2a-d, and the evidence submitted in support of those facts, demonstrate that the circumstances surrounding Andi's brutal murder, including the violent manner of her death, the burning of her body together with that of her vehicle commander's so that no real funeral was possible, the cremation of their ashes together and the division of their ashes between the respective families; caused each of the plaintiffs to endure permanent emotional injuries and "uniquely acute suffering;"              REDACTED

Based on the considerations as to upward departures, as adopted by this Court, Vicki, André, Marci, Chris, and Cory should receive 50 percent upward departures from the baseline solatium damages award established in *Heiser*.

**a.  Medical Proof of Severe Pain, Grief or Suffering[15]**

REDACTED

---

[15] *Thuneibat* 167 F. Supp. 3d at 51; *Barry,* 437 F. Supp. 3d at 54

REDACTED

# REDACTED

---

[16] Rather than repeat the facts related to each plaintiff family member that support an upward departure of solatium damages, plaintiffs will refer to earlier relevant pages which state the facts as to each such family member, and only highlight some of those facts in this sub-section 3.

[17]   REDACTED

REDACTED

REDACTED

### b.  How the Family Members Learned of Andi's Death[18]

Marci was the first family member contacted and was forced to convey the news of Andi's

death to the rest of her family,                      REDACTED



" ECF No. 36-23 ¶¶ 16-21 (Declaration of Marcella Zampini); Ex. 1, Pastor Report,

48- 50; *see supra*, pp. 26-27.  Vicki was at a restaurant before her shift at work when Marci called

and gave her the horrific news.  She cried, "No, please, no" repeatedly, and then everything after that

for her was like a dream.  ECF No. 36-13 ¶ 17 (Declaration of Vicki Parhamovich); *see supra*, p. 20.

André was interrupted while teaching to take the call from Marci, but due to a hearing deficiency, he

had to be notified by the school secretary. ECF No. 36-23 ¶ 21 (Declaration of Marcella Zampini);

*see supra*, p. 23.  His principal had a school staff member drive him home, where he crumpled in

despair in the hallway.  *Id*.  Marci reached Cory and Chris at home where, upon hearing the news,

they both collapsed to their knees crying.  ECF No. 36-33 ¶12 (Declaration of Cory Parhamovich);

ECF No. 36-29 ¶ 12 (Declaration of Chris Parhamovich); *see supra*, p. 28.

### c.  Whether There Was an Opportunity for Andi's Family to Say Good-Bye to Her or to View Her Body [19]

Andi's death was sudden, and the family never had a chance to say goodbye. Another

circumstance that made the suffering particularly agonizing for the family was learning that Andi had

been so badly burned that there was "literally nothing left of her" and that her "burned body was so

charred and fused with the bodyguard whose body was on top of her, that they had to cremate the two

---

[18] *Barry,* 437 F. Supp. 3d at 54.
[19] *Id.*

REDACTED

of them together." Ex. 1, Pastor Report ¶ 56.  The ashes were divided between the families. *Id.* The lack of a casket further exacerbated the pain of her death.  *Id.* ¶ 34; ECF No. 36-33 ¶14 (Declaration of Cory Parhamovich); ECF No. 36-29 ¶ 13 (Declaration of Chris Parhamovich). Andi's "funeral" was truly traumatic for the family as there was no body--only "an urn of ashes and a picture of Andi." Ex. 1, Pastor Report  ¶ 15.

### d.  Andi's Family Unit was Destroyed, and their Suffering was Particularly Acute and Agonizing [20]

The evidence not only demonstrates each family member's profound individual personal loss, but also devastation to the family unit as a whole.       REDACTED

### e.   The Circumstances Surrounding the Terrorist Attack Perpetrated against Andi[21]

The horrific manner of Andi's murder traumatized her family. Andi was a civilian on a mission of bringing democratic governance to Iraq. ECF No. 37-1 ¶¶ 17-18 (Andrea Parhamovich Estate Declaration); ECF No. 36-13 ¶ 12 (Declaration of Vicki Parhamovich). Andi's armored convoy was ambushed and destroyed after an unsuccessful kidnapping attempt by terrorists.  Andi's attackers exploded the fuel tank of her car with a grenade, ultimately killing Andi and her security guard, resulting in the burning of her body and the body of that guard, to the point that the bodies could not be separated and after cremation the ashes shared by the respective families. *See supra,* pp. 11-14.

