# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THE ESTATE OF ANDRÉA S. PARHAMOVICH, *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | Case No. 17-cv-61 (GMH) |
| THE SYRIAN ARAB REPUBLIC, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs—Vicki Parhamovich ("Vicki") on behalf of herself and the Estate of Andréa Parhamovich; André Parhamovich ("André"); Marcella Zampini ("Marci"); Chris Parhamovich ("Chris"); and Cory Parhamovich ("Cory")—brought this action against the Syrian Arab Republic ("Syria") and the Islamic Republic of Iran ("Iran") (collectively, "Defendants") under the state sponsor of terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. This Court entered default judgment as to liability against Defendant Syria in May 2022, ECF No. 52, and against Defendant Iran in December 2022, ECF No. 70. Plaintiffs seek compensatory and punitive damages for the "attempted abduction and extrajudicial killing" of their daughter and sister, Andréa Parhamovich ("Andi"), in Iraq on January 17, 2007. ECF No. 1. After a thorough review of the record evidence,[1] and consideration of damages awarded in this Court's previous cases adjudicating analogous actions against foreign sovereigns, the Court **GRANTS**

---

[1] The relevant docket entries to this Memorandum Opinion and Order are (1) Plaintiffs' Complaint (ECF No. 1); (2) Clerk's Entries of Default (ECF Nos. 22, 59); (3) Orders Entering Default Judgment (ECF Nos. 52, 70); (4) Plaintiffs' Motion for Default Judgment as to Damages (ECF No. 73 and attachments). Citations to page numbers reflect the pagination assigned by the Court's Electronic Case Filing system.

Plaintiffs' motion and **ORDERS** that Plaintiffs be awarded $23,738,000 in compensatory damages, and $150,000,000 in punitive damages, for a total of $173,738,000.[2]

## I.    BACKGROUND

As the undersigned has previously explained, Andréa "Andi" Parhamovich was a "United States citizen who traveled to Iraq to support its transition to democracy after the American-led invasion in 2003." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2021 WL 6843587, at *1 (D.D.C. June 23, 2021) (hereinafter "*Parhamovich I*"). Ms. Parhamovich's position as a communications strategist for the National Democratic Institute ("NDI") allowed her to "travel outside of Baghdad's heavily fortified Green Zone." *Id.* On January 17, 2007, Ms. Parhamovich traveled to the Iraqi Islamic Party ("IIP") headquarters to meet with IIP officials outside of the Green Zone. *Id.*; *see also id.* at *9. When Ms. Parhamovich's three-vehicle convoy departed IIP headquarters, "armed militants attacked her vehicle and attempted to gain entry to the vehicle, presumably to take Ms. Parhamovich hostage." *Id.* at *1. After the attackers failed to open the door, they directed "small arms fire and grenades" at Ms. Parhamovich's vehicle. *Id.* "A grenade placed underneath the vehicle eventually caused the fuel pipe and tank to explode—catching the vehicle on fire with Ms. Parhamovich inside, leading to her death." *Id.*

---

[2] On December 7, 2022, this case was referred to the undersigned for all purposes following consent by Plaintiffs. ECF Nos. 6, 69. Under the Federal Magistrate Act, magistrate judges may, with the consent of the parties, preside over "any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court." 28 U.S.C. § 636(c)(1). A party may, through conduct, impliedly consent to a magistrate judge's jurisdiction. *Roell v. Withrow*, 538 U.S. 580, 591, 123 S.Ct. 1696, 155 L.Ed.2d 775 (2003). On this basis, courts in this Circuit have found a party's default effected consent to a magistrate judge's jurisdiction to decide a motion for default judgment. *See Koch Minerals Sàrl v. Bolivarian Republic of Venezuela*, 514 F. Supp. 3d 20, 38 (D.D.C. 2020); *Radmanesh v. Gov't of Islamic Republic of Iran*, No. 17-cv-1708, 2019 WL 1787615, at *1 (D.D.C. Apr. 24, 2019), *aff'd sub nom. Radmanesh v. Islamic Republic of Iran*, 6 F.4th 1338 (D.C. Cir. 2021); *Baker v. Socialist People's Libyan Arab Jamahirya*, 810 F. Supp. 2d 90, 98 (D.D.C. 2011) ("[D]efaulting nullifies any right to argue the absence of the magistrate judge's jurisdiction . . . ."); *see also Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683–86 (2015) (applying *Roell's* implied consent standard and holding that a bankruptcy judge may enter default judgment against an absent party where their defaulting conduct evinces consent to the bankruptcy judge's jurisdiction).

## II.    TESTIMONY AND OTHER EVIDENCE

### A. Testimony of Vicki Parhamovich[3]

Ms. Vicki Parhamovich supplied testimony by a signed declaration dated June 18, 2020, and filed on March 3, 2021. ECF No. 36-14. Vicki is the mother of Andi Parhamovich, and she describes her daughter as "an amazing daughter" who was "caring, inquisitive, and accomplished." *Id.*, ¶¶ 3, 6. The two shared a "wonderful relationship," and Vicki asserts that her daughter's death has caused "permanent grief and loss." *Id.*, ¶ 6.

Beginning in Andi's early years, Vicki has memories of "joy and excitement" at her daughter's birth, and as a child and teenager, she describes that Andi was "happy, stubborn, determined, and driven to reach her goals." *Id.*, ¶¶ 7-8. Andi was eleven years older than her twin brothers, and often took care of them. *Id.*, ¶ 8. When Andi went off to college, three hours away from home, she and her mother "remained close by talking on the phone or texting and visiting." *Id.*, ¶ 9. Upon Andi's graduation, Vicki helped her move to Boston, and then to New York City. *Id.*, ¶ 10. The family took trips to spend time with Andi, and they "continued to talk and text all the time." *Id.*

Andi met her fiancé, Michael Hastings, in 2005 in New York. *Id.*, ¶ 11. By the time Vicki met him, she felt that she already knew him "pretty well" because of how much Andi had told her about him. *Id.* While Andi and Mr. Hastings were working overseas, after she had moved to Baghdad, Iraq in 2006, the two got engaged, with the hope of meeting up in Paris to formalize the engagement with a ring and a proposal. *Id.*, ¶¶ 14, 15, 20. The last time Vicki saw her daughter,

---

[3] Plaintiffs submitted an unredacted and a redacted version of this declaration. See ECF No. 36-13 (unredacted version); ECF No. 36-14 (redacted version). This discussion recites information from both versions.

however, was when she dropped her off at the Cleveland airport for her trip to Iraq, an emotional

goodbye. *Id.*, ¶ 13.

On January 17, 2007, the day of Andi's death, Vicki was on her way to work as a surgical

nurse. *Id.*, ¶ 17. Because her case had been delayed, she met a friend for breakfast, where she

received a call from her eldest daughter, Marcella "Marci" Zampini, telling her the news that Andi

had been killed. *Id.* Vicki remembers "just crying and saying 'No, please, no' over and over." *Id.*

Everything after felt "like a dream or trance." *Id.* In the following days, the family spent time at

Marci's house, waiting for more information about what happened to Andi and when or if her body

would be returned to the United States. *Id.*, ¶ 18. Vicki recalls that at the funeral, "it seemed like

the line of people, friends, and family would never end." *Id.*, ¶ 19. Later, the family took a trip to

Paris with Hastings and a few of Andi's friends to scatter her ashes. *Id.*, ¶ 20. Hastings later died

in 2013 in a car accident. *Id.*, ¶ 21.



but felt that she "had to stay strong for [her] family." *Id.* Vicki testified

that she is reminded of her daughter and her death "in some way every day," which "usually

involve[s]" tears. ECF No. 36-14, ¶ 23. She feels "cheated" that she did not get to see her daughter

and Hastings get married, that she will never get to hold their children, and that she will not share

in her daughter's happiness, nor will her daughter be able to share in special family occasions or special memories. *Id.*, ¶ 24.