---

[20] *Oveissi*, 768 F. Supp. 2d at 26-27.
[21] *Id.*

REDACTED

### f. The Nature of the Relationship between Andi and Her Family Members was Particularly "Strong and Close"[22]

The family members each detail their close communication and bond with Andi regardless of where she was living: they continued "to talk and text all the time[.]" ECF No. 36-13 ¶ 10 (Declaration of Vicki Parhamovich).  Vicki traveled to New York and Boston to help Andi move. *Id.* In Vicki's words, "Andi's death left a void in [her] life that will never be filled." *Id.*  ¶ 22. "The pain [of the loss of Andi] is always there and raw." *Id.* ¶ 23. Vicki "suffers from profound grief, psychological pain, and irreversible life changes that result directly from the loss of her daughter Andi in 2007." Ex. 1, Pastor Report ¶ 13.

Andi was her father André's "namesake and  [ ] first born," ECF No. 36-19 ¶ 5 (Declaration of André Parhamovich). "Our family was very close." *Id.* ¶ 7. Andi and André bonded over their love for sports.  *Id.* ¶ 8. During Andi's first year at a local college, André and Vicki would drive and pick up Andi every Friday afternoon and drive her back on Sunday night. "Much family bonding occurred during these trips." *Id.* ¶ 9.                              REDACTED

.

 Marci was seven years old when Andi was born. Marci was the "big sister" who would take "care of [her] little sister." ECF No. 36- 23 ¶ 11 (Declaration of Marcella Zampini).  Andi was the bridesmaid at her sister Marci's wedding. *Id.*  Andi "thrived" being an aunt to Marci's two girls; according to Marci, Andi "loved spoiling my daughters." *Id.* ¶ 12. Andi and Marci would often talk on the phone after Andi moved, and Andi would send "postcards of the touristy places where she lived." *Id.* ¶ 13. Marci made quite a few trips to New York City, with her baby, to visit Andi. *Id.*

---

[22] *Barry,* 437 F. Supp. 3d at 54.

REDACTED

Marci stated, "I am raising my daughters to be like [Andi], to be decent and responsible young women." Ex. 1, Pastor Report ¶ 51.

Cory and Chris maintained a close relationship with their older sister, Andi. Cory recalls "always trying to spend time with [Andi]." ECF No. 36-33 ¶ 5 (Declaration of Cory Parhamovich). Cory explains how he and the family would spend time together. *Id.* ¶ 7. "I was blessed to have the family I had. We were all so close and loved one another so much. We looked out for each other and helped each other whenever and whoever needed help. Andi always looked out for me and Chris and for our parents. She liked to make everyone happy and it makes me feel blessed to call her my sister." *Id.* Cory and Chris "do not enjoy the holidays since Andi's death. Instead, they connect the Christmas and New Year's holidays with the grim anniversary of Andi's death on January 17th of each year." Ex. 1, Pastor Report ¶ 76.

Chris recalls that Andi "tried to do whatever it took to keep [him and Cory] happy." ECF No. 36-29 ¶ 6 (Declaration of Chris Parhamovich). Like Cory, Chris also explains how he and the family would spend time together. *Id.* ¶¶ 6-7. Chris states, "My family was a typical Midwestern, loving, blue-collar, hardworking family. Family meant everything to us." *Id.* ¶ 7. Chris (like his twin brother, Cory), was eight years old when Andi moved out of the house to go to college, where she lived on campus. Their relationship "stayed very close." *Id.* ¶ 8.

In summary, the facts and medical testimony in this case demonstrate that each of Andi's family members has lived with a "lifetime of suffering" resulting from an "acute feeling of permanent loss or change caused by [Andi's] absence." *Oveissi*, 768 F. Supp. 2d at 29-30. Under such circumstances, and in light of the factors discussed above, upward departures of 50 percent from the baseline solatium awards set forth in *Heiser* are warranted for Andi's family members. *Oveissi*, 768 F. Supp. 2d at 30.

REDACTED

**4. Punitive Damages**

    **a. Punitive Damages Should be Awarded against Syria and Iran because Andi's Brutal Murder Was a Targeted Killing of a Civilian Aid Worker Involved in Pro-Democracy Work**

Punitive damages against Defendants Syria and Iran are warranted in this case. Section 1605A authorizes punitive damages against foreign state sponsors of terrorism. 28. U.S.C. § 1605A(c). Plaintiffs may "seek and win punitive damages for past conduct" that predates the §1605A(c)'s January 2008 enactment. *Opati v. Republic of Sudan*, 590 U.S. __ , 140 S.Ct. 1601, 1609 (2020). Punitive damages are intended to "punish and deter" defendants for their bad acts. *Cohen v. Islamic Republic of Iran*, 268 F. Supp. 3d 19, 27 (D.D.C. 2017).