### B. Testimony of André Parhamovich[4]

Mr. André Parhamovich supplied testimony by a signed declaration dated June 18, 2020, and filed on March 3, 2021. ECF No. 36–20. He is the father of Andi Parhamovich. *Id.*, ¶ 2. He describes his "namesake" as "a kind, compassionate person who wanted to make a difference in the world by helping others" and as a "hardworking and loyal person." *Id.*, ¶ 5. After Andi's death, André "suffered profound grief . . . from which [he has] never recovered." *Id.*

André is a coach and elementary school gym teacher. *Id.*, ¶¶ 6, 13. The Parhamovich family enjoys sports: their favorite holiday was Thanksgiving, when they would eat dinner and watch a football game together, and they loved to watch Cleveland Indians and Browns games together. *Id.*, ¶¶ 7, 8. However, he and Andi had an especially "close bond" because of their shared love of sports. *Id.*, ¶ 8. In elementary school, Andi was a student in André's gym class, where they would walk each day, hand in hand, to school, and in high school, she played volleyball, soccer, and softball. *Id.* ¶¶ 8, 13. During her first year of college, André and his wife would pick Andi up every Friday afternoon and drop her off every Sunday night, enjoying the "family bonding" that "occurred during these trips." *Id.*, ¶ 9. After Andi graduated from college, living in Boston and New York City, the family visited her "as much as possible," attending baseball games at Fenway Park and Yankee Stadium. *Id.*, ¶ 11. During this time, Andi and André would catch up with weekly Saturday night phone calls. *Id.*

On the day his daughter was killed, André was called from his gym class to the office to take an important phone call. *Id.*, ¶ 13. After his daughter Marci gave him the news of Andi's

---

[4] Plaintiffs submitted an unredacted and a redacted version of this declaration. See ECF No. 36-19 (unredacted version); ECF No. 36-20 (redacted version). This discussion recites information from both versions.

death, a coworker drove him home, and he recalls thinking, "I will never be the same again." *Id.*
A few weeks after Andi's death, André told his wife that he "didn't know how much longer [he] could go on with the pain and sadness," and spoke to her about ending his life. *Id.*, ¶ 16. Thirteen years later, he still has ███████████████████████████ André testified that his daughter's death "altered" him and his family "completely," as the "[g]rief and sadness over the loss of a child never goes away." *Id.* ¶ 18. André has also experienced "immense pain" seeing the struggle that his sons experienced after Andi's death. *Id.*, ¶ 19. There is now a bench dedicated to Andi in a park where Andi and her brothers used to play. *Id.* André has sat on the bench over 2,000 times since Andi's death, and has written poetry there, processing his loss. *Id.*, ¶¶ 19, 20.

### C. Testimony of Marci Zampini[5]

Ms. Marci Zampini supplied testimony by a signed declaration dated June 18, 2020, and filed on March 3, 2021. ECF No. 36-23. Marci is the older sister of Andi Parhamovich. *Id.*, ¶¶ 3, 6. The two sisters, seven years apart, shared a bedroom throughout childhood. *Id.*, ¶ 6. Marci has memories of watching the television program Days of Our Lives together with Andi while drinking hot tea, reading books, and riding bikes. *Id.*, ¶¶ 7–9. She remembers Andi being a bridesmaid in her wedding. *Id.*, ¶ 11. Marci described that Andi "thrived" as an aunt, baking with her nieces and sending them gifts from their travels. *Id.*, ¶ 12. When Andi moved to Iraq, she and Marci kept in touch via phone calls. *Id.*, ¶ 15.

On the day that Andi was killed, Marci received a call from Andi's employer with the news. *Id.*, ¶ 16. She then had to inform each of her family members of Andi's death. *Id.*, ¶¶ 16–21. In the days and weeks after her death, Marci's home became "command central" as her parents and

---

[5] Plaintiffs submitted an unredacted and a redacted version of this declaration. *See* ECF No. 36-23 (unredacted version); ECF No. 36-24 (redacted version). This discussion recites information from the redacted version only.

brothers stayed with her, waiting for news about Andi's body and an ongoing autopsy, playing host to FBI agents who came by, and watching as Marci's front porch filled with food dropped off by community members. *Id.*, ¶ 27. Marci helped to plan Andi's funeral, and in the weeks that followed, the family started a foundation in Andi's name for "young women interested in politics, marketing, and communications." *Id.*, ¶¶ 28–29.

Marci testified that she still has "nightmares" and questions about Andi's death that "haunt" her. *Id.*, ¶ 36. However, those are moments are "fewer" now, and Marci testifies that she has more "happy and contented days, than sad days," and when she "let[s] the dark moments visit," she "acknowledge[s] them and then [she] send[s] them on their way." *Id.*, ¶¶ 35, 36. Her daughters remind her of Andi, which is a "comfort and . . . a dagger." *Id.*, ¶ 39. Marci is "sad [Andi] won't see her nieces graduate college and marry." *Id.*, ¶ 40. She is "upset [Andi] left [her] to deal with [their] dad, to console [their] mom and try somehow to help [their] brothers." *Id.*

### D. Testimony of Chris Parhamovich[6]

Mr. Chris Parhamovich supplied testimony by a signed declaration dated June 18, 2020, and filed on March 3, 2021. ECF No. 36-30. Chris is one of Andi's younger twin brothers. *Id.*, ¶ 6. He described his sister as a "one of a kind spirit and person" who "always wanted to make a positive difference in the world." *Id.*, ¶ 4. Andi was ten years older, and Chris has fond memories with her of holiday gatherings, watching Jeopardy, going to the movies, watching sporting events, and more. *Id.*, ¶¶ 6–7. When Andi moved out of the house to go to college, Chris kept in touch daily with AOL messaging and phone calls. *Id.*, ¶ 8. When she moved to Boston, and then New York City, the two siblings continued to talk daily and visited in person as often as possible. *Id.*,

---

[6] Plaintiffs submitted an unredacted and a redacted version of this declaration. See ECF No. 36-29 (unredacted version); ECF No. 36-30 (redacted version). This discussion recites information from both versions.

¶ 9.  The last time Chris saw his sister was when she visited the family in Ohio for one of his football games and a "wonderful weekend" thereafter.  *Id.*, ¶ 11.  He spoke to her virtually "up until the day she was killed." *Id.*

On the day Andi was killed, Chris learned of the news from a phone call from his eldest sister Marci.  *Id.*, ¶ 12.  He "collapsed" to his knees, "cried out and screamed out her name," knowing that he would never "enjoy another day on this earth because of how much [he] loved [his] sister." *Id.*  Chris described Andi's funeral as "truly traumatic" because there was an urn instead of a body, which "finalized any hope" that "somehow, she was still alive." *Id.*, ¶ 13.  Chris testified that "Andi's death ravaged [his] family so badly that [he] turned down an athletic scholarship" for college so that he could stay home and help them.  *Id.*, ¶ 16. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Chris is reminded of Andi every time he hears an ambulance or a gunshot on television, or when he sees numbers associated with the dates when she was born and when she died. ECF No. 36-30, ¶ 18. ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

### E.  Testimony of Cory Parhamovich[7]

Mr. Cory Parhamovich supplied testimony by a signed declaration dated June 18, 2020 and filed on March 3, 2021.  ECF No. 36-34.  Cory is Andi's other younger twin brother.  *Id.*, ¶ 7.  He describes Andi has a "hard-working, caring, loving, and passionate person" who was "dedicated

---

[7] Plaintiffs submitted an unredacted and a redacted version of this declaration.  *See* ECF No. 36-33 (unredacted version); ECF No. 36-34 (redacted version).  This discussion recites information from both versions.

to her beliefs and goals and to making a difference in the world." *Id.*, ¶ 4. Cory has memories of going to the movies with Andi and his brother Chris every Christmas, sneaking into her bed to watch television, playing music for her with his brother, and more. *Id.*, ¶ 7. After Andi went to college, like his brother, Cory sent AOL instant messages to her "almost daily," and spoke with her on the phone. *Id.*, ¶ 9. They maintained this close relationship after Andi moved to Boston and then New York City. *Id.* Cory last saw Andi when she visited after he had played in a football game in the fall of his senior year, and he last spoke with her via AOL instant messenger a couple of days before she was killed. *Id.*, ¶ 11.

On the day Andi was killed, Cory was at home playing music with his brother. *Id.*, ¶ 12. When Marci broke the news, Cory recalls both brothers falling to their knees crying and screaming. *Id.* In the ensuing days, he recalls staying at Marci's house and "a huge number of people" dropping by to share their condolences. *Id.*, ¶ 13. Before Andi's death, Cory remembers "being incredibly happy in [his] senior year of high school and . . . looking forward to where life would lead [him]." *Id.*, ¶ 16. After she was killed, Cory testifies that "everything changed." *Id.* He suffers daily and thinks of Andi's death "every day and night" and that these memories bring out a number of emotions. *Id.*, ¶¶ 16, 17. ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████         ████████████████

██████████████████████████████████████████████ ██ ██

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████

### F. Expert Declaration of Larry Pastor[8]

Dr. Larry Pastor[9] supplied testimony by a signed declaration dated June 18, 2020, and filed

on March 7, 2023.  ECF No. 73-2.  In April 2019, Dr. Pastor conducted psychiatric evaluations of

the Parhamovich family, which involved reviewing medical records and interviewing each family

member.  *Id.,* ¶ 9.

       1.  Vicki Parhamovich



---

[8] Plaintiffs submitted an unredacted and a redacted version of this report.  *See* ECF No. 72-1 (unredacted version); ECF No. 73-2 (redacted version).  This discussion recites information from both versions.