Courts calculate punitive damages by considering "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* Plaintiffs have submitted evidence establishing that punitive damages are warranted under the four-factor analysis used by this Court.

With respect to the first factor, the attack on the vehicle convoy that resulted in the murder of Andi (and three security officers) was a heinous act against an innocent civilian aid worker who was in Iraq to teach classes in democracy to Iraqi political parties. ECF No. 37-1 ¶¶ 17-18 (Andrea Parhamovich Estate Declaration); ECF No. 36-13 ¶ 12 (Declaration of Vicki Parhamovich). Defendant Syria's and Defendant Iran's provision of material support to the perpetrators of Andi's murder was also heinous. *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 50 (D.D.C. 2012) (finding that "[w]hile Sudan's support of Al Qaeda does not rise to the level of direct involvement in the attacks, it was nonetheless intentional, material, and as a result, reprehensible").

The second factor, "the nature and extent of harm to the plaintiffs that [Defendants Syria and Iran] caused or intended to cause" in supporting AQI/ISI, is clear--to further its own anti-Western, anti-American agenda. As Magistrate Judge Harvey found in his June 23, 2021 Report and

REDACTED

Recommendation, "[a]fter the U.S. invaded Iraq, Syrian officials publicly stated a 'desire to foster an armed insurgency against the United States next-door in Iraq…'" ECF No. 40 at 28. "The Syrian government's public declarations of hostility to America's presence and objectives in Iraq combined with its material support to the likes of AQI/ISI meant AQI/ISI attacks on American interests and citizens (like Ms. Parhamovich, for example) were a natural consequence of Syrian policy." ECF No. 36-37 ¶ 115 (Expert Report of Charles Lister[23]).   In his December 28, 2022 Memorandum Opinion and Order, Magistrate Judge Harvey noted that Iran's support of AQI/ISI "was part of a wider strategy aimed at accelerating the eviction of U.S. troops from Iraq…this effort entailed a deliberate policy of creating instability in Iraq that would both impose political, economic and human costs on the United States, and delegitimize the American-led coalition." ECF No. 70 at 13-14 (quoting ECF No. 65-6 at 47 (Expert Report of Dr. Daveed Gartenstein-Ross[24])).

With respect to the third factor, "the need for deterrence", there continues to be a need to take actions aimed at deterring Syria and Iran from sponsoring terrorism both today and in the future. According to the U.S. Government, Defendant Syria is the longest-lasting state sponsor of terrorism. ECF No. 36-37 ¶ 77. As of 2020,  the United States government continued to consider Syria a state sponsor of terrorism. *Id.* ¶ 109. Through nine years of internal crises, the Syrian government has hosted, supported, provided extensive logistical support to, and facilitated the provision (by Iran) of small, medium and heavy weapons to groups such as Hezbollah to assist its domestic military operations. *Id.* ¶ 109. Syria is "estimated to spend between $500 million to $700 million annually to support terrorism." *Thuneibat*, 167 F. Supp. 3d at 54.

---

[23] In his June 23, 2021 Report and Recommendation, Magistrate Judge Harvey found plaintiffs' expert Charles Lister qualified as an expert on conflict and counter-terrorism issues related to Syria.  ECF No. 40 at 18.
[24] In his December 28, 2022 Memorandum Opinion and Order, Magistrate Judge Harvey found plaintiffs' expert Dr. Daveed Gartenstein-Ross qualified as an expert on issues related to terrorist groups operating in Iraq.  ECF No. 70 at 10.

REDACTED

The Syrian government also played a role in facilitating the release and dispersion of jihadist terrorists aligned with al-Qaeda and ISIS throughout Syrian territory, beginning amid the peaceful uprising in 2011. ECF No. 36-37 ¶ 110. While the Syrian government arrested hundreds and then thousands of civilian, peaceful protestors, it released hundreds of hardened, veteran jihadists from government prisons, many of whom went on to establish, lead and fight within al-Qaeda and ISIS's units in Syria. *Id.* Once ISIS had expanded into large swathes of Syrian territory and emerged as a force actively hostile to Syria's mainstream opposition, the Syrian government focused its military resources on combating moderate opposition groups, leaving ISIS alone in Syria's east to expand and consolidate, eventually catalyzing its creation of a self-declared "Caliphate" in mid-2014.  *Id.*

In regard to Defendant Iran, "Iran [continues] to sponsor terrorism now.  The 2018 State Dept. Country Reports on Terrorism…states, 'Iran remains the world's worst state sponsor of terrorism. The regime has spent nearly one billion dollars per year to support terrorist groups that serve as its proxies and expand its malign influence across the globe.'"  ECF No. 65-2 ¶ 56 (Expert Report of Dr. Patrick Clawson[25]) (quoting ECF No. 65-3 at 2 (Department of State 2018 Country Reports on Terrorism)).