[9] The Court finds that Dr. Larry Pastor is qualified as an expert in areas of psychological stress, trauma, and resiliency. He currently works in the Office of Medical Services of the Central Intelligence Agency, where his work includes the support of individuals exposed to high threat environments, armed conflict, hostile captivity, and acts of terrorism. He also serves an as emergency services psychiatrist for Fairfax County, Virginia, where he is responsible for the diagnosis and management of patients with acute or high-risk clinical issues, psychological trauma, acute exacerbation of pre-existing medical illness, and suicidal or homicidal ideation.  His professional experience includes over twenty-two years as a psychiatrist for the federal government.  ECF No. 73-2.  Courts in this Circuit have found Dr. Pastor to be a qualified expert in FSIA cases.  *See, e.g., Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 97 (D.D.C. 2015); *Dammarell v. Islamic Republic of Iran*, 281 F. Supp. 2d 105, 113 n.7 (D.D.C. 2003), *vacated on other grounds*, 404 F. Supp. 2d 261 (D.D.C. 2005).  The Court finds so here as well.

2.  André Parhamovich

3.  Marci Zampini

11

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████

    4.  Chris and Cory Parhamovich[10]

   ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[10] Dr. Pastor's report considered the two brothers together in his report.  *See* ECF No. 73-2, ¶¶ 54-55.  The Court likewise summarizes Dr. Pastor's report, considering Chris and Cory Parhamovich together.

██████████████████████████████████████████████████

████████████████████████████████████████

**G. Expert Report of Sebastian Schubl**[11], [12]

Dr. Schubl provided an expert report based on his review of the Department of Army CID report, the Defense Health Agency autopsy report, Ms. Parhamovich's death certificate, the Department of State Report of Death of American Citizen Abroad, the January 17, 2007 Report on Incident provided by the Unity Resource Group, autopsy photographs of Ms. Parhamovich, and Plaintiffs' memoranda in support of their motions for default judgment.  ECF No. 73-4 at 8.



---

[11] Plaintiffs submitted an unredacted and a redacted version of this declaration.  *See* ECF No. 72-2 (unredacted version); ECF No. 73-4 (redacted version).  This discussion recites information from both versions.

[12] The Court finds that Dr. Sebastian Schubl is qualified as an expert in burns and trauma.  He currently serves as the Medical Director for Surgical Services for the University of California at Irvine Medical Center.  Dr. Schubl is a graduate of the University of Michigan School of Medicine and was a resident at New York Presbyterian Hospital/Weill Cornell Medical Center in New York City.  He served as a member of the faculty of the Department of Surgery at Weill Cornell Medical Center from 2011 to 2016 while also serving as the Trauma Medical Director at Weill Cornell's trauma affiliate in Queens, Jamaica Hospital, an ACS verified and New York State Designated Level 1 Trauma Center.  ECF No. 73-4.



### H. Expert Report of Steven Wolf[13]

Steven Wolf submitted a report calculating the "present value dollar amount of [Ms. Parhamovich's] past and future income loss directly attributable to her premature death . . . as compared to her planned or anticipated employment opportunities through her anticipated work-life if she had lived." ECF No. 73-3 at 4. Mr. Wolf's analysis relies on Ms. Parhamovich's "historical earnings history, education, employment record, economic statistics, and declaration certification of her mother Vicki L. Parhamovich." *Id.* at 6. When estimating her projected income and benefits, Mr. Wolf asserts he made "conservative . . . assumptions" such as keeping her employment status and income level "[un]change[d] over the course of her life but only adjust[ed] for moderate inflation." *Id.* at 6–7. In particular, he assumed that she would "remain in the same

---

[13] The Court finds that Steven A. Wolf is qualified as an expert in forensic economics. Mr. Wolf is the Managing Director of Wolf Forensics, a forensic advisory service, and a Partner at Cherry Bekaert, LLP. He has taught at Georgetown University as an Adjunct Professor in the School of Business. Other courts in this Circuit have qualified him as an expert in FSIA cases, *see Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, at *2 (D.D.C. May 18, 2022); *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 59 (D.D.C. 2020); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 258 (D.D.C. 2014), *aff'd,* 924 F.3d 1256 (D.C. Cir. 2019), and *aff'd in part, question certified,* 864 F.3d 751 (D.C. Cir. 2017), and *aff'd,* 924 F.3d 1256 (D.C. Cir. 2019); *Estate of Doe v. Islamic Republic of Iran*, 943 F. Supp. 2d 180, 185 (D.D.C. 2013), and the Court does so here.

or a similar job" throughout her projected work life until age 65 "consistent with work life patterns in the United States at which time the majority of worker's normally retire." *Id.* at 7, 10. He used a growth estimate of 2.8% per year for his estimation of Ms. Parhamovich's earnings, which reflects the historical growth in earnings for workers in the "private, non-farm sector of the economy from 1999 to 2019" as published by the Department of Labor. *Id.* at 11. Mr. Wolf also calculated the value of Ms. Parhamovich's lost benefits, including health insurance and retirement benefits, estimating that she would have received employee benefits valued at 25% of her projected wages. *Id.* at 11. He calculated her income tax based on historical tax rates and accounted for inflation. *Id.* at 12. He reduced his estimate of lost earnings to reflect expenditures for personal maintenance, including the assumption that she would marry and have two children. *Id.* at 14, 16. In total, Mr. Wolf found that Ms. Parhamovich's total economic loss after consideration of tax and personal maintenance expenditures was approximately $2,238,000. *Id.* at 17.

## III.    LEGAL STANDARD

If a court deems default judgment appropriate, it must independently determine the appropriate remedies. *See Pescatore v. Palmera Pineda*, 345 F. Supp. 3d 68, 70 (D.D.C. 2018) ("[U]nless the amount of damages is certain, the court is required to make an independent determination of the sum to be awarded." (quoting *Adkins v. Teseo*, 180 F. Supp. 2d 15, 17 (D.D.C. 2001))). Specifically, "unlike a plaintiff's well-pleaded allegations as to liability, a court does not take factual allegations related to damages as true." *Doe v. Syrian Arab Republic*, No. 18-cv-66, 2020 WL 5422844, at *6 (D.D.C. Sept. 10, 2020). Rather, "a court makes its damages determination 'in light of the facts and the circumstances of the case at hand.'" *Id.* (quoting *SEC v. Whittemore*, 691 F. Supp. 2d 198, 209 (D.D.C. 2011)). "While the court may conduct a hearing to fix the amount of damages, it is not required to do so, 'as long as it ensure[s] that there [is] a

basis for the damages specified in the default judgement.'" *Id.* (alterations in original) (quoting *SEC v. China Holdings, Inc.*, No. 09-cv-2045, 2010 WL 11603046, at *2 (D.D.C. Sept. 24, 2010)).

## IV.    DISCUSSION

Plaintiffs in this case are seeking damages for the "attempted abduction and extrajudicial killing" of Andi Parhamovich under 28 U.S.C. § 1605A. ECF No. 1. The FSIA makes foreign states liable to victims of state sponsored terrorism for money damages including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). "To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)); *accord Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries. *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

The Court has already found that Defendants Syria and Iran are liable to Ms. Parhamovich's estate for pain and suffering, as well as to her family for their IIED claims. *See Parhamovich I*, 2021 WL 6843587, at *15; *Estate of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61, 2022 WL 18071921, at *12 (D.D.C. Dec. 28, 2022) (hereinafter "*Parhamovich II*") (finding liability against Iran). Common law claims of IIED provide for the same relief as the solatium claims pleaded by the Plaintiffs under § 1605A(c). *Valore v. Islamic Republic of Iran*,

700 F. Supp. 2d 52, 85 (D.D.C. 2010) ("Under the FSIA, a solatium claim is indistinguishable from an IIED claim."). Accordingly, the specific damages awarded to each Plaintiff family member may be decided using the same framework as solatium claims awarded in previous FSIA cases, and the court may consider precedent pertaining to both IIED and solatium claims. *See id.*

After thoroughly reviewing the relevant evidence in this case and the legal framework and precedent discussed below, the undersigned considers the issue of specific damages due to the estate of Andréa Parhamovich and members of her family for economic, pain and suffering, IIED, and punitive damages.

### A. Economic Damages

"As a general rule, lost earnings —past and future — are compensable economic damages" under the FSIA. *Abedini v. Gov't of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 138 (D.D.C. 2019) (quoting *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71). Generally, plaintiffs submit a forensic economist's expert report to establish economic losses. *See, e.g.*, *Roth*, 78 F. Supp. 3d at 402; *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 59–60 (D.D.C. 2018); *Valore*, 700 F. Supp. 2d at 83. When evaluating an expert's report related to lost future earnings, the Court must consider the "reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed*, 845 F. Supp. 2d at 214). More, "a plaintiff must 'support [a] claim for lost earnings with competent evidence.'" *Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 180 (D.D.C. 2019) (alteration in original) (quoting *Moradi*, 77 F. Supp. 3d at 71) (denying economic damages where plaintiffs did not "offer any quantification of economic loss").