The fourth factor considers the "the wealth of the defendants." The Syrian economy in 2020 was experiencing an acute crisis, with spiraling inflation, unemployment, declining trade, and little foreign direct investment. ECF No. 36-37 ¶ 111 (Expert Report of Charles Lister). Restrictions forced upon the economy by COVID-19 and an economic crisis next-door in Lebanon placed the Syrian government under unprecedented economic stress. *Id.* The foregoing, "…may indicate a heightened possibility that, at this time, meaningful punitive damages enforced upon the Syrian government

---

[25] In his December 28, 2022 Memorandum Opinion and Order, Magistrate Judge Harvey found plaintiffs' expert Dr. Patrick Clawson qualified as an expert on the Islamic Republic of Iran.  ECF No. 70 at 10.

REDACTED

would have a deterrent effect on its future behavior with regard to support for terrorism and terrorist organizations." *Id.*

The finding and statement by the Court in *Gates v. Syrian Arab Republic,* 580 F. Supp. 2d 53 (D.D.C. 2008), when it considered the appropriate punitive damage award in that case, is equally applicable to this case:

> **The evidence shows that Syria supported, protected, harbored, and subsidized a terrorist group whose** *modus operandi* **was the targeting, brutalization, and murder of American and Iraqi civilians.** Premeditated violence against civilian targets is not a legitimate action by any government. Civilized society cannot tolerate states whose partnership with terrorist surrogates, like Zarqawi's terrorist network, is formed for the purpose of achieving political victory through heinous acts of barbarism.

*Gates*, 580 F. Supp. 2d at 74 (emphasis added).

Defendant Iran "has significant wealth, as measured by gross domestic product (GDP), government revenue, exports, and foreign exchange reserves. In its most recent report on the Iranian economy, the International Monetary Fund (IMF) shows Iran's gross domestic product (GDP) as $404 billion at a market exchange rate or, adjusting for the differences in prices between the United States and Iran by using what is called 'purchasing power parity' (PPP) exchange rate, $1.39 trillion." ECF No. 65-2 ¶ 71 (Expert Report of Dr. Patrick Clawson) (citing IMF, Islamic Republic Iran: Article IV Consultation Staff Repot press release).  However, Iran's economy, despite growing briskly in 2017, did not do well for the past three years.  *Id*. ¶ 74. The U.S. "maximum pressure" campaign in particular has led to a drop-off in oil exports and a reduction in government revenue.  *Id*.  "Iranian officials pay extremely close attention to what the outside world has to say about the Iranian government and its policies, and they have shown themselves to be sensitive to the punitive damages levied against Iran.  Were courts to resume awarding punitive damages, Iran's leaders would have an additional reason to consider scaling back their confrontation with the United States by backing away from supporting terrorist attacks on Americans." *Id*. ¶ 75.

REDACTED

**b. Plaintiffs Request an Award of Punitive Damages in the Amount of $300 Million**

In calculating the amount of punitive damages in Section 1605A cases, courts have used several methods.

Courts have awarded punitive damage awards by calculating "the total award based on the ratio between punitive and compensatory damages used in earlier cases, 'if similar conduct has been previously litigated.'" *Colvin v. Syrian Arab Republic,* 363 F. Supp. 3d 141, 163 (D.D.C. 2019) (quoting *Thuneibat,* 167 F. Supp. 3d at 54.)

Courts may also "multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017.) Here, Syria is "estimated to spend between $500 million to $700 million annually to support terrorism." *Thuneibat*, 167 F. Supp. 3d at 54, *citing  Baker v. Socialist People's Libyan Arab Jamahirya,* 775 F. Supp. 2d 48, 85 (D.D.C. 2011).   Iran "has spent nearly one billion dollars per year to support terrorist groups that serve as its proxies and expand its malign influence across the globe." ECF No. 65-2 ¶ 56 (Expert Report of Dr. Patrick Clawson) (quoting ECF No. 65-3 at 2 (Department of State 2018 Country Reports on Terrorism)).