Plaintiffs assert that Ms. Parhamovich's estate is entitled to economic damages of approximately $2,238,000. ECF No. 72-3 at 10–11. In support of this request for damages,

Plaintiffs have submitted the expert report of Steven Wolf. ECF No. 73-3. Mr. Wolf's analysis relies on Ms. Parhamovich's "historical earnings history, education, employment record, economic statistics, and declaration certification of her mother Vicki L. Parhamovich, among other relevant sources." ECF No. 73-3 at 6. When estimating her projected income and benefits, the Court finds that the expert made the "conservative assumption" that her employment status and income level "would not change over the course of her life but only adjust[ed] [her income level] for moderate inflation." *Id.* at 6–7. Further, the expert fairly assumed that Ms. Parhamovich's work life would have extended until she reached age 65 which was "consistent with [when] the majority of [U.S.] worker's [sic] normally retire." *Id.* at 7, 10. Mr. Wolf's methodology is the same as that previously accepted by courts in this Circuit. *See Schwartz v. Islamic Republic of Iran*, No. 18-cv-1349, 2022 WL 1567358, at *2 (D.D.C. May 18, 2022) (approving of Mr. Wolf's methodology and accepting his conclusions to award economic damages); *accord Barry*, 437 F. Supp. 3d at 59; *Owens*, 71 F. Supp. 3d at 258; *Estate of Doe*, 943 F. Supp. 2d at 185.

Mr. Wolf's economic assumptions made in his report are virtually identical to those identified in the above cited cases, and the Court similarly finds here that they are "consistent with generally accepted practices for the computation of lost earnings and [are] based on reasonable and reliable data." *Schwartz*, 2022 WL 1567358, at *2 (quoting the record). Accordingly, the Court awards economic loss damages to the estate of Andréa Parhamovich in the amount of $2,238,000.

### B. Pain and Suffering Damages

Pain and suffering awards can be challenging to calculate, as "[p]utting a number on these kinds of harms can be difficult." *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005). While it is true that "there is no market where pain and suffering are

bought and sold, nor any standard by which compensation for it can be definitely ascertained, or the amount actually endured can be determined," an award amount must be determined, and in doing so a court "will not simply award what it abstractly finds to be fair." *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883, 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020) (quoting *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 22–23 (D.D.C. 2002)), *report and recommendation adopted*, 2020 WL 7869211 (D.D.C. Apr. 11, 2020). Instead, a court is guided by precedent and awards which have been handed down in previous cases decided under the FSIA, *see Price*, 384 F. Supp. 2d at 134, and it should "take pains to ensure" that similarly situated plaintiffs receive similar awards, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), *abrogated on other grounds as recognized by Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9 (D.D.C. 2015).

First, a plaintiff must "prove that the decedent consciously experienced the time between an attack and his or her death" to be entitled to pain and suffering damages. *Roth*, 78 F. Supp. 3d at 402; *see also Ben-Yishai v. Syrian Arab Republic*, No. 18-cv-3150, 2022 WL 17250344, at *10, 12 (D.D.C. Nov. 28, 2022) (awarding no pain and suffering damages where plaintiffs put forth no evidence that the decedent survived or was conscious after the attack); *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 34 (D.D.C. 2022) ("Victims who die instantaneously in a terrorist attack typically cannot recover damages for pain and suffering . . . ."). However, evidence suggesting that the decedent was "even momentarily . . . conscious" can be sufficient. *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193, 2022 WL 17370239, at *14 (D.D.C. Sept. 8, 2022), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); *see Force*, 617 F. Supp. 3d at 34 (awarding pain and suffering damages where medical expert testimony demonstrated that victim of stabbing would have been conscious of the attack itself and likely

19

experienced "extremely uncomfortable shortness of breath" for "a matter of seconds or perhaps a minute or two"); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 5 (D.D.C. 2000) (awarding pain and suffering damages where medical expert testimony demonstrated that the mechanism of death was not instantaneous and that there was a period of pain and suffering of several minutes before death); *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 56, 68 (D.D.C. 2021) (awarding pain and suffering damages where medical expert could not determine the amount of time between first injury and death, but could conclude that the initial injuries were not fatal and the victim suffered for some amount of time).

In this case, the "Detailed Sequence of Events" attached as Annex C to the URG Report on Incident Facts, ECF No. 36-12, provides a minute-by-minute timeline of the events of January 17, 2007. ECF No. 36-12 at 3 (URG Report on Incident Facts), 17–29 (Annex C, Detailed Sequence of Events).



Relying on the Plaintiffs' medical expert opinion and the findings of the autopsy report, the Court finds that Plaintiffs have sufficiently established that Ms. Parhamovich experienced tremendous suffering prior to her death. Like the victims in *Force*, *Eisenfeld*, and *Selig*, Ms. Parhamovich did not die instantaneously, but instead she endured horrific pain before she died, entitling her estate to damages. *See Force*, 617 F. Supp. 3d at 34; *Eisenfeld*, 172 F. Supp. 2d at 5, 16–17; *Selig*, 573 F. Supp. 3d at 56, 68.

Next, having found that the estate is entitled to pain and suffering damages, the Court turns to the question of the appropriate amount to award, keeping in mind that "[t]here is no monetary award that could adequately compensate" what Ms. Parhamovich experienced. *Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-0252, 2021 WL 723257, at \*7 (D.D.C. Feb. 24, 2021) (alteration in original) (quoting *Acree v. Republic of Iraq*, 271 F. Supp. 2d 179, 219 (D.D.C. 2003)).

In the majority of this Circuit's cases, victims of terrorist acts whose "periods of pain and suffering" span from "less than a minute to a few hours after an attack" prior to death have been awarded damages of $1,000,000. *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 83 (D.D.C. 2017) (awarding $1 million to the estate of an infant who survived for two hours after a terrorist attack); *see, e.g.*, *Neiberger*, 2022 WL 17370239, at \*14 (awarding $1 million, where decedent suffered in the "moments" between an explosive device attack on his vehicle and his subsequent loss of consciousness); *Force*, 617 F. Supp. 3d at 34 (awarding $1 million to victim of stabbing who "likely" experienced "extremely uncomfortable shortness of breath prior to losing consciousness" for "only a matter of seconds or perhaps a minute or two"); *Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 145 (D.D.C. 2018) (awarding $1 million to victim of gunshot wounds who survived for "at least several minutes"); *Selig*, 573 F. Supp. 3d at 55, 64 (awarding $1 million to victim of multiple gunshots who lived several hours after injuries); *Fraenkel v. Islamic Republic of Iran*, 248 F. Supp. 3d 21, 40–41 (D.D.C. 2017) (awarding $1 million to estate of boy who was kidnapped and suffered for thirty minutes before death), *aff'd in part and rev'd in part on other grounds*, 892 F.3d 348 (D.C. Cir. 2018); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 299–300 (D.D.C. 2003) (awarding $1 million to the estate of a woman who "suffered several minutes of extreme pain and suffering before succumbing to her injuries"

after a suicide bombing); *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 113 (D.D.C. 2000) (awarding $1 million to the estate of a victim who suffered for at least thirty seconds before death); *Eisenfeld*, 172 F. Supp. 2d at 8 (awarding $1 million, where victims suffered for "several minutes" following explosion in suicide bombing of bus); *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 8, 29 (D.D.C. 1998) (awarding $1 million, where victim suffered for "three to five hours" after suicide bombing of bus), *abrogated on other grounds as recognized by Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 n.2 (D.D.C. 2006).

Plaintiffs acknowledge that a $1 million award is "standard" when the "duration of pain and suffering is short." ECF No. 72-3 at 21. However, they seek $20 million in pain and suffering damages, citing to four cases that departed from the standard. *Id.* at 18–22. First, Plaintiffs cite *Miller v. Cartel*, a case decided under the Antiterrorism Act of 1990 in which the court awarded $45,390,000 to each of the victims' estates for pain and suffering, where a mother and her four children perished in a fire inside a vehicle that had been attacked by gunfire. No. 20-cv-132, 2022 WL 2286952, at *22–24 (D.N.D. June 24, 2022). The court in that case arrived at this figure by starting with the $50,000,000 award in *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 69 (D.D.C. 2008), reducing it by 30% due to mitigating factors, and then applying inflationary calculations to account for the passage of time. *See Miller*, 2022 WL 2286952, at *22–24. First, as Plaintiffs acknowledge, unlike the instant case, the *Miller* case involved the added suffering of a family with four children perishing together. *Id.*; *see* ECF No. 72-3 at 21. Second, the Court does not find the *Miller* court's reliance on *Gates* to be persuasive here. The court in *Gates* did not provide an explanation for how it arrived at the figure of $50 million in pain and suffering which, as the cases cited above demonstrate, is an amount that falls outside of the norm for awards in cases where the victim is conscious of their impending death. Second, the two victims of

terrorism in *Gates* were killed in a uniquely terrible way—a kidnapping and slow decapitation that was broadcasted on the internet for the victims' family and friends to see. 580 F. Supp. 2d at 73–74.