Punitive damages may also be awarded based on "a fixed amount per victim." *Colvin*, 363 F. Supp. 3d at 163.  This amount is typically $150 million per victim.  *Id.* at 163 – 64, citing *Thuneibat*, 167 F. Supp.  3d  22, 54; *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 233 (D.D.C. 2012); *Baker*, 775 F. Supp. 2d at 86; and *Gates*, 580 F. Supp. 2d at 75.

Courts have also "awarded punitive damages in the amount of $300 million in some cases involving a single victim, because the victim was targeted by the foreign state for a particular reason" such as "where the victim was a high ranking official, a dissenter, or an individual conducting humanitarian services." *Colvin*, 363 F. Supp. 3d at 164.

REDACTED

The court in *Colvin* imposed $300 million in punitive damages against Syria for the murder of Marie Colvin, "a journalist who was killed by the Syrian government while reporting on the atrocities occurring during civil war" and who was "specifically targeted because of her profession, for the purpose of silencing those reporting on the growing opposition movement in the country." *Id.,* 363 F. Supp. 3d at 164.   The *Colvin* Court noted that "the murder of journalists acting in their professional capacity could have a chilling effect on reporting such events worldwide" *id.*, and that punitive damages in such a case " 'vindicate[s] the interest of society-at-large in the collection and dissemination of complete and accurate information about world conflicts.' " *Id.* at 165 (quoting *Anderson v. Islamic Republic of Iran*, 90 F. Supp. 2d 107, 114 (D.D.C. 2000)).

Andi's brutal murder was the result of a premeditated ambush of an American-pro-democracy aid worker employed by NDI in the aftermath of the American-led invasion of Iraq, fitting within AQI/ISI's modus operandi in its armed, terroristic insurgency against the American presence in Iraq and all individuals and organizations perceived to exist in support of it; *Gates,* 580 F. Supp. 2d at 74; ECF No. 36-37 ¶ 112 (Expert Report of Charles Lister).

A punitive damages award of $300 million against Syria, and $300 million against Iran, would vindicate the interests of society-at-large in protecting civilian aid workers in conflict zones and would send a message that state sponsors of terrorism cannot murder with impunity.

## III.   POST-JUDGMENT INTEREST

Plaintiffs are entitled to post-judgment interest at the statutory rate.   As Chief Judge Beryl A. Howell very recently wrote in *Ackley v. Islamic Republic of Iran*, 2022 WL 3354720 (D.D.C. August 12, 2022):

> Postjudgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g., Winternitz v. Syrian Arab Republic*, No. 17-2104 (TJK), 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (awarding postjudgment interest because "[a]pplication of section 1961(a) is mandatory, not discretionary") (quoting *Schooley*, 2019 WL 2717888, at *79); *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24,

REDACTED

2021); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 127 (D.D.C. 2015) (Contreras, J.); *Lanny J. Davis & Assocs. v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005). By federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court[,]" and that "[s]uch interest shall be calculated from the date of the entry of judgment. . . ." 28 U.S.C. § 1961(a). Application of section 1961(a) is mandatory, not discretionary. *See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs.*, 962 F. Supp. 2d at 165. The Court will therefore award post-judgment interest at the statutory rate.

## IV.   CONCLUSION

For the reasons stated above, plaintiffs move this Court to enter default judgment as to damages against Defendants the Syrian Arab Republic and the Islamic Republic of Iran, and award compensatory and punitive damages to plaintiffs in the following amounts:

a.   Economic damages to the Estate of Andrea Parhamovich in the amount of $2,238,000;

b.   Pain and suffering damages to the Estate of Andrea Parhamovich in the amount of no less than $20,000,000;

c.   Solatium damages in the following amounts:

   1.   Vicki Parhamovich: $7,500,000
   2.   André Parhamovich: $7,500,000
   3.   Marci Zampini: $3,750,000
   4.   Cory Parhamovich: $3,750,000
   5.   Chris Parhamovich: $3,750,000

d.   Punitive damages in the amount of $300 million against Syria, and $300 million against Iran;

e.   Post-judgment interest at the statutory rate;

f.   And for any other relief the Court deems proper.

REDACTED

Respectfully submitted,

/s/ Joshua M. Ambush
Joshua M. Ambush (Bar No. MD27025)
Law Offices of Joshua M. Ambush, LLC
106 Old Court Road
Suite 303
Baltimore, Maryland 21208
Phone: (410) 484-2070
Facsimile: (410) 484-9330
Email: joshua@ambushlaw.com
*Counsel for Plaintiffs*

Dated:  March 7, 2023

REDACTED