Similarly, Plaintiffs point to *Pugh v. Socialist People's Libyan Arab Jamahiriya*, where the court awarded $18 million to the estates of victims of an attack involving a suitcase bomb on board an airplane, causing victims to fall rapidly for several minutes, burning alive before dying from the impact of ground velocity. 530 F. Supp. 2d 216, 220–21, 265–66 (D.D.C. 2008). Notably, like in *Gates*, the court in *Pugh* provides no explanation for how it arrived at this figure. *See id.* at 266. The awards in *Miller*, *Gates*, and *Pugh* "fall outside the heartland of what courts . . . typically award for pain and suffering," and this Court is not persuaded that a similar award is appropriate in this case. *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 36 (D.D.C. 2022) (discussing the plaintiff's request for $20 million). "'In the interest of fairness . . . courts strive to maintain consistency of awards' between plaintiffs in comparable situations." *Mark*, 626 F. Supp. 3d at 36 (quoting *Borochov v. Islamic Republic of Iran*, 589 F. Supp. 3d 15, 41 (D.D.C. 2022)). For that reason, the Court believes that a significant departure from the $1,000,000 standard award given in cases where a victim is aware of her impending death, and suffered for a relatively short period of time, is not warranted here. Accordingly, the Court will not make an award for pain and suffering at the level awarded in *Miller*, *Gates*, and *Pugh*.

Nevertheless, courts in this Circuit have, on occasion, departed more modestly from this standard amount in cases where the circumstances of the victim's death were "especially horrific." *Force*, 617 F. Supp. 3d at 35 (awarding an additional $500,000 beyond the standard $1 million to victim who watched terrorists systematically attack passengers on a bus before being shot in the head and stabbed in the stomach and suffered for at least one hour). Here, Ms. Parhamovich

undeniably endured unspeakable pain and suffering prior to her death, and that suffering lasted, as the Court found above, for between fifteen to twenty minutes as her armored vehicle was consumed by fire. Accordingly, the Court will increase the standard award by $500,000 and award her estate $1,500,000 for the immense pain and suffering she endured prior to her death. *See id.*

### C. Solatium Damages

"Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009). Such acts are "by [their] nature . . . directed not only at the victims but also at the victims' families." *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 328 (D.D.C. 2006) (quoting *Salazar*, 370 F. Supp. 2d at 115 n.12). The Court has determined that Plaintiffs Vicki Parhamovich, André Parhamovich, Marcella Zampini, Chris Parhamovich, and Cory Parhamovich, have established that both Defendants Syria and Iran are liable for their common law claims of IIED. *Parhamovich I*, 2021 WL 6843587, at *15; *Parhamovich II*, 2022 WL 18071921, at *12. As noted, in cases involving the FSIA, "this Court has recognized the claim of solatium as . . . 'indistinguishable' from the claim of [IIED]." *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 267 n.5 (D.D.C. 2002) (quoting *Wagner v. Islamic Republic of Iran*, 172 F. Supp. 2d 128, 135 n.11 (D.D.C. 2001)). Solatium damages are awarded to family members to compensate "for the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." *Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F. Supp. 2d 48, 83 (quoting *Belkin*, 667 F. Supp. 2d at 22). The undersigned will now consider the specific emotional distress and solatium damages which should be awarded to each of the Plaintiffs.

Damage awards of this kind are fact dependent, requiring case-by-case analysis of each individual plaintiff's unique situation. *See, e.g., Hirshfeld*, 330 F. Supp. 3d at 146. For guidance in determining these awards, "the Court may look to prior decisions awarding damages for intentional infliction of emotional distress as well as to decisions regarding solatium." *See Valore*, 700 F. Supp. 2d at 85 (quoting *Acosta*, 574 F. Supp. 2d at 29).

To determine Plaintiffs' IIED/solatium damages, the Court will follow the "majority of courts in this district [which] have adopted" the framework set forth in *Heiser* to determine how to quantify the emotional harm caused to family members by terrorist acts.[14] *Doe A-1*, 2021 WL 723257, at \*8. "Under that framework, . . . 'the family of a deceased victim typically receives damages in the amount of \$8 million for a spouse, \$5 million for a child or parent, and \$2.5 million for a sibling.'" *Id.* (quoting *Barry*, 437 F. Supp. 3d at 53–54). Indeed, "[t]he framework has gained strong precedential support as other members of this court have repeatedly continued to follow it in FSIA cases." *Reed*, 845 F. Supp. 2d at 214; *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d at 361 ("We recognize that many FSIA decisions issued by the District Court follow *Heiser*'s solatium damages model."); *Kar v. Islamic Republic of Iran*, No. 19-cv-2070, 2022 WL 4598671, at \*18 (D.D.C. Sept. 30, 2022) (applying the *Heiser/Peterson II* framework to determine the measure of solatium damages); *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065, 2022 WL 2817730, at \*45 (D.D.C. July 19, 2022) ("[R]ecent decisions hew close[ly] to the *Peterson II* framework."); *Braun*, 228 F. Supp. 3d at 85 (describing the *Heiser* framework as "a commonly accepted standardized framework . . . for solatium damages"); *Valore*, 700 F. Supp. 2d at 85–86 (noting "strong

---

[14] The *Heiser* framework is similar to the *Peterson II* framework, named after *Peterson v. Islamic Republic of Iran* (*Peterson II*), which applied the *Heiser* amounts to family members of victims who died and halved those amounts for family members of surviving victims. 515 F. Supp. 2d 25, 51–52 (D.D.C. 2007), *abrogated on other grounds as recognized in Mohammadi*, 947 F. Supp. 2d at 65.

precedential support" for the *Heiser* framework). All that said, nothing requires this Court to apply *Heiser*'s damages matrix, *see Fraenkel*, 892 F.3d at 361 ("We decline to impose *Heiser*'s framework as a mandatory scheme under the FSIA."), and even when *Heiser* is used, the "numbers serve only as an anchor from which the Court should deviate to compensate for specific circumstances," *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *26 (D.D.C. July 2, 2020); *see also Fraenkel*, 892 F.3d at 362 ("While past solatium awards from comparable cases are appropriate sources of guidance for district courts, 'different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards.'" (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017), *rev'd on other grounds*, 892 F.3d 348 (D.C. Cir. 2018)). In the interests of promoting consistency and ensuring that similar harm merits similar damage awards, this Court will apply the *Heiser* framework and deviate from it if appropriate. *See Warmbier*, 356 F. Supp. 3d at 58 (adopting the *Heiser* framework "in the interest of consistency"); *see also Kar*, 2022 WL 4598671, at *18 (noting that judges in this Circuit have applied the *Heiser/Peterson II* framework "[t]o bring some uniformity" to the damages awards in cases under the FSIA's terrorism exception). The Court does so with the understanding that *Heiser* is not binding.

Moreover, these awards, while typical, are "not set in stone," and may be adjusted depending on the specific circumstances presented. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Circumstances meriting upward enhancements can include "evidence establishing an especially close relationship between the plaintiff and decedent," "medical proof of severe pain, grief or suffering on behalf of the claimant," *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26–27 (D.D.C. 2011), "[t]estimony which describes a general

feeling of permanent loss or change caused by the decedent's absence," *Flatow*, 999 F. Supp. at 31, and "aggravating circumstances that appreciably worsen the surviving [family member]'s pain and suffering, such as cases involving torture or kidnapping," *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 108 (D.D.C. 2006). "When courts award upward departures, they usually do so because of an unusual circumstance beyond the ordinary anguish that results from losing a family member." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 66 (D.D.C. 2021).

In this Circuit, courts have often awarded an enhancement of 25% in such "unusual circumstance[s]." *Id.*; *see Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739, 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding upward departure of 25% to family members who suffered severe mental distress after violent and unexpected death of loved one); *Neiberger*, 2022 WL 17370239, at *16 (awarding upward departure of 25% to a parent who saw her son's body firsthand at the morgue, attempted suicide, and was hospitalized and diagnosed with PTSD and severe depression); *Selig*, 573 F. Supp. 3d at 70–71 (awarding upward departure of 25% to a family member who experienced traumatic loss as a teenager, resulting in changes in academic status and continued residence in the family home as an adult); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (awarding upward departure of 25% to family members where victim died in a violent, unexpected death and medical evidence demonstrated severe pain as evidenced by diagnoses of "traumatic grief" or "persistent complex bereavement-related disorder"); *Baker*, 775 F. Supp. 2d at 83 (awarding upward departure of 25% where a plaintiff "turned to self-destructive behavior to cope with his pain over his sister's death"); *Valore*, 700 F. Supp. 2d at 86 (awarding upward departure of 25% where a family member "suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered").

In more severe circumstances, courts have awarded an enhancement of 50%. *See W.A.*, 2020 WL 7869218, at *16 (awarding an upward departure of 50% to family members who had to listen to sounds of tortured victim on the phone, faced physical danger, and were forced to flee their home country); *Oveissi*, 768 F. Supp. 2d at 29–30 (awarding an upward departure of 50% where six year old child lost grandfather, was forced to enter hiding and hire guards under "constant threat of death" and suffered permanent changes).

However, courts have declined to award significant enhancements from the *Heiser* baseline to family members who, though they demonstrate "personal connection . . . and mental anguish . . . to support an award of solatium damages," do not "demonstrate an unusual degree of mental anguish that would warrant" an enhancement. *Estate of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *3, *9 (D.D.C. Nov. 18, 2019) (awarding *Heiser* baseline to family members who experienced emotional trauma and ongoing grief, anxiety, sleeplessness, and panic attacks); *see also Stearns v. Islamic Republic of Iran*, No. 17-cv-131, 2023 WL 4999215, at *3 (D.D.C. Aug. 4, 2023) (awarding a 2% upward departure to a sister who experienced trauma related to the violent manner of her brother's death, but did not require hospitalization, significant medical treatment, or other interventions); *Taitt v. Islamic Republic of Iran*, No. 20-cv-1557, 2023 WL 2536518, at *14 (D.D.C. Mar. 16, 2023) (awarding 10% upward departure to a daughter who developed symptoms of PTSD and dissociative identity disorder after her mother was injured in bombing); *Braun*, 228 F. Supp. 3d at 86 (finding that PTSD and similar diagnoses, while serious, do not "warrant a significant damages enhancement on their own").

Here, Plaintiffs argue that each of Ms. Parhamovich's family members is entitled to a 50% upward departure from the baselines established in *Heiser*.[15]  ECF No. 73-1 at 37.  Each family member has provided declaration testimony supporting their claims, as well as the expert report of Dr. Pastor, who interviewed each family member.  The uncontroverted testimony of the family members, coupled with Dr. Pastor's findings, support a determination that each family member's relationship with Ms. Parhamovich warrants an award of solatium damages.  The Court recognizes that "most—if not all—people eligible for *Heiser*-type compensation have endured the unimaginable," *Selig*, 573 F. Supp. 3d at 75, but "must also remain mindful of the general equitable principle that claims for pain and suffering 'should be compared to awards in similar cases,'" *Oveissi*, 768 F. Supp. 2d at 30 (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 55 (D.D.C. 2009)).  Keeping these principles in mind, the Court sets forth the solatium awards below.

       1. Vicki Parhamovich

Vicki Parhamovich shared a "wonderful relationship" with her daughter.  ECF No. 36-14, ¶ 6.  Even once Andi went to college, the two talked on the phone regularly and visited one another.  *Id.*, ¶ 10.  When Andi was killed, Vicki experienced a "void" in her life "that will never be filled."  *Id.*, ¶ 22.  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌  She feels "cheated" that she did not get to see Andi get married or become a mother, and that Andi will not be able to share in special family occasions.  ECF No. 36-14 ¶ 24.  Dr. Pastor also described her experience after conducting a psychiatric evaluation of Vicki.  ECF No. 73-2 ¶ 9.  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

---

[15] Plaintiffs also cite *Elahi*, 124 F. Supp. 2d 97, a pre-*Heiser* case where the court awarded $5 million to each sibling of a victim of a terrorist bombing, a 100% enhancement, due to "profound emotional loss" each experienced. 124 F. Supp. 2d at 112.  As set forth above, such an enhancement does not align with more recent cases in this Circuit, and the Court is not persuaded that it should award a similar enhancement to any of the Plaintiffs. *See also Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599, 2023 WL 4684929, at *23 (D.D.C. July 6, 2023) (finding a case awarding solatium damages that "pre-date[d] the *Heiser* regime and its standardizing influence" to be "of limited assistance").



The Court will award Vicki the $5 million *Heiser* baseline but declines to award an upward departure. The Court recognizes Vicki's terrible suffering from losing her daughter, and the close relationship the two shared, but finds that the *Heiser* baseline is "designed to compensate a parent" for this kind of suffering, however inadequate any amount of money may be. *Selig*, 573 F. Supp. 3d at 66 (awarding the *Heiser* baseline to a parent who was "totally devastated" by the loss of his daughter and experienced "anxiety, stress, and a very empty feeling" as well as "unbearable pain"); *see also Steinberg*, 2019 WL 6117722, at *3, *9 (awarding *Heiser* baseline to family members who experienced emotional trauma and ongoing grief, anxiety, sleeplessness, and panic attacks).

    2.  André Parhamovich

André Parhamovich is the father of Andi Parhamovich, ECF No. 36-20, ¶ 2, and shared a "close bond" with Andi, his namesake. *Id.*, ¶¶ 5, 8. The two shared a love of sports, from the time that Andi was in André's elementary school gym class, through high school, when they spent time together in practice for Andi's participation in volleyball, soccer, and softball, and through college and beyond, when the family would attend baseball games together in the cities where Andi lived and watched football games together on Thanksgiving. *Id.*, ¶¶ 6–9, 11. After Andi left the house for college, she and André had weekly Saturday night phone calls to catch up about the week. *Id.*, ¶ 11.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████ He has dedicated a bench to Andi in a park where she and her brothers used to play, and he often visits it and has written poetry there. *Id.*, ¶¶ 19, 20. Dr. Pastor also described André's condition after conducting a psychiatric evaluation of him. ECF No. 73-2 ¶ 9. ████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

The Court will award André Parhamovich a 25% upward departure from the *Heiser* baseline. The Court finds that André's grief, ███████████████████ constitute the kind of severe mental anguish that warrants such an upward departure. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding upward departure of 25% to family members who suffered severe mental distress after violent and unexpected death of loved one); *Neiberger*, 2022 WL 17370239, at *16 (awarding upward departure of 25% to a parent who saw her son's body firsthand at the morgue, attempted suicide, and was hospitalized and diagnosed with PTSD and severe depression); *Flanagan*, 87 F. Supp. 3d at 118 (D.D.C. 2015) (awarding upward departure of 25% to family members where the victim died a violent, unexpected death and medical evidence demonstrated severe pain as evidenced by diagnoses of "traumatic grief" or "persistent complex bereavement-related disorder"); *Valore*, 700 F. Supp. 2d at 86 (awarding upward departure of 25% where family

member "suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered"). The Court does not find that André's circumstances warrant a 50% upward departure as requested because although his grief is severe and his life has permanently changed, he has not experienced the kind of immediate danger that was present in *Oveissi*, 768 F. Supp. 2d at 29–30, which Plaintiffs cite in support of their request for such an award. As noted above, that case involved the assassination and subsequent evacuation of the victim's family, who then lived under constant threat. 768 F. Supp. 2d at 29–30. Accordingly, the Court finds a 25% upward departure is more appropriate and awards André Parhamovich $6,250,000.

### 3. Marci Zampini

Marci Zampini is Andi Parhamovich's older sister. ECF No. 36-24, ¶¶ 3, 6. The two sisters, seven years apart in age, shared a bedroom throughout childhood and had a close relationship with many happy memories together, watching the television program Days of Our Lives while drinking hot tea, reading books, and riding bikes. *Id.*, ¶¶ 6–9. In adulthood, Andi was a bridesmaid at Marci's wedding, and she "thrived" as an aunt to Marci's two daughters. *Id.*, ¶¶ 11–12. When Andi moved to Iraq, she and Marci kept in touch with regular phone calls. *Id.*, ¶ 15. When Andi was killed, Marci received a call from NDI with the news; Marci then had to track down each of her family members to tell them Andi had been killed. *Id.*, ¶¶ 16–21. Marci testified that following Andi's death she still has "nightmares" and questions that "haunt" her. *Id.*, ¶ 36. She adds that those moments are less frequent now, and she lets the "dark moments" visit and then sends them on their way. *Id.*, ¶¶ 35–36. She is "upset" that Andi "left [her] to deal with [their] dad, to console [their] mom, and try somehow to help [their] brothers." *Id.*, ¶ 40. Dr. Pastor also

made findings related to Marci's experience after Andi's death.  ECF No. 73-2 ¶ 9. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████         ꞇ

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

     The Court finds that an upward enhancement from the *Heiser* baseline is not warranted.

████████████████████████████████████████████, and Marci has not proffered evidence of

"unique circumstance that differentiates her suffering from the pain most [close siblings] endure

when they lose . . . one they love, especially in a terrorist attack." *Selig*, 573 F. Supp. 3d at 69; *see*

*Steinberg*, 2019 WL 6117722, at *3, *9 (awarding baseline to family members who experienced

emotional trauma and ongoing grief).  The fact that Marci had to notify her family of the news of

Andi's death, and her role in the weeks after Andi's death, although undoubtedly extremely

painful, have not warranted upward adjustments in similar cases. *See Mark v. Islamic Republic of*

*Iran*, 626 F. Supp. 3d 16, 40–41 (D.D.C. 2022) (awarding baseline to an oldest daughter who had

to relay the news of her father's death and mother's significant injury to her siblings and had to

take care of her suicidal younger sister); *Selig*, 573 F. Supp. 3d at 69 (awarding baseline to wife of

victim who had to tell her children that their father had died, felt depressed, saw a therapist, and

joined a grief program).  Accordingly, the Court awards Marci the baseline sibling's award of

$2,500,000.

4. Chris and Cory Parhamovich

Chris Parhamovich, one of Andi's twin brothers, is ten years younger than his sister. ECF No. 36-30, ¶ 6. They shared a close relationship, and Chris has fond memories of going to the movie theater and spending holidays together. *Id.*, ¶¶ 6–7. When Andi moved out of the house, she and Chris kept in touch daily through AOL messaging and phone calls. *Id.*, ¶ 8. After Andi was killed, Chris describes that he knew he would never "enjoy another day on this earth." *Id.*, ¶ 12. Part of his trauma, he described, was that at Andi's funeral there was an urn instead of a body, which for him "finalized any hope" that there had maybe been a mistake and she was still alive. *Id.*, ¶ 13. In the aftermath of Andi's death, Chris testified that his family was "ravaged . . . so badly that [he] turned down an athletic scholarship" to college so that he could stay home and help his family. *Id.*, ¶ 16. However, he also struggled. ███████████████████

████████████████████████████████████████████████████████

█████████████████████████████████

Cory Parhamovich is Chris's twin. ECF No. 36-34, ¶ 7. Like Chris, Cory has fond memories of growing up with his older sister, playing music for her and sneaking into her room to watch television. *Id.* Cory and Andi also kept in touch "almost daily" from the time she left for college until her death. *Id.*, ¶¶ 7, 9, 11. Cory testifies that before Andi's death he remembers "being incredibly happy" in his senior year of high school, "looking forward to where life would lead [him]," but that after Andi was killed, "everything changed." *Id.*, ¶ 16. He states that he suffers daily thinking about Andi's death "every day and night." *Id.*, ¶¶ 16, 17. ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████



Dr. Pastor also provided additional findings after interviewing Chris and Cory. ECF No. 73-2, ¶ 9.

The Court will award Chris and Cory Parhamovich each a 25% upward departure from the *Heiser* baseline. The Court finds that the brothers both experienced the kind of severe mental anguish that warrants such an upward departure. *See Selig*, 573 F. Supp. 3d at 70–71 (awarding upward departure of 25% to family member who experienced traumatic loss as a teenager, resulting in changes in academic status and continued residence in the family home as an adult);

*Baker*, 775 F. Supp. 2d at 83 (awarding upward departure of 25% where plaintiff "turned to self-destructive behavior to cope with his pain over his sister's death"); *Valore*, 700 F. Supp. 2d at 86 (awarding upward departure of 25% where family member "suffered several nervous breakdowns, at least one of which required hospitalization, from which she has never fully recovered"). For the same reasons stated above in Part IV.C.2, *supra*, regarding André Parhamovich, the Court finds that a 50% upward departure is not appropriate. Accordingly, the Court awards Chris and Cory Parhamovich damages of $3,125,000 each.

### D. Punitive Damages

Under the FSIA, a foreign sovereign who is a state sponsor of terrorism may be held liable for punitive damages. 28 U.S.C. § 1605A(c); *see e.g.*, *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 184 (D.D.C. 2010); *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009). Punitive damages are awarded not to compensate the victim, but rather for the purpose of punishing and deterring future outrageous conduct by the defendant. *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 55–56 (D.D.C. 2012); *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 29–30 (D.D.C. 2009). Four factors should be considered in determining a punitive damages award, including "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Acosta*, 574 F. Supp. 2d at 30. Courts have found these factors satisfied when a defendant has provided material support to a terrorist organization in carrying out an act of terrorism. *See, e.g.*, *Baker*, 775 F. Supp. 2d at 85 (finding an award of punitive damages warranted where "defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose

modus operandi included the targeting, brutalization, and murder of American citizens and others").

Here, each of the four factors counsel in favor of awarding punitive damages. Enabling the Zarqawi organization to carry out a lethal act of terrorism against a pro-democracy worker, ultimately devastating her family, is a horrific action supporting a punitive damages award. *See Force*, 617 F. Supp. 3d at 39–40 (finding that first two factors supported a punitive damages award where Iran and Syria enabled a lethal terrorist attack). Deterrence is needed because "time and again, courts in this district have been confronted with families shattered by Iran- and Syria-backed terrorists." *Borochov*, 589 F. Supp. 3d at 48–49. Finally, the defendants, "as state actors, can be presumed to possess significant wealth." *Christie*, 2020 WL 3606273, at *21.

There are several different potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun*, 228 F. Supp. 3d at 87). "A second approach is to award each family of a decedent $150 million in punitive damages." *Id.* at 76; *see e.g.*, *Hirshfeld*, 330 F. Supp. 3d at 150 (awarding $150 million in punitive damages to family of student killed in terrorist attack); *Baker*, 775 F. Supp. 2d at 86 (awarding $150 million to each of three victims killed during an airplane hijacking, one of whom died). "Third, some courts in this district have calculated the total compensatory damages awarded for a victim and then multiplied that award 'by a factor between one and five.'" *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz*, 324 F. Supp. 3d at 65). Fourth, some courts have awarded punitive damages equal to the amount of

compensatory damages. *Id.*; *see, e.g.*, *Alinejad*, 2023 WL 4684929, at *27 (awarding punitive damages equal to compensatory damages).

Plaintiffs do not request that the Court apply the first approach, which is appropriate given that this case was not "exceptionally deadly" as the term is used in these cases. *See W.A.*, 2020 WL 7869218, at *19. Likewise, the Court will not apply the third method—using a multiplier of compensatory damages to calculate punitive damages—because only "[a] minority of judges in this jurisdiction follow this approach" and, more, Plaintiffs do "not ask the Court to award punitive damages this way." *Selig*, 573 F. Supp. 3d at 76; *see also Abedini*, 422 F. Supp. 3d at 142 ("[T]he method of applying a court-determined multiplier of compensatory damages was only utilized in a special circumstance during actions against Iran by hundreds of plaintiffs who were family members or victims themselves of the Beirut bombing."). The Court will also not apply the fourth method, which usually is utilized for victims of terrorism who survive the attack. *W.A.*, 2020 WL 7869218 at*20 ("While this approach is not followed explicitly for this reason, it appears to be used most often in cases where the victims survive."); *see, e.g.*, *Alinejad*, 2023 WL 4684929, at *27 (awarding punitive damages equal to compensatory damages for survivor of terrorist attack); *Kar*, 2022 WL 4598671, at *22 (same); *Azadeh v. Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *23 (D.D.C. Sept. 5, 2018) (same); *Hekmati*, 278 F. Supp. 3d at 167 (same).

The second approach awards a lump sum award of $150 million in punitive damages per victim. "The weight of the case law indicates that in cases where at least one of the plaintiffs dies the lump sum approach is used." *W.A.*, 2020 WL 7869218, at *20. In the interest of consistency and in giving like awards to similarly situated plaintiffs, the lump sum approach will be used here. *See Selig*, 573 F. Supp. 3d at 76 ("[The lump sum] approach follows the Supreme Court's guidance

that punitive damages should be 'reasonably predictable in its severity, so that . . . [a] bad man can look ahead with some ability to know what the stakes are in choosing one course of action over another.'" (second and third alterations in original) (quoting *Exxon Shipping Co. v. Baker*, 54 U.S. 471, 502 (2008)); *Braun*, 228 F. Supp. 3d at 87 (awarding $150 million in punitive damages because "[t]he conduct here is more akin to" that in previous cases following the lump sum approach); *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 82 (D.D.C. 2014) (applying the approach that "will result in a punitive damage award consistent with the punitive damage awards in analogous cases").

Plaintiffs appear to request this approach; however, Plaintiffs request an increase to the "typical[]" award, citing *Colvin v. Syrian Arab Republic*, 363 F. Supp. 3d 141 (D.D.C. 2019), for the proposition that a $300 million lump sum payment is more appropriate in scenarios where individuals are specifically targeted for a particular reason.  ECF No. 73-1 at 47–48; *see also Colvin*, 363 F. Supp. 3d at 164 (citing *Kim*, 87 F. Supp. 3d at 291 (awarding $300 million in punitive damages for state agents' kidnapping and presumed torture and murder of missionary seeking to aid refugees)); *Oveissi*, 879 F. Supp. 2d at 56–57 (awarding $300 million in punitive damages for street assassination of a high-ranking official); *Elahi*, 124 F. Supp. 2d at 102, 114 (awarding $300 million in punitive damages for state agents' assassination of a dissident "for his outspoken criticism of the Iranian regime" because of a need to "recognize society's interest in the free expression of political ideas").  In *Colvin*, the court noted that although $150 million "is the typical award per decedent," the victim was a journalist who "was specifically targeted because of her profession" because she reported "on the atrocities occurring during civil war."  *Colvin*, 363 F. Supp. 3d at 164.  The court held that the "targeted murder" of an American journalist perpetrated

by "Syria itself," not "a third-party terrorist organization," warranted the higher punitive award. *Id.* at 165.

Plaintiffs argue that the premeditated attack of "an American-pro-democracy aid worker" similarly warrants an award of $300 million against each sovereign. ECF No. 73-1 at 48. And Plaintiffs' evidence does suggest that Ms. Parhamovich may have been targeted as an employee of NDI, an organization that worked on issues like increasing political participation in Iraq, promoting women's rights, government reform, and building civil society. ECF No. 36-38 at 22. A confidential incident report generated by Unity Resources Group found that ███████████████

███████████████████████████████████████████████████████████

██████████████  █████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████

However, a distinguishing fact important to the reasoning in *Colvin* and present in *Kim* and *Elahi* is that in those cases, state actors themselves perpetrated the acts of kidnapping, torture, or murder. *See Colvin*, 363 F. Supp. 3d at 165; *see also Kim*, 87 F. Supp. 3d at 288; *Elahi*, 124 F. Supp. 2d at 108. In addition, to arrive at the $300 million sum, the court in *Oveissi* relied on a combination of cases that arrived at those awards by multiplying estimated expenditures on terrorism, and cases awarding sums of $150 million *to multiple victims' families* to arrive at totals of $300 million or $450 million. *See Oveissi*, 879 F. Supp. 2d at 56–57 (citing *Gates*, 580 F. Supp.

41

2d at 75; *Acosta* 574 F. Supp. 2d at 30–31; *Baker*, 775 F. Supp. 2d at 86); *see also Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 42 (D.D.C. 2012) (same).

In contrast, the standard award of $150 million has been awarded for the murder of civilians working in Iraq. *See W.A.*, 2020 WL 7869218, at *19 (awarding $150 million for extrajudicial killing of American civilian working in Iraq to "help rebuild the country" and "establish . . . a democratic system" (quoting the record)); *Gates*, 580 F. Supp. 2d at 75 (awarding $150 million in punitive damages against Syria to the estate of each victim for the kidnapping and broadcasted murder of two American civilians working in Iraq). In light of prior caselaw, the four factors this Court considers in awarding punitive damages, and the reprehensibility of Iran and Syria's actions, the Court finds that an award of punitive damages of $150 million is appropriate and declines to extend the reasoning in *Colvin* to this case.

The final question to resolve is whether the punitive damages award should be imposed on Syria and Iran jointly and severally, or individually against each Defendant. In their motion, Plaintiffs seek punitive damages awards imposed individually against Syria and against Iran. ECF No. 73-1 at 48. In their Complaint, however, they seek a joint and several award of punitive damages. ECF No. 1 at 21 ("Plaintiffs . . . demand that judgment be entered against each defendant, jointly and severally, for punitive damages . . . ."). Consistent with the request in the Complaint, courts in this Circuit have awarded punitive damages jointly and severally for cases brought against multiple sovereigns, including cases against Syria and Iran. *See, e.g., Ben-Yishai*, 2022 WL 17250344, at *16; *Force*, 617 F. Supp. 3d at 41; *Borochov*, 589 F. Supp. 3d at 49; *Braun*, 228 F. Supp. 3d at 87; *Wultz*, 864 F. Supp. 2d at 42–43. In addition, the D.C. Circuit recently approved a punitive damages award that was awarded jointly and severally against Iran and Syria.

*Fraenkel*, 892 F.3d at 354, 362. In line with these cases, the Court awards punitive damages jointly and severally against Defendants Syria and Iran.

### E. Prejudgment Interest

In their Complaint, Plaintiffs request prejudgment interest on top of their compensatory-damages award. ECF No. 1 at 21. The decision to award such interest "is subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quoting *Motion Picture Ass'n of Am. v. Oman*, 969 F.2d 1154, 1157 (D.C. Cir. 1992)). "When an award without prejudgment interest fully compensates a plaintiff, an award of prejudgment interest no longer has the intended compensatory purpose and should be denied." *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (quoting *Price*, 384 F. Supp. 2d at 135).

Courts in this Circuit are split on the award of prejudgment interest in FSIA cases. Some have made such an award where there was a significant delay between the attack and relief given. *See, e.g.*, *Reed*, 845 F. Supp. 2d at 214 (citing *Pugh*, 530 F. Supp. 2d at 263). Other courts have rejected that justification, reasoning that the *Heiser* framework reflects the appropriate level of total, just compensation. *See, e.g.*, *Wyatt*, 908 F. Supp. 2d at 232 ("[P]ain and suffering and solatium damages are both designed to be fully compensatory."). In line with that latter view, "the majority of Judges on this Court to consider the issue of prejudgment interest for FSIA damages awards have held 'the "values set by" the *Heiser* framework "represent the appropriate level of compensation, regardless of the timing of the attack,""'" and therefore deny requests for prejudgment interest on solatium damages. *Blank v. Islamic Republic of Iran*, No. 19-cv-3645, 2021 WL 3021450, at *14 (D.D.C. July 17, 2021) (quoting *Barry*, 437 F. Supp. 3d at 60 (collecting cases)); *see also Selig*, 573 F. Supp. 3d at 77 ("[T]he overarching tide of persuasive precedent . . . plainly weighs against awarding prejudgment interest." (alterations in original)

(quoting *Akins v. Islamic Republic of Iran*, 549 F. Supp. 3d 104, 121 (D.D.C. 2021))); *Doe*, 2020 WL 5422844, at *18 (finding the damages award fully compensatory and declining to award prejudgment interest); *Wultz*, 864 F. Supp. 2d at 43 (finding the damages award fully compensatory and declining to award prejudgment interest); *Thuneibat*, 167 F. Supp. 3d at 54 (noting solatium damages "do not typically require prejudgment interest because they are 'designed to be fully compensatory'" (quoting *Wyatt*, 908 F. Supp. 2d at 232)). This rationale is "particularly salient" when, as here, many of the injuries consist of enduring psychological harm and therefore the damage award assumes continued suffering. *Doe*, 2020 WL 5422844, at *18; *see Oveissi*, 768 F. Supp. 2d at 30 n.12 (noting solatium damages are awarded regardless of when attack occurred). The Court's award in this case is calculated to be fully compensatory. Accordingly, the Court denies Plaintiffs' request for prejudgment interest in this case.

### F. Post-Judgment Interest

Plaintiffs also seek post-judgment interest. ECF No. 73-1 at 48. Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Winternitz v. Syrian Arab Republic*, No. 17-cv-2104, 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022) (awarding post-judgment interest under 28 U.S.C. § 1961(a)); *Doe A-1*, 2021 WL 723257, at *9; *Flanagan*, 87 F. Supp. 3d at 127. According to federal statute, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of judgment." 28 U.S.C. § 1961(a). "Application of section 1961(a) is mandatory, not discretionary." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859, 2023 WL 5221955, at *37 (D.D.C. Aug. 15, 2023). The Court will therefore award post-judgment interest at the statutory rate.

## V.    CONCLUSION

For the reasons stated above, it is hereby **ORDERED** that Plaintiffs' motion for default judgment as to damages, ECF No. 73, is **GRANTED**, and Plaintiffs shall be awarded a total of $173,738,000 in overall damages.    A separate Order embodying this damages award will be entered pursuant to Rule 58(a) of the Federal Rules of Civil Procedure contemporaneously with this Memorandum Opinion and Order.  It is further

   **ORDERED** that, because this Memorandum Opinion and Order includes information that Plaintiffs have filed under seal, it, too, will be filed under seal.  It is further

   **ORDERED** that, on or before December 11, 2023, Plaintiffs shall file, under seal, a version of this Memorandum Opinion and Order for filing on the public docket that includes proposed targeted redactions—subject, of course, to the Court's approval of those redactions.

   **SO ORDERED**.


Date:  November 27, 2023

                                                    _____
                                                    G. Michael Harvey
                                                    United States Magistrate Judge